## Civil Court of the City of New York
### County of Bronx

Index Number: **CV-006582-25/BX**

Yerilee Atkinson Velez
      Plaintiff(s)

-against-

Tyla Monet Mazyck
      Defendant(s)

**SUMMONS WITH ENDORSED COMPLAINT**
BASIS OF VENUE: Plaintiff's residence

Plaintiff's Address (s) :
Yerilee Atkinson Velez
2455 Third Ave
Apt 19G
Bronx, NY 10451

To the named defendant (s)

Tyla Monet Mazyck (Defendant), at c/o The Barnes Firm, 420 Lexington Ave, #2140, New York, NY 10170

YOU ARE HEREBY SUMMONED to appear in the Civil Court of the City of New York, County of Bronx at the office of the Clerk of the said Court at 851 Grand Concourse, in the County of **Bronx**, **City and State of New York, within the time provided by law as** noted below and to file your answer to the (endorsed summons) (annexed complaint) * with the Clerk;  upon your failure to answer, judgment will be taken against you for the total sum of $11,176.41 and interest  as detailed below.
Plaintiff's  work sheet may be attached for additional information  if deemed necessary by the clerk.

Date:May 7, 2025

MAY 0 7 2025
CIVIL COURT
BRONX COUNTY

**Tanya Faye**

*Tanya Faye*
CHIEF CLERK

### ENDORSED COMPLAINT

The nature and the substance of the plaintiff's cause of action is as follows:     **Breach of Lease or Rental Agreement for** **$11,176.41**

#### *NOTE TO THE DEFENDANT

    A) If the summons is served by its delivery to you personally within the City of New York, you must appear and answer within *TWENTY* days after such service; or

    B) If the summons is served by delivery to any person other than you personally, or is served outside the City of New York, or by publication, or by any means other than personal delivery to you within the City of New York, you are allowed *THIRTY* days after the proof of service thereof is filed with the Clerk of this Court within which to appear and answer.

    C) Following CPLR 321(a) corporations must be represented by an attorney.

#### * NOTE TO THE SERVER OF THE SUMMONS

The person who serves the summons should complete the Affidavit of Service and shall file it in the Clerk's Office in the county where the action is brought.

**PLAINTIFF'S CERTIFICATION**
*( See 22NYCRR, Section 130-1.1a)*

SIGN NAME: _Yerilee A.-V_
PRINT NAME:     Yerilee Atkinson Velez

**CIVIL COURT OF THE CITY OF NEW YORK**  **APPLICATION FOR A SUMMONS**

06582

## PARTIES

06582

PLAINTIFF: Please print your name, complete address, including your apartment number (no P.O. box number) and a telephone number. [Please note: If the claim is based on an auto accident, the claim must be *Owner* against *Owner*].
A Corporation must be represented by an attorney.

Yeribe Atthinson Vélez                    Email: YERI.ATK@GMAIL.com

2455 Third Avenue Apt 10G BX, NY          Telephone # 787-412-6234

10451          Cell # _____

DEFENDANT(S): Please print the full legal name and street address (no P.O. box number) of the party(ies) you are suing.
Indicate whether you are suing this party as a person or a business. [Please note: If you are suing a business, indicate whether it is a partnership, a corporation or an individual with a business certificate. This information can be obtained in the County Clerk's Office in the county in which the business is located. Failure to check this information may result in a judgment which cannot be executed.]

Tyla Monet Mazyck 06/10/1996 - suing os a
person. Known address is The Barnes Firm
420 Lexington Ave. #2140 NY, NY 10170. 347-814-3073
Tyla.M.Mazyck@gmail.com.

## CLAIM

**REASON FOR CLAIM:**

| Damage cause to: | ☐ automobile | ☐ person | ☐ property other than automobile |
|---|---|---|---|
| Failure to provide: | ☐ repairs | ☐ proper service | ☐ goods ordered |
| Failure to return: | ☐ security | ☐ property | ☐ deposit    ☐ money |
| Failure to pay for: | ☐ wages    ☐ rent | ☐ services rendered    ☐ commissions | ☐ insurance claim    ☐ money loaned    ☐ goods sold and delivered |
| Breach of: | ☑ contract | ☑ lease | **FEE PAID** |
| Loss of: | ☐ luggage | ☐ property | ☐ time for work    ☐ use of property |
| Returned: | ☐ check (bounced) | ☐ merchandise (not reimbursed) | |

MAY 07 2025
CIVIL COURT
BRONX COUNTY

Other: (Be brief)

Co-tenant agreement to share rent.

**DETAILS OF CLAIM:**

Amount of Claim: (Limit $50,000 for each Cause of Action) $ 11,176.41

Date of Occurrence: March 5th 2025.

Place of Occurrence: 2455 3rd Avenue Apt 10G 10451 NY, BX.

If Car Accident: YOUR license plate # _____ DEFENDANT'S license plate # _____

Identifying Number(s): _____
(Receipt #, Claim #, Account #, Policy #, Ticket #, etc.)

05/07/2025.                    x _Yeridee A._

Date                             Signature of Plaintiff

CIV-GP-59 (Revised 1/22)



**Civil Court of the City of New York**
**851 Grand Concourse**
**Bronx, NY 10451**
Phone: (718) 618-2500    Fax:
Hours:
Website: www.nycourts.gov/courts/nyc/civil/index.shtml
Email:

Hon. Shahabuddeen Ally
Administrative Judge

Tanya Faye
Chief Clerk

------------------------------------------------------------------------------

## NOTICE

December 1, 2025

Yerilee Atkinson Velez
2455 Third Ave
Apt 19G
Bronx, NY 10451

**Yerilee Atkinson Velez**
        **-against-**
**Tyla Monet Mazyck**

Index No: CV-006582-25/BX                Calendar No:

**PLEASE TAKE NOTICE** that your Civil case has been scheduled to
April 30, 2026 at 9:30 AM in Part 35 -General Civil-SRL-Non-Procedural Motions, Room 503
as a Control Date.

**You must appear and bring this notice with you.**
For instructions, go to https://nycourts.gov/appear

Tanya Faye
Chief Clerk

CC:    Tyla Monet Mazyck

**Civil Court of the City of New York**

County of ___Bronx___

Index Number ___CV- 6582  25___

Part ___11___

Yarilee Atkinson Velez

Claimant(s)/Plaintiff(s)/Petitioner(s)

*against*

Tyla Monet Mazyck

Defendant(s)/Respondent(s)

**DECISION/ORDER**

Plaintiff is to provide a copy of the motion to amend the complaint to the Clerk of the Court for service upon Defendant as there is an order of confidentiality re: Defendant's address. To be filed by Oct 3, 2025.

Defendant is to file the motion to dismiss/SJ with Clerk of Court by Oct 3, 2025. Motion has been served in Court upon Plaintiff

Both motions are to be heard on Dec 1, 2025 at 9:30 a.m.

Opposition to both motions is to be filed and served by Nov 5, 2025. Reply papers due to be filed & served by Nov 18, 2025.

Adj'd to 12-1-25 for motions.

ENTERED

SEP 2 9 2025

CIVIL COURT
BRONX COUNTY

SEP 2 9 2025

Date

Judge, Civil Court

HON. ANDREA KRUGMAN

CIV-GP-41 (January, 1998)

Scanned with
CS CamScanner



# Payment History for: "Yerilee Atkinson Velez".

| Property Address | Amount | LLC/Association | Description |
|---|---|---|---|
| Date: 8/27/2025 10:42:18 AM EST  - Confirmation #: A2508271042_KE8UY3  - Total: $3,505.91 | | | |
| 2455 Third Avenue, #19G, Bronx, NY | $3,505.91 | The Motto Apts A-F (2455 Third Avenue) | Balance as of September |
| Date: 8/7/2025 9:37:13 AM EST  - Confirmation #: A2508070937_IS0DX6  - Total: $3,505.91 | | | |
| 2455 Third Avenue, #19G, Bronx, NY | $3,505.91 | The Motto Apts A-F (2455 Third Avenue) | Current Balance as of 08/06/2025 |
| Date: 7/10/2025 12:57:22 PM EST  - Confirmation #: A2507101257_UK1ZW1  - Total: $3,505.91 | | | |
| 2455 Third Avenue, #19G, Bronx, NY | $3,505.91 | The Motto Apts A-F (2455 Third Avenue) | Current Balance as of 07/09/2025 |
| Date: 6/14/2025 12:20:56 PM EST  - Confirmation #: A2506141220_NZ6HJ5  - Total: $3,505.91 | | | |
| 2455 Third Avenue, #19G, Bronx, NY | $3,505.91 | The Motto Apts A-F (2455 Third Avenue) | Current Balance as of 06/13/2025 |
| Date: 6/1/2025 8:09:05 AM EST  - Confirmation #: A2506010809_BI4GD9  - Total: $3,505.91 | | | |
| 2455 Third Avenue, #19G, Bronx, NY | $3,505.91 | The Motto Apts A-F (2455 Third Avenue) | Balance as of June |
| Date: 5/14/2025 11:52:15 AM EST  - Confirmation #: A2505141152_TJ3VC9  - Total: $3,505.91 | | | |
| 2455 Third Avenue, #19G, Bronx, NY | $3,505.91 | The Motto Apts A-F (2455 Third Avenue) | Current Balance as of 05/13/2025 |
| Date: 4/30/2025 12:03:12 PM EST  - Confirmation #: A2504301203_OI0GV0  - Total: $1,802.95 | | | |
| 2455 Third Avenue, #19G, Bronx, NY | $1,802.95 | The Motto Apts A-F (2455 Third Avenue) | Balance as of May |
| Date: 2/1/2025 5:21:34 AM EST  - Confirmation #: A2502010521_SX5PM2  - Total: $1,802.95 | | | |
| 2455 Third Avenue, #19G, Bronx, NY | $1,802.95 | The Motto Apts A-F (2455 Third Avenue) | Total Amount Due |

To: Tyla

New Message

Okayyy then

So what are we paying each and when is it due

Maya said they did that to her too

So I guesss

😂

So there's a $50 difference each month from what he quoted

The en-suite is $1802.95 and the other room $1703

Such weird numbers but yea

Why is there a difference

LOL Jonathan is a mess

😂

Because our rent is $100 more now

More specifically $105.91

Girl

These people are sneaky but what ever

**Search:** 1703

Conversations

**Messages**

Tyla                                    5/2/24

The en-suite is $1802.95 and the other room $1703

iMessage

deposit

Jonathan & Tyla
Jonathan                                          5/3/24

Go to the bank, go to the teller & request a BANK CERTIFIED CHECK. Check name: "E 135th and 3rd owner LLC" — please note, you need two of these checks for 1st month and security **deposit**

on the changes etc.?

Jonathan
Ok

May 3, 2024 at 1:37 PM

Jonathan
This is probably the best breakdown

Monthly:

1720 tyla
1785 yeri

To move in:

1960 tyla x2
2025 yeri x2

Go to the bank, go to the teller & request a BANK CERTIFIED CHECK. Check name: "E 135th and 3rd owner LLC" — please note, you need two of these checks for 1st month and security deposit

Tyla
Got it thank you

Will do on Monday as its my next day off

May 6, 2024 a

## ENVIRONMENTAL EASEMENT DISCLOSURE

**The Property is subject to an Environmental Easement held by the New York State Department of Environmental Conservation pursuant to Title 36 of Article 71 of the Environmental Conservation Law**

# STANDARD FORM OF APARTMENT LEASE

**(FOR APARTMENTS NOT SUBJECT TO THE RENT STABILIZATION LAW)**

## THE REAL ESTATE BOARD OF NEW YORK, INC.

©Copyright 2019. All Rights Reserved. Reproduction in whole or in part prohibited.

**REBNY Apt non-stab 2019 Rev 7.19**

**PREAMBLE:** This lease contains the agreements between Tenant and Owner concerning the rights and obligations of each party. Tenant and Owner have other rights and obligations which are set forth in government laws and regulations.

Tenant should read this Lease carefully. If Tenant has any questions, or if Tenant does not understand any words or statements herein, obtain clarification from an attorney. Once Tenant and Owner sign this Lease, Tenant and Owner will be presumed to have read it and understood it completely. Tenant and Owner admit that all agreements between Tenant and Owner have been written into this Lease. Tenant understands that any agreements made before or after this Lease was signed and not written into it will not be enforceable.

**THIS LEASE** is made as of **May 2, 2024**
between Owner(hereinafter referred to as "Owner" or "Lessor"), **E 135 and 3rd Ave Owner LLC**
whose address is **2455 3rd Avenue, Bronx, NY 10451 AKA 227 East 134th Street, Bronx, NY 100451**
and Tenant (hereinafter referred to "Tenant" or "Lessee" ), **Tyla Mazyck and Yerilee Atkinson Velez**
whose address is **2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street #19G, Bronx, NY  10451**.

---

**Please note the following paragraphs that require a selection among alternative wording:** 2, 3E, 34
**Please note the following paragraphs that require deletions if inapplicable:** 9D, 12C(ii), 12E, 25, 32C(i), 33, 34, 35, 36, 37, 38, 59, 60
**Please note the following paragraphs that require the insertion of terms (and/or delete if inapplicable):** 1, 2, 3A, 3B, 4, 9D, 12B, 12C, 25, 32C, 34A, 35, 38B, Exhibit A (Memorandum Confirming Term), Exhibit C (Owner's Work), Exhibit D (Apartment Furniture)

---

1. **APARTMENT AND USE**    Owner agrees to lease to Tenant Apartment **19G** (the "Apartment") in the property known as **2455 THIRD AVENUE - MARKET** in the building at **2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street, Bronx, NY 10451** (the "Building"), Borough of Bronx, City and State of New York.

    Tenant shall use the Apartment for living purposes only and for no other purpose (such restricted purposes includes, but are not limited to, any commercial activity or illegal or dangerous activity).

    The Apartment may only be occupied by Tenant and the following Permitted Occupants (and occupants as permitted in accordance with Real Property Law §235-f):

    Tenant acknowledges that no other person other than Tenant and the Permitted Occupants may reside in the Apartment without the prior written consent of the Owner. If Tenant violates any of the terms of this provision, the Owner shall have the right to restrain the same by injunctive relief and/or any other remedies provided for under this Lease and at law and/or equity.

2. **LEASE COMMENCEMENT DATE; LENGTH OF LEASE**    The "Lease Effective Date" is the date a fully executed Lease is returned to Tenant or Tenant's representative by Owner or its representative. The "Lease Commencement Date" is **July 1, 2024**. Except as may be provided for otherwise in this Lease, the term (that means the length) of this Lease will begin on the Lease Commencement Date and will end on **June 30, 2026** (the "Term"). Tenant acknowledges that notwithstanding anything to the contrary contained in this Lease: (i) the Term of this Lease may be reduced provided for herein and (ii) the Term shall consist of the period beginning with the Lease Commencement Date through and including, the date that is the last day of the month in which the **[CHOOSE ONE AND CROSS OUT THE OTHER ALTERNATIVES]** [one (1) year] **[two (2) year]** [‾‾‾‾‾‾‾ (‾‾) month(s)] anniversary of the Lease Commencement Date occurs.

3. **RENT**

    A. "Rent" is defined as the base rent due under this Lease. Tenant's monthly Rent for the Apartment is **$3,985.00** per month. Tenant must pay Owner the Rent, in equal monthly installments, on the first day of each month either to Owner at the above address or at another place that Owner may inform Tenant of by written notice.

    B. When Tenant signs this Lease, Tenant must pay by bank or cashier's check (or by electronic fund transfer, if instructed by Owner as described below) , the following:
        **(i)** one (1) months' Rent (i.e., **$3,985.00**);
        **(ii)** the Security Deposit (in the amount stated in Article 4); and
        **(iii)** any commission due by Tenant to the Brokers (as defined in Article 34 hereinafter) in connection with this Lease.


Initials:  

2

C.  If the Lease Commencement Date shall not occur on the first day of a calendar month, the Rent for such calendar month shall be prorated on a per diem basis. If the Lease begins after the first day of the month, Tenant must pay when it signs this Lease one (1) full months' Rent and for the next full calendar month Tenant shall pay a prorated Rent based on the number of days the Lease began after the first day of the month (for example, if the beginning date of this Lease is the 16 th day of the month, Tenant would pay for fifteen (15) out of thirty (30) days, or one-half (1/2), of a full months' Rent for the second calendar month). In any event, if the Lease Commencement Date shall not occur on the first day of a calendar month, the Term shall also include the remainder of the month in which the Lease Commencement Date occurred.

D.  Within five (5) business days after the request of Owner, at Owner's option, Tenant shall return a document supplied by Owner in the form attached hereto as Exhibit A (a "Memorandum Confirming Term") confirming the Lease Commencement Date, the Rent Commencement Date (if different than the Lease Commencement Date) the Lease expiration date and any other material terms of this Lease, certifying that Tenant has accepted delivery of the Apartment and that the condition of the Apartment complies with Owner's obligations hereunder. Tenant's failure to so deliver the Memorandum Confirming Term shall be considered a material default under this Lease, however, Tenant's failure to do so shall not affect the occurrence of the Lease Commencement Date or the validity of this Lease or alter the terms and provisions contained in the Memorandum Confirming Term if so delivered to Tenant by Owner.

E.  Tenant may be required to pay other charges to Owner under the terms of this Lease, such additional charges shall be referred to as "Additional Rent". Any Additional Rent must be paid by Tenant to Owner upon the earlier of (i) the first day of the month immediately following the month said Additional Rent is billed to Tenant or (ii) fifteen (15) days from the date Tenant is billed for the Additional Rent. If Tenant fails to pay the Additional Rent on time, Owner shall have the same rights against Tenant as if Tenant failed to pay Rent. Said Rent and Additional Rent must be paid in full in accordance with the foregoing, without deduction or offset and without the need for demand or notice from Owner. Except as may be provided for otherwise in this Article 3, all Rent and Additional Rent shall be payable to Owner by _____ **[CROSS OUT ANY FORM OF PAYMENT THAT IS INAPPLICABLE]** or such other form of payment as required by Owner only. If by direct deposit, Owner shall provide Tenant the necessary wiring instructions.

F.  Tenant shall be entitled to a five (5) day grace period for the payment of any sum of Rent or Additional Rent due under this Lease. Any sum of Rent or Additional Rent not paid within five (5) days of the date due shall be subject to a late fee of the lesser of (i) $50.00, or (ii) five percent (5%) of the unpaid amount. Interest shall also be payable on the aforesaid late Rent or Additional Rent beginning thirty (30) days from the due date, such interest accruing at the lesser of (i) the maximum amount allowable by law, or (ii) one and one - half percent per month (1.5%), until the late Rent or Additional Rent is paid in full. There shall be a Fifty Dollar ($50.00) fee for any check which is dishonored or returned. Any late charge or interest charge shall be considered Additional Rent.

G.  Owner need not give notice to Tenant to pay Rent. Rent must be paid in full and no amount subtracted from it. The whole amount of Rent is due and payable as of the Lease Commencement Date. Payment of Rent in installments is for Tenant's convenience only. If Tenant is in default under any of the terms and conditions of this Lease, Owner may give notice to Tenant that it may no longer pay Rent in installments and the entire Rent for the remaining part of the Term will then immediately be due and payable.

4.  **SECURITY DEPOSIT**      Tenant is required to give Owner the sum of **$3,985.00** (such amount not to exceed one (1) months' Rent pursuant to The Housing Stability and Tenant Protection Act of 2019) when Tenant signs this Lease as a security deposit (the "Security Deposit"). Owner will deposit the Security Deposit in **Bank United** bank at **14817 Oak Lane, Miami Lakes FL 33016**. This Security Deposit shall not bear interest, unless if otherwise required by applicable law. In the event that the Security Deposit shall earn interest, then in such event Owner shall be entitled to an administrative fee pursuant to applicable law.

If Tenant carries out all of Tenant's agreements in this Lease and if Tenant moves out of the Apartment and returns it to Owner vacant, broom clean and in the same condition it was in when Tenant first occupied it, except for ordinary wear and tear or damage caused by fire or other casualty through no fault of Tenant, Owner will return to Tenant the full amount of the Security Deposit within fourteen (14) days after the later of (i) the date this Lease ends, or (ii) the date Tenant vacates the Apartment. However, if Tenant is in default of Tenant's obligations under this Lease and/or there are any damages to the Apartment beyond ordinary wear and tear or damage caused by fire or other casualty, Owner may keep all or part of the Security Deposit to cover reasonable repairs of such damage and Owner shall provide Tenant with an itemized statement indicating the basis for the amount of the Security Deposit retained within the aforementioned fourteen (14) day period. Furthermore, for sake of clarity and emphasis, (i) if Tenant does not carry out all of Tenant's obligations under this Lease, Owner may keep all or part of the Security Deposit necessary to pay Owner for any losses incurred, including missed payments and (ii) Owner's retention of the Security Deposit as allowable under this Lease shall not be deemed to be Owner's sole remedy for any default by Tenant of Tenant's obligations pursuant to the terms and conditions of this Lease.

TENANT ACKNOWLEDGES AND AGREES THAT THE SECURITY DEPOSIT CANNOT BE USED TOWARDS RENT OR



Initials:  

ADDITIONAL RENT BY TENANT. Notwithstanding anything to the contrary contained in this Lease, if Owner shall apply all or any portion of the Security Deposit to cure a default by Tenant hereunder during the Term of this Lease, Tenant shall, within five (5) business days, deposit with Owner that sum which shall be necessary to maintain the security in an amount equal to the Security Deposit as so required in this Article 4. Failure to replenish the Security Deposit in a timely manner shall be deemed a default under this Lease.

If Owner sells the Apartment, Owner, at its sole option, will turn over Tenant's security either to Tenant or to the person buying the Apartment within five (5) days after the sale. Owner will then notify Tenant, by registered, certified or overnight mail by a nationally recognized overnight courier, of the name and address of the person or company to whom the deposit has been turned over. In such case, Owner will have no further responsibility to Tenant for the Security Deposit and the new owner will become responsible to Tenant for the Security Deposit.

5. **IF TENANT IS UNABLE TO MOVE IN**    Except as otherwise provided herein, Owner shall not be liable for failure to give Tenant possession of the Apartment on the Lease Commencement Date. Rent shall be payable as of the beginning of this Lease Term unless Owner is unable to give Tenant possession. A situation could arise which might prevent Owner from letting Tenant move into the Apartment on the Lease Commencement Date. If this happens for reasons beyond Owner's reasonable control, Owner will not be responsible for Tenant's damages or expenses, and this Lease will remain in effect. However, in such case, this Lease will start on the date when possession is available, and the ending date of this Lease as specified in Article 2 will remain the same (unless otherwise mutually agreed to in writing by Tenant and Owner). Tenant will not have to pay Rent until the date possession is available, or the date Tenant moves in, whichever is earlier (however, in no event shall Tenant move in or take possession prior to the date Owner shall have given Tenant notice that Tenant may take possession of the Apartment). Owner will notify Tenant as to the date possession is available. If Owner does not give Tenant notice that possession is available within thirty (30) days after the Lease Commencement Date, provided that Owner's failure to deliver possession is not due to a Tenant delay, Tenant may send a fifteen (15) day written termination notice (the "Termination Notice") to Owner, and if Owner is unable to deliver possession within fifteen (15) days of receipt of Tenant's Termination Notice, this Lease shall terminate and be o f no further force and effect and all prepaid Rent, the Security Deposit and any other fees paid by Tenant (except for non-refundable fees required in the Lease package) at the execution of this Lease shall be promptly returned to Tenant.

6. **CAPTIONS**    In any dispute arising under this Lease, in the event of a conflict between the text and a caption, the text controls.

7. **WARRANTY OF HABITABILITY**

   **A.**  All of the sections of this Lease are subject to the provisions of the Warranty of Habitability Law. Under that law, Owner agrees that the Apartment is fit for human habitation and that there will be no conditions which will be detrimental to life, health or safety.

   **B.**  Tenant will do nothing to interfere with or make more difficult Owner's efforts to provide Tenant and all other occupants of the Building with the required facilities and services. Any condition caused by Tenant's misconduct or the misconduct of Tenant Parties (as hereinafter defined) or anyone else under Tenant's direction or control shall not be a breach by Owner.

8. **CARE OF TENANT'S APARTMENT; END OF LEASE; MOVING OUT**

   **A.**  At all times during the Term of this Lease, Tenant will take good care of the Apartment and will not permit or do any damage to it, except for damage which occurs through ordinary wear and tear. Tenant shall, at Tenant's own cost and expense, make all repairs caused or occasioned by Tenant or Tenant's agents, contractors, invitees, licensees, guests or servants (collectively hereinafter "Tenant Parties"). In addition, Tenant shall promptly notify Owner and/or the Building Superintendent/Building Manager in writing upon the occurrence of any problem, malfunction or damage to the Apartment. Tenant will move out on or before the ending date of this Lease and leave the Apartment in good order and in the same condition as it was when Tenant first occupied it, except for ordinary wear and tear and damage caused by fire or other casualty through no fault of Tenant.

   **B.**  CLEANING. Tenant is required to use only non-abrasive cleaning agents in the Apartment. Tenant is responsible for damage done by use of any improper cleaning agents.

   **C.**  If Tenant fails to maintain the Apartment or make a needed repair or replacement as required hereunder, Owner may hire a professional and make such maintenance, repairs or replacements at Tenant's sole cost and expense. Owner's reasonable expense will be payable by Tenant to Owner as Additional Rent within ten (10) business days after Tenant receives a bill from Owner

   **D.**  When this Lease ends, Tenant must remove all of Tenant's movable property. Tenant must also remove at Tenant's own expense, any wall covering, bookcases, cabinets, mirrors, painted murals or any other installation or attachment Tenant may have installed in the Apartment, even if it was done with Owner's consent. Tenant must restore and repair to its original condition those portions of the Apartment affected by those installations and removals. Tenant has not

 

moved out until all persons, furniture and other property of Tenant's is also out of the Apartment. If Tenant's property remains in the Apartment after this Lease ends, Owner may either treat Tenant as still in occupancy and charge Tenant for use, or may consider that Tenant has given up the Apartment and any property remaining in the Apartment. In this event, Owner may either discard the property or store it at Tenant's expense. Tenant agrees to pay Owner for all costs and expenses incurred in removing such property. The provisions of this article will continue to be in effect after the end of this Lease.

**E.** Except as provided for otherwise in Article 35 of this Lease, in the event that (i) Owner intends to offer to renew this Lease with a Rent increase equal to or greater than five (5%) percent above the then current Rent, or (ii) Owner does not intend to renew this Lease, Owner shall provide Tenant written notice as follows:

**i.** If Tenant has occupied the Apartment for less than one (1) year and does not have a Lease Term of at least one (1) year, Owner shall provide at least thirty (30) days' notice;

**ii.** If Tenant has occupied the Apartment for more than one (1) year but less than two (2) years, or has a Lease Term of at least one (1) year but less than two (2) years, Owner shall provide at least sixty (60) days' notice; or

**iii.** If Tenant has occupied the Apartment for more than two (2) years or has a Lease Term of at least two (2) years, Owner shall provide at least ninety (90) days' notice.

**F.** Within a reasonable time after notification of either party's intention to terminate this Lease, unless Tenant provides less than two (2) weeks' notice of Tenant's intention to terminate, Owner shall notify Tenant in writing of Tenant's right to request an inspection before vacating the Apartment. Tenant shall have the right to be present at said inspection. Subject to the foregoing, if Tenant requests such inspection, the inspection shall be made no earlier than two (2) weeks and no later than one (1) week before the end of the tenancy. Owner shall provide at least forty-eight (48) hours written notice of the date and time of the inspection. After the inspection, Owner shall provide Tenant with an itemized statement specifying repairs, cleaning or other deficiencies that are proposed to be the basis of any deductions from the Security Deposit. If Tenant requests such inspection, Tenant shall be given an opportunity to remedy any identified deficiencies prior to the end of the tenancy (or, at Owner's sole option, if Tenant fails to remedy any such identified deficiencies, Owner may remedy such identified deficiencies at Tenant's sole cost and expense as described hereinafter). Any and all repairs or alterations made to the Apartment as a result of said inspection shall be at Tenant's sole cost and expense. Said repairs must be approved by Owner and shall be performed, at Owner's sole option by (i) licensed and adequately insured Tenant's contractors in a good and skillful manner with materials of quality and appearance comparable to existing materials and approved by Owner or (ii) by Owner's contractor(s).

## 9. CHANGES AND ALTERATIONS TO APARTMENT

**A.** Tenant cannot build in, add to, change or alter, the Apartment in any way, including, but not limited to, installing, changing, or altering any paneling, wallpaper, flooring, "built in" decorations, partitions, railings, paint, carpeting, plumbing, ventilating, air conditioning, electric, or heating systems without first obtaining the prior written consent of Owner which may be withheld in Owner's sole discretion. If Owner's consent is given, the alterations and installations shall become the property of Owner when completed and paid for by Tenant. They shall remain with and as part of the Apartment at the end of the Term. Notwithstanding the foregoing, Owner has the right to demand that Tenant remove the alterations and installations at the end of the Lease Term, and in such case Tenant shall repair all damage resulting from said removal and restore the Apartment to its original condition, including any holes in the wall or damage caused by the removal of any pictures, artwork or TV mounts hung by Tenant on the walls. Any and all work shall be performed by Tenant in accordance with the terms and conditions of this Lease and in accordance with all applicable laws, rules, regulations and codes of any governmental or quasi-governmental entity. Tenant's contractor shall also supply, before performing any such work, a certificate of insurance naming Owner and the Building's managing agent (if applicable) as additional insured.

**B.** Without Owner's prior written consent, Tenant cannot install or use in the Apartment any of the following: dishwasher machines, clothes washing or drying machines, electric stoves, garbage disposal units, heating, ventilating or air conditioning units or any other electrical equipment which, in Owner's reasonable opinion, will overload the existing wiring installation in the Building or interfere with the use of such electrical wiring facilities by other tenants of the Building. Also, Tenant cannot place in the Apartment water-filled furniture.

**C.** If a lien is filed on the Apartment or Building due to Tenant's fault, Tenant must promptly pay or bond the amount stated in the lien. Owner may pay or bond the Lien if Tenant fails to do so within ten (10) days after Tenant has written notice about the lien, in which case, Owner's costs shall be paid by Tenant as Additional Rent.


Initials:  

**D.** ~~APPROVED ALTERATIONS.~~ **[DELETE IF INAPPLICABLE]** ~~Anything contained herein to the contrary notwithstanding, provided that both Owner and Tenant have acknowledged their agreement to the following by each party affixing their initials immediately below this provision, Owner hereby consents to the following alterations to be performed by Tenant, at Tenant's sole cost and expense, but for the sake of clarity and emphasis all other terms and conditions of this Lease (including, without limitation, the terms and conditions contained in this Article 9 hereof) shall still apply:~~ _____ .

Owner Initial: _____ Tenant Initial: _____

## 10. TENANT'S DUTY TO OBEY AND COMPLY WITH LAWS, REGULATIONS AND RULES

**A.** GOVERNMENT LAWS AND ORDERS. Tenant will obey and comply (i) with all present and future city, state and federal laws rules, regulations and codes of any governmental or quasi-governmental entity or body which affect the Building or the Apartment, and (ii) with all orders and regulations of insurance rating organizations which affect the Apartment and the Building. Tenant will not allow any windows in the Apartment to be cleaned from the outside unless the prior written consent of the Owner is obtained.

**B.** OWNER'S RULES AFFECTING TENANT. Tenant, its Permitted Occupants and Tenant Parties must obey all Owner's rules (the "Owner's Rules and Regulations") annexed hereto and made apart hereof as Exhibit B and all future reasonable rules of Owner or Owner's agent. Notice of all additional rules shall be delivered to Tenant in writing or posted in the lobby or other public place in the building. Owner shall not be responsible to Tenant for not enforcing any rules, regulations or provisions of ano ther tenant's lease except to the extent required by law.

**C.** TENANT'S RESPONSIBILITY. Tenant is responsible for the behavior of Tenant, the Permitted Occupants of the Apartment, the Tenant Parties and any other people who are visiting the Apartment. Tenant will reimburse Owner as Additional Rent upon demand for the cost of all losses, damages, fines and reasonable legal expenses incurred by Owner because Tenant, the Permitted Occupants of the Apartment, the Tenant Parties or any other people visiting the Apa rtment have not obeyed applicable laws, rules, regulations and codes of any governmental or quasi-governmental entity or rules of this Lease.

## 11. OBJECTIONABLE CONDUCT

Tenant, the Permitted Occupants of the Apartment, the Tenant Parties or any other people visiting the Apartment will not engage in objectionable conduct at the Apartment or the Building. Objectionable conduct ("Objectionable Conduct") means behavior which makes or will make the Apartment or the Building less fit to live in for Tenant or other occupants. It also means anything which interferes with the right of others to properly and peacefully enjoy their apartment, or causes conditions that are dangerous, hazardous, unsanitary or detrimental to other occupants of the Building. Objectionable Conduct by Tenant, the Tenant Parties, or any other people visiting the Apartment, gives Owner the right to end this Lease on six (6) days' written notice to Tenant that this Lease will end.

## 12. SERVICES AND FACILITIES

**A.** REQUIRED SERVICES. Owner will provide (i) cold and hot water and heat as required by law, (ii) repairs to the Apartment not caused by Tenant (subject to the terms and conditions of this Lease), the Tenant Parties or any other people visiting the Apartment, as required by law, (iii) elevator service if the Building has elevator equipment; and (iv) the utilities, if any, included in the Rent, as set forth in subparagraph B below. Tenant is not entitled to any Rent reduction because of a stoppage or reduction of any of the above services unless it is provided by law.

**B.** The following utilities are included in the rent: **Heat & Hot Water and Tenant acknowledges that if there is an individual heating and cooling system installed in their unit they are responsible for the electricity supplied to the two fan motors.**. **[INSERT "NONE" IF NO UTILITIES ARE INCLUDED IN THE RENT]**

**C.** ELECTRICITY AND OTHER UTILITIES. Tenant acknowledges and understands that Owner has no obligation to supply, or liability in connection with, utilities or services in or to the Apartment (except as may be provided for otherwise in this Lease). Tenant shall be responsible, at Tenant's sole cost and expense, for securing, air conditioning, electricity, gas, cable, phone, and all other utilities and services (except as may be provided for otherwise in this Lease).

    **(i)** Tenant shall contract directly with the appropriate utility provider for all aforementioned services (not including the utilities included in the Rent as provided for in subparagraph B).

    **(ii)** ~~Notwithstanding anything to the contrary contained in this Lease, the Owner provides the following services _____ for a separate, sub-metered charge. It is covenanted and agreed by Tenant that all the aforesaid costs and expenses shall be paid by Tenant to Owner within five (5) days after rendition of any bill or statement to Tenant therefor~~ **[DELETE IF INAPPLICABLE].**

**D.** Stopping or reducing of service(s) will not be reason for Tenant to stop paying Rent, to make a money claim or to claim constructive eviction. Damage to the equipment or appliances supplied by Owner, caused by Tenant's acts, omissions or neglect, or the act, omission or neglect of the Tenant Parties or any other person visiting the Apartment, shall be

  

repaired at Tenant's sole cost and expense. In the event that Tenant fails to make such repairs within a reasonable period of time, Owner shall have the option to make such repairs at Tenant's expense and charge the same to Tenant as Additional Rent. Damage to the equipment or appliances supplied by the Owner, which are not caused by Tenant's negligence, acts or misuse or the negligence, acts or misuse of the Tenant Parties or any other people visiting the Apartment, shall be promptly repaired by the Owner at the Owner's sole cost and expense. Owner may stop service of the plumbing, heating, elevator, air cooling or electrical systems, because of accident, emergency, repairs, or changes until the work is complete. Notwithstanding the foregoing, except in emergency situations, Owner shall provide Tenant no less than twenty-four (24) hours prior written notice of any planned service stoppages. Owner shall take all necessary steps to ensure that service stoppages do not interfere with Tenant's use and enjoyment of the Apartment.

**E.** APPLIANCES. Appliances supplied by Owner in the Apartment are for Tenant's use. They shall be in working order on the date hereof and will be maintained and repaired or replaced by Owner, except if repairs or replacement are made necessary because of Tenant's or the Tenant Parties' negligence or misuse, Tenant will pay Owner for the cost of such repair or replacement as Additional Rent. ~~Notwithstanding anything to the contrary contained in this Lease, provided the appliance in need of repair has been delivered in working order on the Lease Commencement Date, Tenant shall be responsible for the initial **$0.00** in cost of such appliance's repair or replacement **[DELETE IF INAPPLICABLE OR INSERT AMOUNT].**~~ Tenant must not use a dishwasher, washing machine, dryer, freezer, heater, ventilator or other appliance unless installed by Owner or with Owner's prior written consent (in its sole discretion). Tenant must not use more electric than the wiring or feeders to the Building can safely carry.

**F.** FACILITIES AND AMENITIES. If Owner permits Tenant to use any storeroom, storage bin, laundry or any other facility located in the Building but outside of the Apartment (e.g., fitness center, resident lounge, roof deck, golf simulator, movie theater, swimming pool, spa, etc.), the use of any such facility will be furnished to Tenant free of charge and at Tenant's own risk. Tenant will operate at Tenant's expense any coin operated appliances located in any such facility. Owner shall have no obligation to provide any of the aforementioned facilities or any type of doorman, attendant, porter or any other type of similar service at the Building, and Owner may discontinue same without being liable to Tenant therefor or without in any way affecting this Lease or the liability of T enant hereunder or causing a diminution of Rent and the same shall not be deemed to be lessening or a diminution of facilities or services within the meaning of any law, rule or regulation now or hereafter enacted, promulgated or issued.

**13. INABILITY TO PROVIDE SERVICES**    Because of a strike, labor trouble, national emergency, repairs, or any other cause beyond Owner's reasonable control, Owner may not be able to provide or may be delayed in providing any services or in making any repairs to the Building. In any of these events, any rights Tenant may have against Owner are only those rights which are allowed by laws in effect when the reduction in service occurs.

**14. ENTRY TO APARTMENT**    During reasonable hours and with reasonable notice, except in emergencies, Owner an Owner's representatives, agents and employees may enter the Apartment for the following reasons:

**A.** To erect, use and maintain pipes and conduits in and through the walls and ceilings of the Apartment; inspect; exterminate; install or work on master antennas or other systems or equipment; and to perform other work and make any and all repairs, alterations, or changes Owner decides are necessary. Tenant Rent will not be reduced because of any of the foregoing.

**B.** To show the Apartment to potential buyers or lenders.

**C.** For ninety (90) days before the end of the Lease Term, to show the Apartment to persons who wish to lease it.

**D.** If, during the last month of the Lease, Tenant has moved out and removed all or almost all of Tenant's property from the Apartment, Owner may enter the Apartment to make changes, repairs, or redecorations. Tenant's Rent will not be reduced for that month and this Lease will not be ended by Owner's entry.

**E.** If, at any time, Tenant is not personally present to permit Owner or Owner's representatives, agents or employees to enter the Apartment and entry is necessary or allowed by law or under this Lease, Owner or Owner's representatives, agents or employees may nevertheless enter the Apartment. Owner may enter by force in an emergency. Owner or Owner's representatives, agents or employees will not be responsible to Tenant, unless during such entry, any authorized party is negligent or misuses Tenant's property.

**15. ASSIGNING; SUBLETTING; ABANDONMENT**

**A.** ASSIGNING AND SUBLETTING. Tenant cannot assign this Lease or sublet all or part of the Apartment or permit any other person to use the Apartment (other than a Permitted Occupant without the prior written consent of the Owner, which Tenant acknowledges may be withheld by Owner in its sole and absolute discretion, for any reason or no reason. If Tenant assigns this Lease or sublet all or part of the Apartment and fail to obtain Owner's prior written consent, in addition to any and all other rights of Owner under this Lease and at law and/or in equity, Owner has the right to cancel the Lease. Tenant must get Owner's written permission as provided for herein, each time Tenant wants to assign or sublet. Permission to assign or sublet is good only for that assignment or sublease. Tenant remains bound


*Initials:*  

7

to the terms of this Lease after an assignment or sublet is permitted, even if Owner accepts money from the assignee or subtenant. The amount accepted will be credited toward money due from Tenant, as Owner shall determine. The assignee or subtenant does not become Owner's tenant. Tenant is responsible for acts and neglect of any person in the Apartment. Notwithstanding the foregoing, Owner expressly reserves the right to terminate this Lease with respect to the Apartment upon the receipt by Owner of any request for assignment or sublease ("Owner's Recapture Right"). Owner's Recapture Right, if exercised, must be sent to Tenant in writing within thirty (30) days after Tenant's request to assign or sublet the Apartment. In the event that Owner consents to an assignment and elects not to exercise Owner's Recapture Right, Tenant shall reimburse Owner for all of Owner's attorneys' fees in connection with the review of the assignment or sublease. In the event that Owner agrees to an assignment or sublease, subject to applicable law, Owner shall be entitled to one hundred percent (100%) of any consideration or rent over and above that Rent provided for in this Lease. The sublease shall provide that the subtenant shall, at Owner's option, attorn to Owner upon any termination of this Lease.

**B.** ABANDONMENT. If Tenant moves out of the Apartment (abandonment) before the end of this Lease without the consent of Owner, this Lease will not be ended. Tenant will remain responsible for each monthly payment of Rent and Additional Rent as it becomes due until the end of this Lease. In case of abandonment, Tenant's responsibility for Rent and Additional Rent will end only if Owner chooses to end this Lease for default as provided in Article 16.

## 16. DEFAULT

**A.** Tenant defaults under the Lease if Tenant acts in any of the following ways:

**(i)** Tenant fails to carry out any agreement or provision of this Lease;

**(ii)** Tenant does not take possession or move into the Apartment fifteen (15) days after the beginning of this Lease; or

**(iii)** Tenant and the Permitted Occupants of the Apartment move out permanently before this Lease ends;

If Tenant defaults in any one of these ways, other than a default in the agreement to pay Rent and/or Additional Rent, Owner may serve Tenant with a written notice to stop or correct the specified default within ten (10) days. Tenant must then either stop or correct the default within such ten (10) day period, or, if the nature of the default is not reasonably capable of being cured within such ten (10) day period, then Tenant must begin to take all steps necessary to correct the default within ten (10) days and thereafter diligently continue to do all that is necessary to correct the default as soon as possible (however, in no event shall any extension of the aforesaid ten (10) day period exceed thirty (30) days).

**B.** If Tenant does not stop, correct or begin to materially correct a default within ten (10) days as provided for above, or engages in Objectionable Conduct, Owner shall give Tenant a written notice that this Lease will end six (6) days after the date such written notice is sent to Tenant. At the end of the six (6) day period, this Lease will end and Tenant then must move out of the Apartment. Even though this Lease ends, Tenant will remain liable to Owner for unpaid Rent and/or Additional Rent up to the end of this Lease, and damages caused to Owner after that time as stated in Article 17.

**C.** If Owner does not receive the Rent and/or Additional Rent within five (5) days of when this Lease requires, Owner or Owner's agent shall send Tenant, via certified mail, a written notice stating the failure to receive such Rent and/or Additional Rent. Provided Owner has served Tenant with a fourteen (14) day written demand, and Owner does not receive the overdue Rent (and Additional Rent, as applicable) within fourteen (14) days after such written fourteen (14) demand for Rent (and Additional Rent, as applicable) has been made, Owner may commence an action or summary proceeding seeking the payment of all Rent and/or Additional Rent. If the Lease ends, Owner may do the following: (i) enter the Apartment and retake possession of it if Tenant has moved out or (ii) go to court and ask that Tenant and all other occupants in the Apartment be compelled to move out.

Once this Lease has been ended, whether because of default or otherwise, Tenant gives up any right Tenant might otherwise have to reinstate this Lease.

## 17. REMEDIES OF OWNER AND TENANT'S LIABILITY
If this Lease is ended by Owner because of Tenant's default, the following are the rights and obligations of Tenant and Owner.

**A.** Tenant must pay Rent and Additional Rent until this Lease has ended. Thereafter, Tenant must pay an equal amount for what the law calls "use and occupancy" until Tenant actually moves out.

**B.** Once Tenant is out, Owner may re- rent the Apartment or any portion of it for a period of time which may end before or after the ending date of this Lease. Owner may re-rent to a new tenant at a lesser rent or may charge a higher rent than the Rent in this Lease. Notwithstanding the foregoing, if Tenant vacates the Apartment in violation of the terms of this Lease, only then shall Owner use reasonable efforts to re-rent the Apartment at the lesser of the fair market value of the Apartment or the Rent paid hereunder.

**C.** Whether the Apartment is re-rented or not, Tenant must pay to Owner as damages:

**(i)** the difference between the Rent in this Lease and the amount, if any, of the rents collected in any later lease of the

8

  

Apartment for what would have been the remaining period of this Lease; and

**(ii)** Owner's expenses for the cost of getting Tenant out and re-renting the Apartment, including, but not limited to, putting the Apartment in good condition, repairing damages, decorating and/or cleaning the Apartment for re-rental, advertising the Apartment and for real estate brokerage fees; and

**(iii)** Owner's expenses for attorney's fees (except in the event of a default judgment).

**D.** Tenant shall pay all aforementioned damages due in monthly installments on the Rent day established in this Lease. Any legal action brought to collect one or more monthly installments of damages shall not prejudice in any way Owner's right to collect the damages for a later month by a similar action.

**E.** If the Rent collected by Owner from a subsequent tenant of the Apartment is more than the unpaid Rent and damages which Tenant owes Owner, Tenant cannot receive the difference. Owner's failure to re-rent to another tenant will not release or change Tenant's liability for damages. Except as may be provided for otherwise in Article 17(B) of this Lease, Owner is not required to re -rent the Apartment.

**18. ADDITIONAL OWNER REMEDIES; LEGAL FEES**    If Tenant does not do everything Tenant has agreed to do, or if Tenant does anything which shows that Tenant intends not to do what Tenant has agreed to do, Owner has the right to ask a Court to make Tenant carry out Tenant's agreements or to give the Owner such other relief as the Court can provide. This is in addition to the remedies in Article 16 and 17 of this Lease.

**19. FEES AND EXPENSES (INCLUDING BUT NOT LIMITED TO LEGAL FEES)**

**A.** Tenant must reimburse Owner for any of the following fees and expenses incurred by Owner:

**(i)** Making any repairs to the Apartment or the Building, including any appliances in the Apartment, which result from misuse, omissions or negligence by Tenant, the Permitted Occupants of the Apartment, the Tenant Parties or any other visitors to the Apartment;

**(ii)** Correcting any violations of city, state or federal laws or orders and regulations of insurance rating organization concerning the Apartment or the Building which Tenant, the Permitted Occupants of the Apartment, the Tenant Parties, or any other persons who visit the Apartment or work for Tenant have caused;

**(iii)** Preparing the Apartment for the next tenant if Tenant moves out of the Apartment before the Lease ending date without Owner's prior written consent;

**(iv)** Any legal fees and disbursements for the preparation and service of legal notices; legal actions or proceedings brought by Owner against Tenant because of a default by Tenant under this Lease; or for defending lawsuits brought against Owner because of the actions of Tenant, the Permitted Occupants of the Apartment, the Tenant Parties or any other persons who visit the Apartment;

**(v)** Removing any of Tenant's property from the Apartment after this Lease is ended;

**(vi)** Any miscellaneous charges payable to the Owner for services Tenant requested that are not required to be furnished Tenant under this Lease for which Tenant has failed to pay the Owner and which Owner has paid;

**(vii)** All other fees and expenses incurred by Owner because of the failure to obey any other provisions and agreements of this Lease by Tenant, the Permitted Occupants of the Apartment, the Tenant Parties or any other persons who visit the Apartment or work for Tenant.

These fees and expenses shall be paid by Tenant to Owner as Additional Rent within ten (10) business days after Tenant receives Owner's bill or statement. If this Lease has ended when these fees and expenses are incurred, Tenant will still be liable to Owner for the same amount as damages. In the event Tenant does not reimburse Owner within such ten (10) business day period, Owner shall be entitled to deduct the fees and expenses from the Security Deposit.

**B.** Tenant has the right to collect reasonable legal fees and expenses incurred in a successful defense by Tenant of a lawsuit brought by Owner against Tenant or brought by Tenant against Owner to the extent provided by Real Property Law, Section 234.

**20. PROPERTY LOSS, DAMAGES OR INCONVENIENCE**    Tenant understands and agrees that unless caused by the gross negligence or willful misconduct of Owner or Owner's representatives, agents or employees, none of these authorized parties are responsible to Tenant for any of the following (i) any loss of or damage to Tenant or Tenant's property in the Apartment or the Building due to any accidental or intentional cause, including a theft or another crime committed in the Apartment or elsewhere in the Building; (ii) any loss of or damage to Tenant's property delivered to any employee of the Building (e.g., doorman, superintendent, etc.); or (iii) any damage or inconvenience caused to Tenant by actions, negligence or violations of their lease made by any other tenant or person in the Building except to the extent required by law. Tenant further understands and agrees that Owner's employees are not authorized by Owner to care for Tenant's personal property. Owner is not responsible for any loss, theft, damage to Tenant's personal property, or any injury caused by the property or its use by Building employees.

Owner will not be liable for any temporary interference with light, ventilation, or view caused by construction by or on behalf


Initials:  

9

of Owner. Owner will not be liable for any such interference on a permanent basis caused by construction on any parcel of land not owned by Owner. Owner will not be liable to Tenant for such interference caused by the permanent closing, darkening or blocking up of windows, if such action is required by law. None of the foregoing events will cause a suspension or reduction of the Rent or allow Tenant to cancel the Lease.

## 21. FIRE OR CASUALTY

**A.** Tenant shall give Owner immediate notice in case of fire or other damage to the Apartment. If the Apartment becomes unusable, in part or totally, because of fire, accident or other casualty, this Lease will continue unless ended by Owner under subparagraph C below or by Tenant under subparagraph D below. However, the Rent will be reduced as of the date of the fire, accident or other casualty. This reduction will be based upon the square footage of the Apartment which is unusable, as determined by Owner.

**B.** Owner will repair and restore the Apartment, unless Owner decides to take actions described in subparagraph C below. For the sake of clarity and emphasis, Owner is not required to repair or restore the Apartment or replace the furnishings, decorations or any of Tenant's property, and furthermore (unless otherwise agreed to by Owner in writing), Owner shall not be responsible for any delays due to settling insurance claims, obtaining cost estimates, labor, material, equipment and/or supply problems, force majeure or for any other delay beyond Owner's reasonable control. If the Lease is cancelled, Owner need not restore the Apartment.

**C.** After a fire, accident or other casualty in the Building, Owner may decide to tear down the Building or to substantially rebuild it. In such case, Owner need not restore the Apartment but may end this Lease. Owner may do this even if the Apartment has not been damaged, by giving Tenant written notice of this decision within the later of sixty (60) days after the date when the damage occurred or ten (10) business days after Owner is advised by its insurance carrier as to the amount of insurance proceeds it will have available to restore the Apartment. If there is substantial damage to the Apartment or if the Apartment is completely unusable, Owner may cancel this Lease by giving Tenant written notice of this decision within 30 days after the date when the damage occurred. If the Apartment is unusable when Owner gives Tenant such notice, this Lease will end sixty (60) days from the last day of the calen dar month in which Tenant was given notice.

**D.** If the Apartment is completely unusable because of fire, accident or other casualty and it is not repaired in thirty (30) days, Tenant may give Owner written notice that Tenant ends the Lease. If Tenant gives that notice, this Lease is considered ended on the day that the fire, accident or casualty occurred. Owner will promptly refund Tenant's Security Deposit and the pro-rata portion of Rent (and Additional Rent, as applicable) paid for the month in which the casualty happened.

**E.** Unless prohibited by the applicable policies, to the extent that such insurance is collected, Tenant and Owner release and waive all right of recovery against the other or anyone claiming through or under each by way of subrogation.

**F.** Tenant acknowledges that if fire, accident, or other casualty causes damage to any of Tenant's personal property in the Apartment, including, but not limited to Tenant's furniture and clothes, the Owner will not be responsible to Tenant for the repair or replacement of any such damaged personal property unless such damage was as a result of the Owner's negligence.

## 22. PUBLIC TAKING
The entire Building or a part of it can be acquired (condemned) by any government or government agency for a public or quasi- public use or purpose. If this happens, this Lease shall end on the date the government or agency take title. Tenant shall have no claim against Owner for any damage resulting; Tenant also agrees that by signing this Lease, Tenant assigns to Owner any claim against the government or government agency for the value of the unexpired portion of this Lease.

## 23. SUBORDINATION CERTIFICATE AND ACKNOWLEDGEMENTS
Notwithstanding any provisions to the contrary contained in this Lease, this Lease and Tenant's rights, are subject and subordinate to all present and future: (a) leases for the Building or the land on which it stands, (b) Owner's mortgage(s) now existing or hereinafter existing), (c) agreements securing money paid or to be paid by a lender, and (d) terms, conditions, renewals, changes of any kind and extensions of the mortgages, leases or lender agreements. If certain provisions of any such mortgage come into effect, the holder of any such mortgage can end this Lease and such parties may commence legal action to evict Tenant from the Apartment . If this happens, Tenant acknowledges that Tenant has no claim against Owner or such lease or mortgage holder. If Owner requests, Tenant will sign promptly any acknowledgment(s) of the "subordination" in the form that Owner may require. Tenant authorizes Owner to sign such acknowledgment(s) for Tenant if Tenant fails to do so within five (5) days of Owner's request.

Tenant also agrees to sign (if accurate) a written acknowledgment within ten (10) days of request to any third party designated by Owner that this Lease is in effect, that Owner is performing Owner's obligations under this Lease and that Tenant has no present claim against Owner.

## 24. TENANT'S RIGHT TO LIVE IN AND USE THE APARTMENT
If Tenant pays the Rent and any required Additional Rent


Initials: 

10

on time and Tenant does everything Tenant has agreed to do in this Lease, Tenant's tenancy cannot be cut off before the ending date, except as provided for otherwise in this Lease, including, but not limited to, in Articles 21, 22, and 23.

**25. BILLS AND NOTICE; ELECTRONIC SIGNATURES**    Any notice, statement, demand or other communication required or permitted to be given rendered or made by either party to the other, pursuant to this Lease or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Lease) and shall be given by registered or certified mail, return receipt requested, or by overnight mail by a nationally recognized overnight carrier [or via email] [DELETE IF INAPPLICABLE], addressed to each of the following parties:

An electronic signature on this Lease, rider or any renewal of Owner or Tenant shall be deemed an original document and a binding signature pursuant to the Electronic Signatures and Records Act of the State Technology Law.

If to Owner:
**E 135 and 3rd Ave Owner LLC**
**316 West 118th Street**
**New York, NY 10026**

Email address: _____ **[DELETE IF INAPPLICABLE]**

With a copy to:
_____
_____
_____
_____

If to Tenant: at Apartment, subsequent to Commencement Date
Email address: _____ **[DELETE IF INAPPLICABLE]**

Prior to Commencement Date:
**2011 Lurting Ave**
**Bronx, NY 10461**

Notwithstanding anything to the contrary contained in this Lease, any notice from Owner or Owner's agent or attorney may be delivered to Tenant personally at the Apartment. Notices shall be deemed received the next business day if by overnight carrier, the date of delivery if by personal delivery, or three (3) business days after being mailed if by registered or certified mail.

**26. GIVING UP RIGHT TO TRIAL BY JURY AND COUNTERCLAIM**

**A.** Both Tenant and Owner agree to give up the right to a trial by jury in a court action, proceeding or counterclaim (excluding compulsory counterclaims) on any matters concerning this Lease, the relationship of Tenant and Owner as lessee and lessor or Tenant's use or occupancy of the Apartment. This agreement to give up the right to a jury trial does not include claims for personal injury or property damage.

**B.** If Owner begins any court action or proceeding against Tenant which asks that Tenant be compelled to move out, Tenant cannot make a counterclaim unless Tenant is claiming that Owner has not done what Owner is supposed to do about the condition of the Apartment or the Building.

**27. NO WAIVER OF LEASE PROVISIONS**

**A.** Even if Owner accepts Tenant's Rent and/or Additional Rent or fails once or more often to take action against Tenant when it has not done what Tenant has agreed to do in this Lease, the failure of Owner to take action or Owner's acceptance of Rent and/or Additional Rent does not prevent Owner from taking action at a later date if Tenant does not do what Tenant has agreed to do herein.

**B.** Only a written agreement between Tenant and Owner can waive any violation of this Lease.

**C.** If Tenant pays and Owner accepts an amount less than all the Rent and/or Additional Rent due, the amount received shall be considered to be in payment of all or part of the earliest Rent and/or Additional Rent due. It will not be considered an agreement by Owner to accept this lesser amount in full satisfaction of all of the Rent and/or Additional Rent due unless there is a written agreement between Tenant and Owner.

**D.** Any agreement to end this Lease and also to end the rights and obligations of Tenant and Owner must be in writing, signed by Tenant and Owner or Owner's agent. Even if Tenant gives keys to the Apartment and they are accepted by Owner or Owner's representative, this Lease is not ended.

**28. CONDITION OF THE APARTMENT; APARTMENT RENTED "AS IS"**    By signing this Lease Tenant acknowledges that Owner, Owner's representatives or superintendent has not made any representations or promises with respect to the Building or the Apartment except as herein expressly set forth. After signing this Lease but before Tenant begins


Initials:  

occupancy, Tenant shall have the opportunity to inspect the Apartment with Owner or Owner's agent to determine the condition of the Apartment. If Tenant requests such inspection, the parties shall execute a written agreement before Tenant begins occupancy of the Apartment attesting to the condition of the Apartment and specifically noting any existing defects or damages. Before taking occupancy of the Apartment, Tenant has inspected the Apartment (or Tenant has waived such inspection) and Tenant accepts it in its present condition "as is," except for any condition which Tenant could not reasonably have seen during Tenant's inspection. Tenant agrees that Owner has not promised to do any work in the Apartment except as specified in Exhibit C annexed hereto (if any) and made apart hereof.

## 29. HOLDOVER

**A.** At the end of the Term, Tenant shall: (i) return the Apartment to the Owner in broom clean, vacant and in good condition, ordinary wear and tear excepted; (ii) remove all of Tenant's property and all of Tenant's installations, alterations and decorations (if so directed by Owner); and (iv) repair all damages to the Apartment and Building caused by moving; and restore the Apartment to its condition at the beginning of the Term ordinary wear and tear excepted.

**B.** Tenant hereby indemnifies and agrees to defend and hold Owner harmless from and against any loss, cost, liability, claim, damage, fine, penalty and expense (including reasonable attorneys' fees and disbursements but excluding consequential or punitive damages) resulting from delay by Tenant in surrendering the Apartment upon the termination of this Lease, including any claims made by any succeeding tenant or prospective tenant or successor landlord founded upon such delay.

**C.** If Tenant holds over possession after the expiration date of the Lease or earlier termination of the Lease term or any extended term of this Lease, such holding over shall not be deemed to extend the term of this Lease or renew this Lease. Un der no circumstances (i) will such holdover constitute a month-to-month tenancy, (ii) shall this Article 29 imply any right of Tenant to remain in the Apartment after the expiration or earlier termination of this Lease, (iii) will Owner be prohibited from exercising any rights permitted by law against a holdover tenant; or (iv) will any monies paid by Tenant or accepted by Owner (e.g., Rent, Additional Rent, holdover rent or otherwise) after the expiration or earlier termination of this Lease be deemed to reinstate any form of tena ncy between Tenant and Owner. In connection with such holdover, Tenant shall pay the following charges for the use and occupancy of the Apartment for each calendar month or part thereof (even if such part shall be a small fraction of a calendar month), which total sum Tenant agrees to pay to Owner per month promptly upon demand, in full, without set-off or deduction:

**i)** TWO (2) times the highest monthly Rent set forth in this Lease, plus

**ii)** Items of Additional Rent that would have been payable monthly pursuant to this Lease, had this Lease not expired or terminated,

The aforesaid provisions of this Article 29 shall survive the expiration or earlier termination of this Lease.

## 30. DEFINITIONS

**A.** Owner: The term "Owner" means the person or organization receiving or entitled to receive Rent and Additional Rent from Tenant for the Apartment at any particular time other than a rent collector or managing agent of Owner. Owner is the person or organization that owns legal title to the Apartment. It does not include a former owner, even if the former owner signed this Lease.

**B.** Tenant: The Term "Tenant" means the person or persons signing this Lease as lessee and the respective heirs, distributes, executors, administrators, successors and assigns of the signer. This Lease has established a lessor-lessee relationship between Owner and Tenant.

## 31. SUCCESSOR INTERESTS    The agreements in this Lease shall be binding on Owner and Tenant and on those who succeed to the interest of Owner or Tenant by law, by approved assignment or by transfer.

## 32. INSURANCE

**A.** As a material inducement for Owner to enter into this Lease, Tenant shall obtain (i) liability insurance insuring Tenant, the Permitted Occupants of the Apartment, the Tenant Parties and any other people visiting the Apartment, and (ii) personal prope rty insurance insuring Tenant's furniture and furnishings and other items of personal property located in the Apartment. Tenant may not maintain any insurance with respect to any furniture or furnishings belonging to Owner that are located in the Apartment unle ss otherwise directed by Owner. Tenant acknowledges that Owner may not be required to maintain any insurance with respect to the Apartment.

**B.** Owner is not liable for loss, expense, or damage to any person or property, unless due to Owner's gross negligence or wrongful acts. Owner is not liable to Tenant for permitting or refusing entry of anyone into the Building. Tenant must pay for damages suffered and reasonable expenses of Owner relating to any claim arising from any act, omission or neglect by Tenant. If an action is brought against Owner arising from Tenant's acts, omissions or neglect, Tenant shall defend Owner at Tenant's sole cost and expense with an attorney reasonably acceptable to Owner. Tenant is responsible for all acts, omissions or neglect of the Tenant Parties.


*Initials:*  

**C.** Tenant shall indemnify and save harmless Owner from and against any and all liability, penalties, losses, damages, expenses, suits and judgments arising from injury during the term of this Lease to person or property of any nature and also from any matter growing out of the occupation of the Apartment, provided however that such is not the result of Owner's gross negligence or wrongful acts or that of Owner's employees, or agents. Tenant agrees, at Tenant's sole cost and expense to procure and maintain at all times during the Lease term the following insurance:

   **(i)** General Liability Insurance for an amount not less than **fifty thousand dollars** (**$50,000.00**) ~~with an umbrella policy of no less than _____ Dollars ($_____)~~ **[DELETE IF INAPPLICABLE OR INSERT AMOUNTS]**; and; and

   **(ii)** Renters Insurance, which covers any, and all personal property or belongings contained in the Apartment. Tenant agrees to hold Owner harmless regarding these personal belongings due to loss or damage except in cases of Owner's gross negligence.

**D.** The aforementioned insurance policies shall name Owner and the property manager (if applicable) as additional insureds or interests, as applicable. In the event of Tenant's failure to procure and/or maintain the aforementioned policies prior to the date possession of the Apartment is ready to be delivered to Tenant on the Lease Commencement Date , Owner may (i) refuse to deliver possession of the Apartment to Tenant until such time as evidence of such insurance is delivered by Tenant to Owner (however, Tenant shall nonetheless remain responsible for the payment of Rent and Additional Rent as of the Lease Commencement Date), and/or (ii) order such insurance policies, pay the premiums, and add the amount thereof to the Rent next coming due as Additional Rent, and the Owner shall have all rights and remedies for the collection thereof as is provided for collection of ordinary Rent. The abovementioned insurance policies shall provide for no less than thirty (30) days' notice of cancellation or modification to Owner, and Tenant shall provide Owner with a copy of such insurance policies. Evidence of the aforesaid coverage being in place shall be presented to the Owner on or before the first day of the term of this Lease and may be requested at any time during term of t his Lease. Such insurance policies are to be written by a good and solvent company licensed to do business in the state of New York. Tenant shall immediately reimburse Owner for the cost of any insurance policy Owner obtains for the Apartment, including but not limited to insurance for Owner's furniture or furnishings in the Apartment. Tenant acknowledges that Owner may not be required to maintain any insurance with respect to the Apartment.

**33.** ~~**FURNITURE [DELETE IF INAPPLICABLE]**     The Apartment is being leased as fully furnished. All furniture and furnishings contained in the Apartment (the "Apartment Furniture") are listed in Exhibit D annexed hereto (if any) and made apart hereof. Tenant shall accept the Apartment Furniture "as is" on the commencement date of this Lease. Owner represents that all Apartment Furniture is in good repair and in working order on the commencement date of this Lease except as may be noted in Exhibit D.~~

~~Tenant shall take good care of the Apartment Furniture during the pendency of this Lease and shall be liable for any damages caused by Tenant or Tenant Parties to the Apartment Furniture. Tenant shall not be responsible for any damages to the Apartment Furniture not caused by Tenant or Tenant Parties or caused by ordinary wear and tear. Tenant shall surrender the Apartment Furniture when this Lease terminates in the same condition as on the date this Lease commenced, subject to ordinary wear and tear. If a ny repairs are required to the Apartment Furniture when this Lease terminates, Tenant shall pay Owner upon demand the cost of any required repairs.~~

~~Tenant may not remove the Apartment Furniture from the Apartment or change the location of the Apartment Furniture during the pendency of this Lease without Owner's prior written consent.~~

**34.** **BROKER [DELETE EITHER SUBPARAGRAPH A OR B; IF SUBPARAGRAPH B IS DELETED, INSERT NAME OF BROKER(S) IN SUBPARAGRAPH A]**

   **A.** Owner and Tenant represent that in the negotiation of this Lease they dealt with no broker(s) other than **Johnathan Ladines** (the "Tenant's Broker") and **NestSeekers** (the "Owner's Broker") (hereinafter collectively referred to as the "Broker"). Such Broker(s) will be compensated by ~~[Tenant]~~ **[Owner]** **[CHOOSE ONE AND CROSS OUT THE OTHER ALTERNATIVE]** in accordance with a separate agreement subject to a fully executed and delivered lease.

   **B.** ~~Tenant represents to Owner that Tenant has not dealt with any real estate broker in connection with the leasing of the Apartment.~~

   **C.** Owner and Tenant hereby agree to indemnify, defend and hold harmless each other from and against any and all claims, demands, liabilities, suits, losses, costs and expenses (including reasonable attorneys' fees and disbursements) arising out of any inaccuracy or alleged inaccuracy of the above representation. Owner shall have no liability for any brokerage commissions arising out of a sublease or assignment by Tenant. The provisions of this Article 34 shall survive the expiration or sooner termination of this Lease.

**35.** ~~**TENANT'S OPTION TO RENEW [DELETE IF INAPPLICABLE; IF APPLICABLE, PLEASE INSERT NECESSARY INFORMATION]**~~


Initials: 

A. ~~Tenant shall have the right to extend the term of this Lease for _____ year(s) commencing _____ , and ending on _____ , (the "Extension Term") provided: (i) Tenant gives Owner notice (the "Extension Notice"), in the manner required under this Lease, of Tenant's election to extend the term of this Lease; (ii) the Election Notice must be given to Owner at least ninety (90) days prior to the ending date of this Lease as stated in Article 2, TIME BEING OF THE ESSENCE; (iii) Tenant shall have been timely in Tenant's payment of Rent and Additional Rent and may not have been in default prior to delivering the Extension Notice or then be in default of any provisions of this Lease when the Extension Notice is given or on the commencement date of the Extension Term; and (iv) Tenant is occupying the Apartment and have not assigned this Lease nor sublet the Apartment. If Owner fails to receive the Extension Notice by the date specified herein, TIME BEING OF THE ESSENCE, this Article 35 shall be of no further force and effect.~~

B. ~~The monthly Rent payable by Tenant during the Extension Term shall be $_____ .~~

C. ~~All provisions of this Lease, except as specifically modified by this Article 35, shall be, and remain in, full force and effect during the Extension Term.~~

36. ~~**TERRACES, BALCONIES AND BACKYARDS [DELETE IF INAPPLICABLE]**    All of the terms and conditions of this Lease apply to the terrace, balcony and/or backyard (as applicable). Tenant's use of the terrace or balcony must comply with any rules that may be provided to Tenant by Owner.~~

~~Tenant shall clean the terrace or balcony and keep the terrace or balcony free from snow, i ce, garbage and other debris. No cooking is allowed on the terrace or balcony except as may be otherwise permitted by law. Tenant may not install a fence or any addition on the terrace or balcony. Tenant is responsible for making all repairs to the terrace or balcony if caused by Tenant, the Tenant Parties or any other visitor to the Apartment, at Tenant's sole expense.~~

37. ~~**LEAD PAINT DISCLOSURE [DELETE IF THE BUILDING WAS ERECTED AFTER 1978]**    Simultaneously with the execution of this Lease, Tenant and Owner shall sign and complete the disclosure of information on lead- based paint and/or lead-based paint hazards annexed as a rider attached to this Lease. Tenant acknowledges receipt of the pamphlet, "Protect Your Family From Lead in Your Home" prepared by the United States Environmental Protection Administration.~~

38. **PETS [DELETE EITHER SUBPARAGRAPH A OR B; IF SUBPARAGRAPH A IS DELETED, INSERT NECESSARY INFORMATION IN SUBPARAGRAPH B]**

A. Tenant may not keep any pets in the Apartment. IF TENANT BREACHES THIS SECTION, TENANT WILL FORFEIT TWENTY PERCENT (20%) OF THE SECURITY DEPOSIT TO OWNER, TO COMPENSATE OWNER FOR ANY AND ALL COSTS RELATING THERETO AS LIQUIDATED DAMAGES (AND NOT AS A PENALTY). TENANT ACKNOWLEDGES AND AGREES THAT THE FOREGOING IS A MATERIAL INDUCEMENT FOR OWNER TO ENTER INTO THIS LEASE, AND BUT FOR SAID COVENANT, OWNER WOULD NOT HAVE EXECUTED THIS LEASE AGREEMENT.

B. ~~Tenant may keep pets in the Apartment provided: (i) Tenant obtains the prior written consent of Owner; and (ii) Tenant complies with any rules with respect to the keeping of pets in the Apartment. Owner hereby consents to the following pet(s): _____~~

39. **KEYS/SECURITY**

A. Tenant shall not remove, alter, or change in any way the existing locks, security codes or keys that are provided for the Apartment or any part thereof. Tenant assumes liability for any person keys are entrusted to. The name, address and telephone number of any person with an additional set of keys to the Apartment are required to be furnished to Owner or its managing agent. Only Owner may make such additional sets of keys upon Tenant's written request with the abovementioned information. Owner will not refuse any such reasonable request. All extra sets of keys must be returned to Owner no later than one (1) day prior to move out unless agreed to by Owner. In the event that all keys are not returned to the Owner by or before the last day of tenancy, Ten ant agrees to pay for the replacement cost as mentioned below (or part thereof if Owner deems it appropriate).

B. Tenant agrees and understands that Tenant will be charged a re-keying fee in the sum of **$350.00** for the entrance door each and every time a key replacement is required or deemed necessary by Owner if the need arises due to Tenant's loss of the key, employee changes, or request. Said charges shall be deemed Additional Rent.

40. **WINDOW GUARDS**    Simultaneously with the execution of this Lease, Tenant shall complete and deliver to Owner a notice with respect to the installation of window guards in the Apartment in the form required by the City of New York annexed as a rider attached to th is Lease. Tenant acknowledges that it is a violation of law to refuse, interfere with installation, or remove window guards where required.

41. **BED BUG DISCLOSURE**    Tenant and Owner shall sign and complete the disclosure of bedbug infestation history annexed as a rider attached to this Lease.

42. **SPRINKLER DISCLOSURE**    Tenant and Owner shall sign and complete the sprinkler disclosure annexed as a rider



Initials:  

attached to this Lease.

**43. OCCUPANCY NOTICE FOR INDOOR ALLERGEN HAZARDS**      Owner shall complete and deliver to Tenant the Occupancy Notice for Indoor Allergen Hazards annexed as a rider attached to this Lease. Owner acknowledges that it has delivered to Tenant "What Every Tenant Should Know About Indoor Allergens" and Tenant acknowledges receipt of such notice.

**44. STOVE KNOB COVERS**     Simultaneously with the execution of this Lease, Tenant shall complete and deliver to Owner the Annual Notice for Tenants in Multiple Dwelling Units with gas-powered stoves annexed as a rider attached to this Lease.

**45. NO SHORT TERM RENTAL**     Under no circumstances shall Tenant put a listing for the Apartment on Airbnb or for other similar short term rental (i.e., a rental for less than thirty (30) days), or use the Apartment for same. If Tenant does so, Owner has the right to immediately terminate this Lease.

TENANT ACKNOWLEDGES AND AGREES THAT THE FOREGOING IS A MATERIAL INDUCEMENT FOR OWNER TO ENTER INTO THIS LEASE, AND BUT FOR SAID COVENANT, OWNER WOULD NOT HAVE EXECUTED THIS LEASE AGREEMENT. IF TENANT DISREGARDS THIS AGREEMENT, IN ADDITION TO THE RIGHT OF INJUNCTION, THE RIGHT TO TERMINATE THIS LEASE ON SIX (6) DAYS' WRITTEN NOTICE TO TENANT AND ANY AND ALL REMEDIES AVAILABLE UNDER THIS LEASE AND AT LAW OR EQUITY, TENANT WILL FORFEIT THE ENTIRE SECURITY DEPOSIT TO THE OWNER, TO COMPENSATE OWNER FOR ANY AND ALL COSTS RELATING THERETO AS LIQUIDATED DAMAGES (AND NOT AS A PENALTY). TENANT SHALL ALSO BE RESPONSIBLE FOR ANY AND ALL FINES AND PENALTIES IMPOSED BY ANY GOVERNMENTAL OR QUASI -GOVERNMENTAL AGENCY OR BODY.

**46. INDEMNIFICATION**      Tenant shall indemnify and save harmless Owner and Owner's agents and, at Owner's option, defend Owner and Owner's agents against and from any and all claims against Owner and Owner's agents arising wholly or in part from any act, omission or negligence of Tenant or the Tenant Parties. This indemnity and hold harmless agreement shall include indemnity from and against any and all liability, fines, suits, demands, costs, damages and expenses of any kind or nature (including without limitation attorney's and other professional fees and disbursements) incurred in or in connection with any such claims (including any settlement thereof) or proceeding br ought thereon, and the defense thereof

**47. NOISE**     Tenant shall not create any unreasonable noise levels which shall interfere with the quiet enjoyment of the other tenants of the Building or the neighbors of the Building. Tenant agrees to promptly notify Owner in writing of all noise complaints or summons which Tenant receives in writing, and to submit a proposal reasonably satisfactory to Owner as to how to handle same and assure that such complaints shall not recur. TENANT ACKNOWLEDGES AND AGREES THAT THE FOREGOING IS A MATERIAL INDUCEMENT FOR OWNER TO ENTER INTO THIS LEASE, AND BUT FOR SAID COVENANT, OWNER WOULD NOT HAVE EXECUTED THIS LEASE AGREEMENT. IF TENANT DISREGARDS THIS AGREEMENT, IN ADDITION TO THE RIGHT OF INJUNCTION AND ANY AND ALL REMEDIES AVAILABLE UNDER THIS LEASE AND AT LAW OR EQUITY, TENANT WILL FORFEIT THE ENTIRE SECURITY DEPOSIT TO THE OWNER, TO COMPENSATE OWNER FOR ANY AND ALL COSTS RELATING THERETO AS LIQUIDATED DAMAGES (AND NOT AS A PENALTY).

**48. WAIVER OF LIABILITY**      Anything contained in this Lease to the contrary notwithstanding, Tenant agrees that Tenant shall look solely to the estate and property of Owner in the Apartment or to any proceeds obtained by Owner as a result of a sale by Owner of the Apartment, for the collection of any judgment (or other judicial process) requiring the payment of money by Ow ner in the event of any default or breach by Owner with respect to any of the terms and provisions of this Lease to be observed and/or performed by Owner, subject, however, to the prior rights of any lessor under a superior lease or holder of a superior mortgage. No other assets of Owner or any partner, officer, director or principal of Owner, shall be subject to levy, execution or other judicial process for the satisfaction of Tenant's claim hereunder.

**49. OWNER'S APPROVAL**     If Tenant shall request Owner's approval or consent and Owner shall fail or refuse to give such approval or consent, Tenant shall not be entitled to any damages for any withholding or delay of such approval or consent by Owner, it being intended that Tenant's sole remedy shall be an action for injunction without bond or specific performance (the rights to money damages or other remedies being hereby specifically waived). Furthermore, such remedy shall be available only in those cases where Owner shall have expressly agreed in writing not to unreasonably withhold its consent or approval (as applicable), or where as a matter of law, Owner may not unreasonably withhold its consent or approval. In such event, provided Tenant is successful therein, Owner shall be responsible to pay Tenant's actual costs and expenses incurred therein, including reasonable attorneys' fees.

**50. BANKRUPTCY; INSOLVENCY**     If (i) Tenant files a voluntary petition in bankruptcy or insolvency or are the subject of an involuntary bankruptcy proceeding, (ii) Tenant assigns property for the benefit of creditors, or (iii) a non-bankruptcy trustee or receiver of Tenant's or Tenant's property is appointed, Owner may give Tenant thirty (30) days' notice of cancellation of



*Initials:*  

15

the Term of this Lease. If any of the above is not fully dismissed within the thirty (30) day period, the Term shall end as of the date stated in the notice. Tenant must continue to pay Rent and Additional Rent and any damages, losses and expenses due Owner without offset.

**51. CONTROLLING LAW**    Tenant acknowledges that by negotiating and entering into this Lease, Tenant has transacted business within the State of New York. Any action, proceeding or claim arising out of this Lease or breach thereof, shall be litigated within the State of New York and the parties consent to the personal jurisdiction of the courts (including the New York City Housing Court) within the State of Ne w York and consent that any process may be served either personally, by facsimile or by certified or registered mail, return receipt requested, to Tenant at Tenant's address as set forth in this Lease, or in any manner provided by New York Law.

Tenant shall not be entitled, directly or indirectly, to diplomatic or sovereign immunity and shall be subject to, and Tenant shall agree to consent to, the service of process in, and the jurisdiction of, the courts of, New York State.

**52. OWNER'S CONTROL**    The Lease shall not end or be modified nor will Tenant's obligations be ended or modified if for any cause not fully within Owner's reasonable control, Owner is delayed or unable to (a) fulfill any of Owner's promises or agreements, or (b) supply any required service or (c) make any required repairs to the Apartment.

**53. COUNTERPARTS**    This Lease may be executed in any number of identical counterparts and by scanned or facsimile signature, and each counterpart hereof shall be deemed to be an original instrument, but all counterparts hereof taken together shall constitute but a single instrument.

**54. BINDING EFFECT**    It is expressly understood and agreed that this Lease shall not constitute an offer or create any rights in Tenant's favor, and shall in no way obligate or be binding upon Owner, and this Lease shall have no force or effect until this Lease is duly executed by Tenant and Owner and a fully executed copy of this Lease is delivered to both Tenant and Owner.

**55. SMOKING**    THERE IS NO SMOKING PERMITTED INSIDE THE APARTMENT (OR ON THE BALCONY OR TERRACE, IF ANY) UNDER ANY CIRCUMSTANCES. IF TENANT DISREGARDS THIS AGREEMENT, TENANT WILL FORFEIT ONE-THIRD (1/3) OF THE SECURITY DEPOSIT TO THE OWNER, TO COMPENSATE OWNER FOR ANY AND ALL COSTS RELATING THERETO AS LIQUIDATED DAMAGES (AND NOT AS A PENALTY). TENANT ACKNOWLEDGES AND AGREES THAT THE FOREGOING IS A MATERIAL INDUCEMENT FOR OWNER TO ENTER INTO THIS LEASE, AND BUT FOR SAID COVENANT, OWNER WOULD NOT HAVE EXECUTED THIS LEASE AGREEMENT.

TENANT AND OWNER SHALL SIGN AND COMPLETE THE BUILDING'S SMOKING POLICY ANNEXED AS RIDER ATTACHED TO THIS LEASE.

**56. GARBAGE, REFUSE AND RECYLCLING**    Tenant shall comply with the rules and regulations of the Building in all respects, including, but not limited to, those regarding garbage and recycling laws. Tenant shall not place any large articles outside of the Apartment except in compliance with the rules and regulations of the Building in all respects. Tenant agrees to promptly pay Owner for any violations fo r violation of Tenant's obligations pursuant to this Article 56.

**57. TOILETS/PLUMBING FIXTURES**    The toilets and plumbing fixtures shall only be used for the purposes for which they were designed or built for. No feminine hygiene or similar products such as paper towels may be discarded in the toilets or plumbing fixtures.

**58. EMERGENCIES**    Tenant will provide Owner with list of persons to contact in the event of an emergency. Emergencies include, but are not limited to: health and safety of Tenant or guests, water damage or fire, or unauthorized persons attempting entry into the Apartment without Owner's knowledge.

**59. BICYCLES [DELETE IF INAPPLICABLE]**    All bicycles are expressly forbidden in the Apartment.

**60. ~~ALARM SYSTEM [DELETE IF INAPPLICABLE]~~**    ~~Tenant hereby acknowledges and agrees that the Apartment comes equipped with an alarm system (the "Alarm System") which must be turned on each and every time that Tenant leaves the Apartment unoccupied for an extended period of time. Owner shall deliver codes to Tenant to the Alarm System prior to Lease commencement. Tenant acknowledges that Tenant shall not change the Alarm System codes under any circumstances without the prior written consent of Owner. Tenant acknowledges and agrees that the fore going is a material inducement for Owner to enter into this Lease, and but for said covenant, Owner would not have executed this Lease. Notwithstanding the presence of the Alarm System in the Apartment, Tenant hereby acknowledges and agrees that Owner will not be responsible for any loss or lost or stolen personal property, equipment, money or any article taken from the Apartment regardless of how or when such loss occurs.~~

**61. THIRD PARTY BENEFICIARY**    This Lease is an agreement solely for the benefit of Owner and Tenant (and their permitted successors and/or assigns). No person, party or entity other than Owner and Tenant shall have any rights hereunder or be entitled to rely upon the terms, covenants and provisions contained herein. The provisions of this Article 61 shall survive the termination hereof.



Initials:  

**62. MOVING IN, VACATING APARTMENT AND TERMINATION**

**A.** Should Owner become concerned with the inadequate care and/or supervision of Tenant's moving company's crew, Tenant shall instruct moving personnel to comply with Owner's reasonable request for added protection throughout the Apartment. All moving personnel must be fully insured and reasonable proof of such insurance must be supplied to Owner before moving will be permitted on or in the Apartment.

**B.** In the course of Tenant's moving in, out or having items delivered to the Apartment, should there be any damage to the halls, doors or any other part of the Apartment or the Building, Tenant shall be responsible to pay for the repair of such damage.

**C.** Upon the expiration of this Lease, Tenant shall return the Apartment in broom clean condition. Additional cleaning charges incurred by Owner due to Tenant's breach of this Article 62 shall be borne by Tenant and shall be deemed Additional Rent.

**63. OWNER UNABLE TO PERFORM**    Notwithstanding anything to the contrary contained in this Lease, any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain services, labor, or materials or reasonable substitutes therefore, governmental actions, civil commotion, fire or other casualty, and other causes beyond the reasonable control of the party obligated to perform, except with respect to the obligations imposed with regard to the payment of Rent and Additional Rent to be paid by Tenant pursuant to this Lease (any of the foregoing "Force Majeure") shall excuse the performance of such party for a period equal to any such prevention, delay or stoppage.

**64. ILLEGALITY.**    If a term in this Lease is illegal, invalid or unenforceable, the rest of this Lease remains in full force.

<p align="center"><strong>SIGNATURES CONTINUED ON NEXT PAGE</strong></p>



Initials: 

TO CONFIRM OUR AGREEMENTS, OWNER AND TENANT RESPECTIVELY SIGN THIS LEASE AS OF THE DAY AND YEAR FIRST WRITTEN ON PAGE 1.

**BY: E 135 AND 3RD AVE OWNER LLC**

5/23/2024
11:34 AM EDT

_(Landlord/Agent)_                                    _Date_

**Signed by Tyla Mazyck**
Thu May 2 2024 03:36:25 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

Tyla Mazyck _(Tenant)_                                    _Date_

**Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:14:58 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

Yerilee Atkinson Velez _(Tenant)_                                    _Date_



_Initials:_ _____ T.M. EFCDFF47 _____ Y.A. 0F469534

ADDITIONAL CLAUSES WHICH ARE attached to and forming a part of Lease dated **May 2, 2024** between **2455 THIRD AVENUE - MARKET** and **Tyla Mazyck and Yerilee Atkinson Velez** as Tenant(s), for Apartment **19G** in the premises located at **2455-2457 Third Avenue, Bronx, NY  10451**.

In the event of any inconsistency between the provisions of this Rider and the provisions of The Standard Form of Apartment Lease, The Real Estate Board of New York, Inc. form, hereinafter referred to as the printed form, to which this Rider is annexed, the provisions of this Rider shall govern and be binding. The provisions of this Rider shall be construed to be in addition to and not in limitation of the rights of the Owner and the obligations of the Tenant

34. **Sublet Surcharge**     It is agreed that if the Landlord consents to a sublet request by a Tenant in accordance with Real Property Law Section 226-b that the Landlord will be entitled to collect the applicable sublet surcharge under The Rent Stabilization Code. Section 2525.6 provides that upon the consent of the Owner to a sublet or an assignment of this Lease, the legal regulated rent payable to the Owner effective upon the date of subletting or assignment may be increased by the vacancy allowance or any special sublet guideline as promulgated by the Rent Guidelines Board, if any, provided that in the case of an assignment the legal regulated rent may also be increased by the increase provided in Section 2522.8 (Rent adjustments upon vacancy in succession) prior to the application of any such vacancy allowance or special guideline increase as promulgated by the rent Guidelines Board for subletting or assignment. Such increase in the case of an assignment shall remain part of the legal regulated rent for any subsequent renewal Lease provided, however, in the case of a subletting, upon termination of the sublease, the legal regulated rent shall revert to the legal regulated rent without the sublet allowance.

35. **Major Capitol Improvement**     The rent provided for in this vacancy or renewal Lease may be increased during its term pursuant to an order of the New York State Division of Housing and Community Renewal (N.Y.S.D.H.C.R.). If the Rent Guidelines Board should change the currently adopted increase levels, the Landlord and Tenant further agree that the Tenant will be responsible for paying any retroactive rent increase incurred during the Tenant's Lease term pursuant to an Order of the N.Y.S.D.H.C.R., even if the Tenant vacates the premises.

36. **Delay in Giving Possession**     This paragraph replaces paragraph 6 of this Lease. A situation could arise which might prevent Owner from letting Tenant move into the Apartment on the beginning date set in this Lease. If this happens from reasons beyond Owner's reasonable control, Owner will not be responsible for Tenant's damages or expenses and this Lease will remain in effect. Tenant understands that this Building is being newly constructed and that there may be a delay in the completion of construction, the issuance of a temporary or permanent certificate of occupancy, or in scheduling access to the service elevator required before Tenant may obtain possession of the Apartment. Tenant agrees that these are examples of delays beyond Owner's reasonable control. However, in case of a delay, this Lease will start on the date when Owner is able to allow Tenant to move in. Tenant will not have to pay rent until the move-in date which Owner will give Tenant by written notice at least fourteen days in advance, or the date Tenant moves in, whichever is earlier. If Owner is not able to allow Tenant to move in until a day in a later calendar month, the ending date in Article 2 will be changed to the last day of the calendar month after Tenant is able to take possession plus the whole number of years of the original term without regard to any days which are only part of the initial month, except that if Tenant is not able to move in until a day in a later calendar month than the first day of that month, then the term will end on the day before plus the whole number of years of the original term without regard to any days which are only part of the initial month (For example, (a) if the beginning date in paragraph 2 is August 1, 2013 and the ending date is July 31, 2014 and the Owner is not able to allow Tenant to take possession until August 28, 2013 the ending date would remain unchanged at July 31, 2014; (b) if the beginning date in paragraph 2 is August 1, 2013 and the ending date in paragraph 2 is July 31, 2014, and the Owner is not able to allow Tenant to take possession until September 3, 2013, the ending date would be September 30, 2014; (c) if the beginning date in paragraph 2 is August 1, 2013, and the ending date in paragraph 2 is July 31, 2014, and the Owner is not able to allow Tenant to take possession until October 1, 2013, the ending date would be September 30, 2014). If Owner does not give Tenant written notice of the move-in date that is within **30** days of the beginning date of the term of the Lease as stated in Article 2, Tenant may tell Owner in writing that Owner has 15 additional days to let Tenant move in, or else the Lease will end. If Owner does not allow Tenant to move in within those additional 15 days, then the Lease is ended. Any money paid by Tenant on account of this Lease will then be refunded promptly by Owner.

37. **Change in Rent Stabilization Law**     To the extent that any change in the Rent Stabilization Law (or any



Initials:  

other applicable law) or the Rent Stabilization Code reduces any obligation of or increases any benefit for the Owner, such change shall be deemed applicable to this Lease on the effective date of such change.

**38. Rent Stabilization Lease Rider**    Tenant acknowledges receipt of the Rent Stabilization Lease Rider - a copy of which is attached hereto.

**39. Carpeting Clause**    It is agreed that the Tenant will cover at least 80% of the wood floor area of the apartment with rugs or carpeting. The Tenant is also required to install at least 1/4 inch thick padding underneath such carpeting or rugs.

**40. Unpaid Return Checks**    If an unpaid check is returned to the Owner, the Tenant will be charged **$20.00** or such greater amount charged to Owner by its bank for the purpose of defraying the expenses incurred in handling the returned check.

**41. Remedies of Owner**    The Tenant agrees that any violation of the provisions of this Lease shall be deemed a material violation of a substantial obligation of this Lease and shall entitle the Owner to terminate this Lease.

**42. Construction of Neighboring Buildings and Lot Line Windows**    In the event any windows, light, or view in the apartment shall become obstructed, in whole or in part, as a result of the erection of a building or structure or otherwise, such occurrences shall not be deemed a breach of this Lease or any of Owner's obligations hereunder and this Lease shall remain in full force and effect without any right by Tenant to make a claim for damages, nuisance, abatement of rent or otherwise. If Tenant's apartment contains one or more "lot line" window(s), Tenant is advised that a building or structure may be erected on adjacent property which may completely block the said lot line window(s).

**43. No Oral Agreements**    It is agreed that this instrument cannot be changed orally and is subject to the review and approval of the Owner. The applicant hereby waives any claims against the Owner in the event this Lease is rejected for any reason. The Owner will in no event be bound, nor will possession be given unless and until this Lease is executed by the Owner and delivered to the Tenant. No representations other than those contained within this lease agreement have been made by Owner. All understandings and agreements heretofore made between the parties hereto are merged in this contract, which alone, fully and completely expresses the agreement between Owner and Tenant.

**44. Personal Property**    Tenant acknowledges that the Owner is not obligated to replace or maintain any personal property left in the apartment by a previous Tenant.

**45. Waterbeds**    Tenant agrees not to keep furniture which contains water or other liquid, including but not limited to "water beds" in the apartment.

**46. Patios, Terraces, and Balconies**    Tenant shall keep its terrace or balcony, if any, and the drains located therein, free from all rubbish, dirt, debris or wind blown materials, and Tenant shall be responsible for any water damage caused to Tenant's apartment or any other apartment or to the Building, resulting from clogged drains or from any other use of such patio, terrace, or balcony. The Tenant may not install a fence or any addition to the terrace or balcony. No plantings or other objects shall be placed on any terrace or balcony without the written permission of the Owner. Tenant shall remove all furniture and personal belongings during October through April of each year.

**47. Employees Misconduct**    In the event any employee of the Owner renders assistance in parking or delivery of an automobile or in the handling or delivery of any furniture, household goods, or other articles at the request of the Tenant or any lawful occupant, or at the request of any employee or guest of the Tenant, then said Owner's employee shall be deemed an agent of the person making such request and the Owner is expressly relieved from any and all loss or liability in connection therewith.

**48. Pet Rider**    It is agreed between the parties that the Tenant will not harbor a dog or any other animal in the apartment, for any reason whatsoever, without the written permission of the Owner. The harboring of a dog or any other animal constitutes a material violation of a substantial obligation of this Lease, and of the Tenant's tenancy. Tenant understands, acknowledges, and agrees that the harboring of a dog or any other animal without the Owner's permission constitutes a default of the Tenant's Lease, and that the Owner may commence summary proceedings to evict the Tenant from the apartment. Owner's permission to other Tenants in the Building to harbor dogs or any other animals does not constitute a waiver of this provision.

If permission is given by the Owner to harbor a particular dog, this will not be construed as permission to

  

harbor an additional dog or a different dog. This clause shall be applicable whether or not the permission is explicitly given or by reason of the New York City Pet Law.

49. **Garbage Recycling**      The Tenant agrees at his sole cost and expense, to comply with all present and future laws, orders and regulations, commissions and boards regarding the collection, sorting, separation, and recycling of waste products, in accordance with the rules and regulations adopted by the Owner for the sorting and separation of such designated recyclable materials. Owner reserves the right, where permitted by law, to refuse to collect or accept from Tenant any waste products, garbage, refuse, or trash, which is not separated and sorted as required by law. Tenant shall pay all cost expenses, fines, penalties, or damages which may be imposed on Owner or Tenant by reason of Tenant's failure to comply with the provisions of this Article. Tenant's failure to comply with this Article shall constitute a violation of a substantial obligation of the tenancy, local statute and all of Owner's Rules listed in this Lease. Tenant shall be liable to the Owner for any costs, expenses, or disbursements, including attorney's fees, incurred by Owner in the commencement and/or prosecution of any action or proceedings by Owner against Tenant, predicated upon Tenant's breach of this Article.

50. **Insurance        It is recommended that during the term of this Lease Agreement, the Tenant shall maintain "Renters" insurance with minimum coverage of $500,000 per occurrence for bodily or personal injury and minimum contents limit of $150,000 per occurrence for property damage.**

   **Tenant shall pay for damages suffered by and reasonable expenses of Owner relating to any claim arising from any act or neglect committed by Tenant.**

51. **Clothes Washers and Clothes Dryers**      Notwithstanding anything to the contrary contained herein, Tenant shall not install any clothes washing machine or clothes dryer machine in the apartment. The only clothes washing machine and dryers allowed in the apartment are those installed by the Owner.

52. **Owner's Rules Listed in this Lease**      Owner reserves the right to rescind or amend any of the Owner's rules listed in this lease, and to institute such other rules from time to time as may be deemed necessary for the safety, care, or cleanliness of the Apartment Building and for securing the comfort and convenience of all Tenants. The Owner shall not be liable to Tenant for the violation of any of the Owner's rules or the breach of any of the items in any Lease by any other Tenant or occupant of the Building.

53. **Abandoned Property**      Whatever remains in the Apartment after Tenant vacates is considered abandoned by Tenant and at the election of the Owner, shall either be left in the Apartment or removed. Tenant shall be responsible for Owner's expenses and/or damages resulting from removal of abandoned property or restoration of the Apartment necessary to correct any damage caused by removal of Tenant's installation.

54. **Notation on Checks**      Writing, notations, statement or otherwise, written on the front or back of any check, money order, or other form of payment given to the Owner will not be considered part of this Lease and will not binding on the Owner. The Owner's acceptance, endorsement, deposit, or negotiation of the check, money order, or other form of payment will not be considered an acceptance of the conditions on the check and the Owner may accept the check as if the writing, statement, or notification did not exist. The Owner's acceptance of a check, money order, or other form of payment from a person or entity not on this Lease will not be considered acceptance of that party either as an occupant or a party to this Lease.

55. **Failure to Pay Full Rent**      The receipt by the Owner of any amount which is less than that amount of rent or additional rent owed by Tenant shall not be deemed a waiver of the right to collect the balance in a summary proceeding for nonpayment of rent. Any payment of rent or additional rent which is less than the full amount owed, shall be deemed to be on account of and shall be applied to the earliest rent due.

56. **Third Party Payment**      Tenant acknowledges that the Owner may not fully scrutinize and examine each check to see that the check submitted is the check of the Tenant. Accordingly, in the event a third party check is given for rental due and is accepted by the Owner, such acceptance shall not constitute a waiver of Owner's rights nor confer any rights upon the third party nor entitle the third party to make a claim as a Tenant or right to occupy the premises, or creates a Owner-Tenant relationship between the third party and Owner.

57. **Noise**

   a.  No Tenant shall make or permit any disturbing noises in the Building by him/herself, his/her family, friends, guests, employees, or servants, nor do or permit anything by such persons that will interfere with the rights,


Initials:  

comforts, or convenience of other Tenants.

**b.** No Tenant shall make or permit any disturbing noises or activity or permit anything to be done in Tenant's Apartment that will interfere with the rights, comforts or conveniences of other Tenants at any time. No Tenant shall play or suffer to be played any musical instruments, or operate or permit to be operated a stereo, radio, television or CD player, loud speakers or similar devices in Tenant's Apartment between the hours of 10:00 p.m. and the following 8:00 a.m. if the same shall disturb or annoy any other occupant of the Building. No construction, repair work or other installation by Tenant that involves noise or vibration shall be conducted in any Apartment except on weekdays, excluding legal holidays, and only between the hours of 9:00 a.m. and 5:00 p.m.

**58. Moving**    Tenant can use the service elevator only to move furniture and possessions on designated days and hours that have been scheduled in advance and with prior approval from the Owner. Owner shall not be liable for any costs, expenses, or damages incurred by Tenant in moving because of delays caused by the unavailability of the elevator.

**59. Invalidity of Any Provision**    If any term, covenant, condition, or provision of this Lease or Rider shall be invalid or unenforceable to any extent, the remaining terms, covenants, conditions, and provisions of this Lease or Rider other than those as to which any term, covenant, condition, or provision is held invalid or unenforceable, shall not be affected thereby and each remaining term, covenant, condition, and provision of this Lease and Rider shall be valid and shall be enforceable to the fullest extent permitted by law.

**60. Fitness Center Facility, Courtyard, and Common Roof Deck**    To the extent such facilities are provided by owner during the term of this Lease, Tenant shall join such Fitness Center and related facilities at an additional fee. Initially such facilities shall consist of exercise room, Courtyard and Common roof deck. Tenant agrees to sign any requisite liability waivers and membership application, which may be required for use of the Fitness Center and related facilities. Tenant shall be required to comply with all Rules established from time to time in connection with the Fitness Center and related facilities. If Tenant defaults in connection with any obligation of Tenant with respect to the Fitness Center and related facilities, then Tenant shall be prohibited from using the Fitness Center and related facilities. In addition, if Tenant defaults in connection with any obligation of Tenant with respect to the Fitness Center and related facilities, said default shall be deemed to be a default under this Lease and said default shall give Owner the right to terminate this Lease and to exercise any and all remedies available to Owner under this Lease, at law, or in equity, in connection with any default under this Lease. Owner makes no representation as to what facilities are available and reserves the right to change the facilities at a future time and eliminate the facility completely. Notwithstanding anything to the contrary contained in this Lease, Tenant shall not have any right to use the fitness center and/or related facilities following the termination of this Lease and/or Tenant vacating the leased apartment.

**61. Storage**    To the extent such facilities are provided by Owner, during the term of this Lease, Tenant may be provided with space for storage and shall be permitted to utilize such storage facilities during the term of this Lease. Owner makes no representation that storage space will be available, and if available that it will be available to all Tenants. If such storage space is available, Tenant's use will be pursuant to a separate License Agreement at an additional fee and the payment thereof shall be deemed to be additional rent. The applicable part of Provision 13F in the printed form of this Lease is hereby amended to conform to this Clause. Tenant shall be responsible for providing a lock for such storage unit. Owner shall bear no liability and shall be held harmless by Tenant regarding any property placed by the Tenant in such storage unit. It is expressly understood that Tenant shall bear the full risk in voluntarily electing to place any personal property in such unit. It is agreed and understood that any personal property not removed by Tenant from or on the storage unit (including the lock) within three (3) days after Tenant has vacated the apartment, shall be deemed abandoned by Tenant, such that such personal property (and the lock) may be removed and disposed of by the Owner without liability.

Owner shall have the right to eliminate the storage space assigned to Tenant, reduce the size of the storage space, relocate the storage space and limit and/or prohibit access to the storage space in connection with repairs and/or maintenance to Tenant's storage space, any other storage space or to the adjoining area(s) of the Building. If Tenant defaults in connection with any obligation of Tenant with respect to the storage space, including, but not limited to, a default under any separate agreement signed by Tenant in connection with the storage space, then said default shall be deemed to be a default under this Lease and said default shall give Owner the right to terminate this Lease and the right to exercise any and all remedies available to Owner,


Initials:  

22

under this Lease, at law, or in equity, in connection with any default under this Lease. If Owner eliminates the storage space, then Owner shall have the right to terminate Tenant's right to use the storage space by giving written notice thereof to Tenant. If Tenant's right to use the storage space is terminated or if the amount of storage space is diminished, relocated or eliminated or if Tenant's access to the storage space is limited and/or prohibited to facilitate any repairs and/or maintenance, then Owner shall not have any liability to Tenant and Tenant shall not be entitled to any compensation or diminution of abatement of rent, and said termination, diminution, relocation, limitation, prohibition or elimination shall not be deemed to constitute a constructive, actual, or partial eviction. Notwithstanding anything to the contrary contained in this Lease, Tenant shall not have any right to use any storage space following the termination of this Lease and/or Tenant vacating the leased apartment.

62. **Bicycle Storage Facility**     To the extent such facilities are provided by Owner, during the term of this Lease, Tenant may be provided with space for bicycle storage and shall be permitted to utilize such bicycle storage facility during the term of this Lease. Owner makes no representation that such bicycle storage facility will be available, and if available that it will be available to all Tenants. If such bicycle storage facility is available, Tenant's use will be pursuant to a separate License Agreement at an additional fee and the payment thereof shall be deemed to be additional rent. The applicable part of Provision 13F in the printed form of this Lease is hereby amended to conform to this Clause. Owner shall bear no liability and shall be held harmless by Tenant regarding any property placed by the Tenant in such bicycle storage facility. It is expressly understood that Tenant shall bear the full risk in voluntarily electing to place any personal property in such facility. It is agreed and understood that any personal property not removed by Tenant from or on the bicycle storage facility within three (3) days after Tenant has vacated the apartment, shall be deemed abandoned by Tenant, such that such personal property may be removed and disposed of by the Owner without liability.

Owner shall have the right to eliminate the bicycle storage space assigned to Tenant, reduce the size of the bicycle storage facility, relocate the bicycle storage facility and limit and/or prohibit access to the bicycle storage facility in connection with repairs and/or maintenance to bicycle storage facility, any other bicycle storage space or to the adjoining area(s) of the Building. If Tenant defaults in connection with any obligation of Tenant with respect to the bicycle storage facility, including, but not limited to, a default under any separate agreement signed by Tenant in connection with the bicycle storage facility, then said default shall be deemed to be a default under this Lease and said default shall give Owner the right to terminate this Lease and the right to exercise any and all remedies available to Owner, under this Lease, at law, or in equity, in connection with any default under this Lease. If Owner eliminates the bicycle storage facility, then Owner shall have the right to terminate Tenant's right to use the bicycle storage facility by giving written notice thereof to Tenant. If Tenant's right to use the bicycle storage facility is terminated or if the bicycle storage facility space is diminished, relocated or eliminated or if Tenant's access to the bicycle storage facility is limited and/or prohibited to facilitate any repairs and/or maintenance, then Owner shall not have any liability to Tenant and Tenant shall not be entitled to any compensation or diminution of abatement of rent, and said termination, diminution, relocation, limitation, prohibition or elimination shall not be deemed to constitute a constructive, actual, or partial eviction. Notwithstanding anything to the contrary contained in this Lease, Tenant shall not have any right to use any storage space following the termination of this Lease and/or Tenant vacating the leased apartment.

63. **Vacate Notice**     Tenant agrees to supply Owner with sixty (60) days written notice or as provided by law prior to the expiration of this Lease in the event Tenant does not desire to renew the term hereof.

64. **Keys and Locks**     Owner may retain a pass key to the Apartment. Tenant may not replace the cylinder to the door lock provided by the Owner with a cylinder of the Tenant's choosing. Tenant may, at Tenant's sole cost, add an additional lock. Tenant must provide Owner with a duplicate key for entrance to the Apartment in the event that emergency conditions warrant such entry.

65. **Lockout Fees**     The following fees will be charged to unlock apartment entrance doors. Owner makes no representation that staff will be available at all times to provide access:

8:00 A.M. - 4:00 P.M. (Monday through Friday): $50.00

4:00 P.M. - 8:00 A.M. (Monday through Friday): $75.00

4:00 P.M. Friday through 8:00 A.M. Monday $100.00


Initials:  

66. **Roof Deck**    Tenant agrees and understands that he/she may be permitted to use the outside roof deck on the main roof of the building. However, if such use and/or occupancy is provided it shall be a revocable license, and if such license is revoked, or if the amount of such space is diminished, Owner shall not be subject to any liability nor shall Tenant be entitled to any compensation or diminution or abatement of rent, nor such revocation or diminution be deemed a constructive or actual eviction. Tenant agrees and understands such use of the roof deck shall not be considered a required service under the Rent Stabilization Law.

Tenant agrees and understands that such use and/or occupancy of the roof deck may be limited to Tenant only. No guests, friends, invitees, and/or relatives of Tenant are permitted to use the roof deck unless the Owner gives consent. Use of the roof deck shall be limited from 10:00 A.M. to 10:00 P.M., subject to change at any time.

Tenant agrees and understands to be bound by any future rule changes, additions, or deletions with respect to the roof deck. Tenant agrees to sign any requisite liability waivers, which may be required for use of the roof deck. It is specifically agreed and understood that a breach of any of the rules contained herein with respect to the roof deck shall be deemed a breach of a substantial obligation of the tenancy and if Tenant fails to adhere to Owner's termination or revocation of the license to use or occupy the roof deck, then Owner shall have the right to terminate this Lease.

67. **Tenant Misrepresentation**    Owner has reasonably relied upon all representations made by Tenant in applying to lease an apartment, absent which reliance Owner would neither have offered nor executed this lease. It is agreed that in the event the Tenant shall in its application for an apartment which applications is incorporated by referenced herein, and made a part hereof, make any misrepresentation or untruthful statement, Owner may treat same as a violation of the covenant of this Lease, and the remedies provided under the terms of this Lease in the event of violation of the terms hereof shall become applicable thereto in addition to which Owner may seek rescission of this Lease by reason of such misrepresentation. In the event the Owner shall discover or ascertain such misrepresentation or untruthful statement before the commencement of the term hereunder, the Owner shall have the right to terminate this Lease and refuse occupancy to the Tenant.

68. **Deliveries**    Notwithstanding anything contained in any other Article of this lease. The Tenant agrees not to deliver or cause to be delivered to Owner or Owner's authorized agent for delivery to the Tenant or to any other person any item of property (packaged or otherwise) which shall have a value in excess of $250.00. The Tenant further agrees that in no event shall Owner be liable for loss or damage to any property (package or otherwise) which shall be delivered to Owner's authorized agent for delivery to the Tenant or to any other person and the Tenant hereby indemnify and agree to hold Owner harmless from any liability or claim for loss or damage to any such property which may be asserted by the Tenant or any consignor, deliverer, shipper, owner of such property or other person.

69. **Laundry Equipment**    The laundry equipment is being operated and maintained by a separate vendor as an accommodation to tenants of the Building. The Owner is not responsible for the maintenance of the laundry equipment, any damage to Tenant's personal property caused by such equipment, or the operations of the laundry service itself. The Tenant will operate at its own expense any laundry equipment.

70. **Security Deposit**    It is expressly understood that Tenant may not use the security Deposit as rent payment for any months in which rent payment is due. If due, pursuant to the terms of this Lease, refunds of security deposits will be made only after all Tenants and occupants have vacated the premises, returned all keys to the leasing office, and have fully complied with all of the terms conditions, and obligations of tenant contained in this lease agreement with respect to the application of the security deposit.

71. **Illegal Activity/Eviction**    It is expressly agreed and understood that any Tenant, any member of Tenant's family, Tenant's employees, guests, or invitees who conduct any illegal trade, or manufacture, or other illegal business, or activity in the Building, the Apartment, common area or grounds surrounding the Building shall be subject to immediate eviction from the premises.

72. **Objectionable Conduct**    Notwithstanding anything contained herein above to the contrary, and in particular, Article 17(1)(b), Owner is not required to serve a notice of default in the event of objectionable conduct on the part of the Tenant as described in the Article above. In the event the objectionable conduct is deemed by Owner to be of a continuing nature, then Owner need only serve a six (6) day termination notice based upon the allegations of objectionable conduct.


Initials:  

**73.** **Vehicles**      No vehicle belonging to the Tenant or to a member of the Tenant's family, guest, employee of the Tenant shall be parked in such manner to prevent ready access to any entrance or driveway of the Building.

**74.** **Cooking Gas**      Owner will provide gas, for cooking purposes only, at no additional cost to Tenant. All other services such as telephone, electric, cable and internet service are not included in the rent and Tenant must pay for the service.

**75.** **Smoke Detector**      The Apartment shall be equipped with a smoke detector(s) and carbon monoxide detector(s) as required by applicable law. Tenant shall not disable, cover, remove, repair or otherwise tamper with any smoke detector(s) and carbon monoxide detector(s). Tenant shall give prompt written notice to Owner of any damage to the smoke detector(s) and carbon monoxide detector(s), and as to any defect or malfunction in the operation thereof.

**76.** **Sprinkler Heads**      Tenant shall not paint over or in any way tamper with or cover any sprinkler heads in the Apartment because such activity may render the sprinkler inoperable. In the event that Tenant paints over or in any way damages a sprinkler head, Tenant shall be responsible for the full cost of replacement of the sprinkler head, which sum shall be collectible as additional rent. Tenant is advised that hot objects, if brought too close to a sprinkler head, may cause the sprinkler system to activate. In the event flooding should occur as the result of activation of any sprinkler head because of tampering, misuse, of the Apartment or negligent conduct therein, Owner will repair any damage to the Building and/or the Apartment at Tenant's sole cost and expense, which cost and expense shall be paid by Tenant as additional rent under this Lease.

**77.** **Noxious Odors and Hazardous or Toxic Materials**      Tenant shall not permit any noxious odors or objectionable odors to emanate from Tenants Apartment or any area of the Building. Further Tenant shall not use, generate, store or dispose of any type of hazardous or toxic materials or substances at, from or in the Apartment or any area of the Building.

**Second hand Smoke**

a) Tenant acknowledges that scientific studies have shown that second hand smoke, smoke created by the burning of tobacco or other substance by one individual which is present in the environment and which may be inhaled by other individuals, poses a significant health risk.

b) Upon notice from the landlord that it has received a complaint concerning the emanation of secondhand smoke of whatever nature from tenant's apartment, tenant shall, a tenant's sole cost and expense, take all steps necessary to abate the emanation of smoke from tenant's apartment. Nothing in this provision authorizes the tenant to perform any alteration addition or change to any fixture, appliance, window, vent, or other part of the apartment or building infrastructure without the express written consent of the landlord.

c) The failure to abate any condition described in this paragraph shall constitute a violation of a substantial obligation of tenancy. In addition to any remedies landlord may prohibit Tenant, occupants and any guests in the apartment, available to landlord under this lease and applicable law, in the event landlord receives repeated complaints concerning the emanation of smoke; landlord may prohibit smoking by the tenant, occupants and any guests in the apartment.

d) Nothing in this provision shaft make the landlord or its agents and employees the guarantor f tenant's health or of the smoke free condition of any apartment or common area of the building. Landlord is not required to take any steps in response to smoking unless landlord has been given written notice of said smoking.

**78.** **Noises, Odors, or Scents**      Tenant acknowledges that the Owner has not made any representations or promises with respect to noises or odors however arising and whether occurring inside or outside the Building, and Tenant waives and releases any claim, cause of action or set off by reason of or arising out of any noise, inconvenience, aromas, scents, or odors, however arising, and whether occurring inside or outside the Building. Tenant shall not rescind this Lease or be entitled to any compensation or diminution or abatement of rent, nor shall it fail to honor any other obligations under this Lease by virtue of any of the above mentioned items.

**79.** **Electrical Appliances**      Tenant shall not install, maintain or use any additional electrical appliances in the Apartment without first obtaining prior written consent of the Owner. Such electrical appliances include, but are not limited to, laundry machines, dishwashers, satellite dishes, air conditioners, ventilating equipment, garbage disposals, trash compactors, radio transmitters, and electric heating units.

Initials:    

80. **Broker**      Tenant represents that no broker brought about this Lease or if a broker did, in fact bring about this Lease, Tenant has agreed with the broker to pay the broker's fee and Tenant agrees to hold Owner's harmless from any claim for commission made by any broker in connection with this Lease including without limitation the costs of defense plus reasonable attorney's fees by an attorney selected by Owner to defend it. Owner shall not be subject to any liability nor shall Tenant be entitled to any compensation or diminution or abatement of rent, nor such revocation or diminution be deemed a constructive or actual eviction.

81. **Public Areas**      Tenant acknowledges and agrees that (i) the public halls or stairways of the Building shall not be obstructed or used for any purpose other than ingress to or egress from the apartments in the Building, (ii) no fire tower in the Building shall be obstructed in any way, (iii) no public hall shall be decorated or furnished by any person in any manner, (iv) children shall not play in the public halls, courts, plaza, public terraces, lobby, elevators, or fire towers, (v) children shall not be fed or diapered in the lobby or in any other public areas of the Building, (vi) housekeepers and caregivers shall not congregate in the lobby or in other public areas of the Building; (vii) children shall at all times be supervised by an adult while in the public areas of the Building, and (viii) no strollers or carriages are to be stored in any common areas of the Building.

82. **Advertisement**      Tenant acknowledges and agrees that (i) no sign, notice, advertisement or illumination shall be inscribed, placed or displayed on or at any window or door of the Apartment, (ii) no sign, notice, or advertisement may be placed in any public area of the Building, and (iii) Tenant shall not peddle, distribute or solicit any merchandise, book, periodical, circular, handbills, pamphlets, advertising material or otherwise, or solicit donations or contributions for or membership in any public or private organization in any public area of the Building.

83. **Barbecuing Prohibited**      Tenant agrees that he/she shall not cook or barbecue on any balconies or terraces located in the building, regardless of whether such balcony or terrace is a part of the leased premises.



Initials:

**84. Preventing Moisture and Mildew**

**a.** Tenant acknowledges that it is necessary for Tenant to provide appropriate climate control in the Apartment and take other measures to retard and prevent mold and mildew from accumulating in the Apartment. Tenant shall: (i) maintain the Apartment in clean condition, dust the Apartment on a regular basis and remove any visible moisture accumulation in or on the leased premises, including on windows, walls, floors, ceilings, bathroom fixtures, and other surfaces; mop up spills and thoroughly dry affected area as soon as possible after occurrence; and (ii) not block or cover any of the heating, ventilation or air-conditioning ducts in the Apartment and keep climate and moisture in the Apartment at reasonable levels.

**b.** Tenant shall promptly notify management in writing of the presence of the following conditions: (i) any evidence of a water leak or excessive moisture or standing water inside the Apartment or in any Common Area or the garage at the Building; (ii) any evidence of mold or mildew-like growth in the Apartment that persists after tenant has tried several times to remove it with a common household cleaner containing disinfectants and/or bleach, (iii) any failure or malfunction in the heating, ventilation and air conditioning systems or the laundry equipment, if any, in the Apartment; and, (iv) any inoperable doors or windows.

**c.** If Tenant fails to comply with the provisions of this Article, then, in addition to Tenant's obligation to indemnify Owner in accordance with the terms of this Lease for all damage, loss, cost and expense, including attorneys fees and disbursements, suffered or incurred by Owner in connection with said failure to comply, Tenant shall also be responsible for all damage or loss to and all costs and/or expenses suffered or incurred by Tenant, Tenant's personal property and other occupants of the Building and their respective personal property.

**E 135 and 3rd Ave Owner LLC**

Signed by Tyla Mazyck
Thu May 2 2024 03:57:10 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

5/23/2024
11:34 AM EDT

---
Tyla Mazyck *(Tenant)*     *Date*     *(Landlord/Agent)*     *Date*

Signed by Yerilee Atkinson Velez
Thu May 2 2024 09:22:36 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

---
Yerilee Atkinson Velez *(Tenant)*     *Date*



Initials:

27



State of New York
**Division of Housing and Community Renewal**
Office of Rent Administration
Web Site: www.nysdhcr.gov

| |
|---|
| **NOTICE TO TENANT**<br>**DISCLOSURE OF BEDBUG INFESTATION HISTORY** |

Pursuant to the NYC Housing Maintenance Code, an owner/managing agent of residential rental property shall furnish to each tenant signing a vacancy lease a notice that sets forth the property's bedbug infestation history.

Name of tenant(s): **Tyla Mazyck and Yerilee Atkinson Velez**

Subject Premises: **2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street #19G, Bronx, NY 10451**

Apt.#: **19G**

Date of vacancy lease: **July 1, 2024**

## BEDBUG INFESTATION HISTORY
(Only boxes checked apply)

- ☒ There is no history of any bedbug infestation within the past year in the building or in any apartment.
- ❑ During the past year the building had a bedbug infestation history that has been the subject of eradication measures. The location of the infestation was on the _____ floor(s).
- ❑ During the past year the building had a bedbug infestation history on the _____ floor(s) and it has not been the subject of eradication measures.
- ❑ During the past year the apartment had a bedbug infestation history and eradication measures were employed.
- ❑ During the past year the apartment had a bedbug infestation history and eradication measures were not employed.
- ❑ Other:

**E 135 and 3rd Ave Owner LLC**

Signed by Tyla Mazyck
Thu May 2 2024 03:57:21 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

_____
Tyla Mazyck *(Tenant)*                                      *Date*

5/23/2024
11:34 AM EDT

_____
*(Landlord/Agent)*                                      *Date*

Signed by Yerilee Atkinson Velez
Thu May 2 2024 09:22:52 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

_____
Yerilee Atkinson Velez *(Tenant)*                                      *Date*



Initials:

# WINDOW GUARDS REQUIRED

## LEASE NOTICE TO TENANT

APPENDIX A

**THE CITY OF NEW YORK**
DEPARTMENT OF HEALTH
AND MENTAL HYGIENE

*You are required by law* to have window guards in all windows if a child 10 years of age or younger lives in your apartment.

*Your Landlord is required by law* to install window guards in your apartment:

* If a child 10 years or younger lives in your apartment.
* OR If you ask him/her to install window guards at any time (you need not give a reason).

*It is a violation of law* to refuse, interfere with installation, or remove window guards where required.

**CHECK WHICHEVER APPLY:**

❏ CHILDREN 10 YEARS OF AGE OR YOUNGER LIVE IN MY APARTMENT

☒ NO CHILDREN 10 YEARS OF AGE OR YOUNGER LIVE IN MY APARTMENT

❏ I WANT WINDOW GUARDS EVEN THOUGH I HAVE NO CHILDREN 10 YEARS OF AGE OR YOUNGER

**Apartment Address:** 2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street #19G, Bronx, NY 10451



**Signed by Tyla Mazyck**
Thu May 2 2024 03:57:40 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

Tyla Mazyck *(Tenant)*                                           *Date*

**Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:23:06 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

Yerilee Atkinson Velez *(Tenant)*                               *Date*

RETURN THIS FORM TO:
**2455 3rd Avenue, Bronx, NY 10451 AKA 227 East 134th Street, Bronx, NY 100451**

FOR FURTHER INFORMATION CALL:
**Window Falls Prevention Program    (212) 676-2162**

 
Initials:

# ADDENDUM

**Sorting and Separation of Refuse and Trash**

**1.** Resident's duties. Residents agrees, at his/her sole cost and expense to comply with all present and future laws, orders and regulations of all state and federal, municipal, and local governments, departments, commissions, and boards regarding the collection, sorting, separation and recycling of waste products, garbage, refuse and trash. Residents shall sort and separate such items into categories as provided by law, and in accordance with the rules and regulations adopted by Owner for the sorting and separating of such designated recyclable materials.

**2.** Owner's rights if resident fails to comply. Owner reserves the right, where permitted by law, to refuse to collect or accept from Resident any waste products, garbage, refuse, or trash which is not separated and sorted as required by law, and to require Resident to arrange for such collection, at Resident's sole cost and expense, using a contractor satisfactory to Owner.

**3.** Fines and penalties; Indemnification of owner. Resident shall pay all cost, expense, fines penalties, or damages imposed on Owner or Resident by reason of Resident's failure to comply with Paragraphs a and b above, and shall indemnify, defend and hold Owner harmless from and against and actions, claims, and suits arising from such noncompliance using counsel reasonably satisfactory to Owner if Owner so elects. Resident's noncompliance with Paragraphs a, b or c shall constitute a violation of a substantial obligation of the tenancy and Owner's rules and regulations. Resident shall be liable to Owner against Resident based upon Resident's breach of Paragraph a, b or c.

## MOVE-OUT COST SCHEDULE

**Cleaning and Repair Charges**

| | | | | | |
|---|---|---|---|---|---|
| Oven | $60.00 | Toilet | $50.00 | Trash removal | $150.00 |
| Drip Pan | $10.00 | Tub/shower(s) | $50.00 | Wallpaper removal | $200.00 |
| Stove and vent hood | $20.00 | Sinks/countertops/cabinets | $40.00 | Painting | $650.00 |
| Refrigerator/freezer | $60.00 | | | Tile Floors | $200.00 |
| Cabinets/countertops | $40.00 | | | Holes in wall | $125.00 |
| | | | | Plywood floor | $225 |

If prior to moving out, you do not clean the items listed above and leave them in satisfactory working order, the following charges will be deducted from your security deposit or owed to us if your security deposit is insufficient to cover the charges. You will be charged the listed amount for each instance in which a listed item must cleaned or repaired. The prices given for the items listed above and below are average prices only. If Owner incurs a higher cost for cleaning or repairing an item, you will be responsible for paying the higher cost.

Please note that this is not an all-inclusive list: you may be charged for cleaning or repairing items that are not on the list.

**Replacement Charges**

If additional service is required or items missing or damaged to the point that they must be replaced when Resident(s) moves out, Resident will be charged for the current cost of replacement, including labor and service charges.

A representative list of replacement charges is provided below. These are guidelines for prices. If Landlord incurs a higher cost for replacing an item, the Resident(s) may be responsible for paying the higher cost. Please note that this is not an all inclusive list; the Resident(s) may be charged for the replacement of items that are not on the list.

| | | | | | |
|---|---|---|---|---|---|
| Window/glass | $150.00 | Ice trays | $10.00 | Door | $200.00 |
| Front door key | $150.00 | Crisper covers | $15.00 | Light fixtures | $75.00 |
| Window screens | $50.00 | Refrigerator shelves and racks | $50.00 | Light bulbs | $2.00 |
| Patio screens | $100.00 | Disposal | $65.00 | Countertops | $350.00 |
| Mailbox keys | $5.00 | | | Tub fixing | $250.00 |
| Apartment key | $25.00 | | | Medicine cabinet | $100.00 |
| Mirror (bath) | $60.00 | | | | |

---

<u>Late Payment Rider</u>

If any installment of rent or additional rent due hereunder is not paid on or before the **6th** day of the calendar month during which such installment is due, Tenant agrees to pay **2455 THIRD AVENUE - MARKET** as additional rent, on or before the **1st** day of the following month, a late fee of **two hundred thirty-nine dollars and ten cents**, in order to defray Landlords administrative and other costs in connection with such late payment.


**Signed by Tyla Mazyck**
Thu May 2 2024 03:58:20 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89


**Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:23:34 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

Tyla Mazyck *(Resident)*      *Date*    Yerilee Atkinson Velez *(Resident)*      *Date*

---

<u>Security Deposit Rider</u>

The security deposit, or any part of it, is not intended, nor shall it be construed to be applied as rent by tenant, and the full monthly rent shall be paid on or before the first day of every month, including the last month of possession of the lease term.


**Signed by Tyla Mazyck**
Thu May 2 2024 03:59:08 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89


**Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:23:37 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

Tyla Mazyck *(Resident)*      *Date*    Yerilee Atkinson Velez *(Resident)*      *Date*



*Initials:*

## Sprinkler Addendum

**Landlord: <u>2455 THIRD AVENUE - MARKET</u>**

**Tenant: <u>Tyla Mazyck and Yerilee Atkinson Velez</u>**

**Premises: <u>2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street #19G, Bronx, NY  10451</u>**

**Lease dated: <u>July 1, 2024</u>**

The tenant acknowledges that there is, in the demised premises, a sprinkler system. The tenant hereby agrees to make no contact, either directly or indirectly, with the sprinkler system or any part thereof, including but not limited to removing the sprinkler, hanging property from the sprinkler, moving the sprinkler, covering the sprinkler, otherwise manipulating the sprinkler, etc. Any damage to the sprinkler, or to the premises, or the personal property of other tenants in the building as a result of the tenant's conduct with respect to the sprinkler will constitute a material breach of the lease herein and will entitle the landlord to take all necessary action pursuant to the lease agreement to protect the landlord's rights herein.

**E 135 and 3rd Ave Owner LLC**



Signed by Tyla Mazyck
Thu May 2 2024 03:59:21 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

5/23/2024
11:34 AM EDT

Tyla Mazyck *(Tenant)*                    Date        *(Landlord/Agent)*                    Date

Signed by Yerilee Atkinson Velez
Thu May 2 2024 09:23:47 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

Yerilee Atkinson Velez *(Tenant)*                    Date

*Initials:*  

## Military Service Lease Rider

You represent that at the date of the signing of this lease that you are not in any branch of the military service of the United States or the state of New York and that you are not financially dependent on anybody who is in any branch of the military service. If for some reason you do join any branch of the military service of the United States or the state of New York, you must notify Landlord in writing of the change in your military status. The notice must state the branch of the military service, the date your active military service begins, and where you will be located or stationed. You understand that the Landlord may use this statement by you regarding your military status to seek your removal from the apartment in the event that you default in any of your obligations pursuant to this lease. You must send this notice by regular and certified mail, return receipt requested.

**E 135 and 3rd Ave Owner LLC**

Signed by Tyla Mazyck
Thu May 2 2024 03:59:33 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

5/23/2024
11:34 AM EDT

Tyla Mazyck *(Tenant)*                    *Date*

*(Landlord/Agent)*                    *Date*

Signed by Yerilee Atkinson Velez
Thu May 2 2024 09:23:56 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

Yerilee Atkinson Velez *(Tenant)*                    *Date*

Sworn to on this _____

Notary public _____



*Initials:*  T.M. EFCDFF47   Y.A. 0F469534

32

# Tenant Move In Form

Name of Lease holders: **Tyla Mazyck and Yerilee Atkinson Velez**

Building Address: **2455-2457 Third Avenue, Bronx, NY  10451**

Apartment Number: **19G**

Move In Date: **July 1, 2024**

Date Keys Given: **July 1, 2024**
**Keys Given**
Apartment: **2**
Mail Box: **2**
Front Door: **2**

Date of Lease Signing: **July 1, 2024**

Other Comments:

_____

_____

_____

_____

**Super Check List**

❑ How to work the radiators, shutting the heat on and off

❑ Opening, closing, and locking the windows

❑ Child guards procedures (who to talk to, when to install them)

❑ If extra top lock is installed by the tenant, was it given to the super/office for emergencies?

❑ Show new tenants recycling and trash facilities, as well as the laundry room, & bike storage

❑ Location of circuit breaker, carbon monoxide/ smoke detector

❑ How to properly operate refrigerator, ,stove, faucets, and shower

❑ Any other tenant(s) concerns about the apartment, and or the building

❑ Make sure the apartment has no leaks in ceiling, faucets, or toilet

**E 135 and 3rd Ave Owner LLC**

 **Signed by Tyla Mazyck**
Thu May 2 2024 03:59:42 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

**5/23/2024
11:34 AM EDT**

_____     _____
Tyla Mazyck *(Tenant)*                Date      *(Landlord/Agent)*                Date

 **Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:24:19 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

_____
Yerilee Atkinson Velez *(Tenant)*                Date

*Initials:*   

33



# FIRE SAFETY PLAN

I/We, **Tyla Mazyck and Yerilee Atkinson Velez**, of Apartment **19G** located in the building known as **2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street**, **Bronx**, **NY 10451** have received a copy of the building's current Fire Safety Plan.

I understand that this notice, as to the existence or non-existence of a Sprinkler System is being provided to me to help me make an informed decision about the Leased Premises in accordance with New York State Real Property Law Article 7, Section 231-a.

**CHECK ONE:**

1. ☐  There is **NO** Maintained and Operative Sprinkler System in the Leased Premises.

2. ☒  There is a Maintained and Operative Sprinkler System in the Leased Premises.

   A.  The last date on which the Sprinkler System was maintained was on **7/1/2023** and inspected on **7/1/2023**.

**A "Sprinkler System"** is a system of piping and appurtenances designed and installed in accordance with generally accepted standards so that heat from a fire will automatically cause water to be discharged over the fire area to extinguish it or prevent its further spread (Executive Law of New York, Article 6-C, Section 155-a(5)).

Distributed by **2455 THIRD AVENUE - MARKET**  Date: **May 2, 2024**

Received by:





| | |
|---|---|
| Tyla Mazyck *(Received)* — Date | Yerilee Atkinson Velez *(Received)* — Date |

Copy of this form **MUST** be available for FDNY inspection.
Original **MUST** be returned to **2455 THIRD AVENUE - MARKET**


Initials: 

34

# FIRE SAFETY PLAN
## PART I - BUILDING INFORMATION SECTION

BUILDING: **The Motto**
ADDRESS: **2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street, Bronx, NY  10451**

**BUILDING OWNER/REPRESENTATIVE:**
Name: **E 135 and 3rd Ave Owners LLC**
Address: **316 West 118th Street, New York, NY 10026**
Telephone: **(212) 360-5092**

**BUILDING INFORMATION:**
Year of Construction:          **2022**

Type of Construction:          **Non-Combustible**

Number of Floors:          **24** Above Ground          **1** Below Ground

Sprinkler System:          **Yes**
                                      Common Areas
                                      Apartments

Fire Alarm:          **Yes**; Transmits Alarm to Fire Dept/Fire Alarm Co.
Manual Pull Stations:          1 located in the compactor room

Public Address System:          **Yes**
Location of Speakers:          Stair well and dwelling units

**Means of Egress:** (e.g., Unenclosed/Enclosed Interior Stairs, Exterior Stairs, Fire Tower Stairs, Fire Escapes, Exits):

| Type of Egress | Identification | Location | Leads to |
|---|---|---|---|
| East & West Buildings: Enclosed Interior Stairs | East Building Stairs A & Stair B/West Building: Stairs C & Stair D | East & West Buildings: Street Level | East & West Buildings: Both exits lead to East 135th Street |

**Other Information:**          All apartments in the West building will use Stair C or Stair D as a means of egress which leads to East 135th Street.
                                      Cellar space and all apartments in the East building will use Stair A or Stair B as a means of egress which leads to East 135th Street

**DATE PREPARED:**          5/11/2023


Initials: 

# FIRE SAFETY PLAN
## PART II - FIRE EMERGENCY INFORMATION

BUILDING: **The Motto**
ADDRESS: **2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street #19G, Bronx, NY 10451**

THIS FIRE SAFETY PLAN IS INTENDED TO HELP YOU AND THE MEMBERS OF YOUR HOUSEHOLD PROTECT YOURSELVES IN THE EVENT OF FIRE. THIS FIRE SAFETY PLAN CONTAINS:

- Basic fire prevention and fire preparedness measures that will reduce the risk of fire and maximize your safety in the event of a fire.

- Basic information about your building, including the type of construction, the different ways of exiting the building, and the types of fire safety systems it may have.

- Emergency fire safety and evacuation instructions in the event of fire in your building.

PLEASE TAKE THE TIME TO READ THIS FIRE SAFETY PLAN AND TO DISCUSS IT WITH THE MEMBERS OF YOUR HOUSEHOLD. FIRE PREVENTION, PREPAREDNESS, AND AWARENESS CAN SAVE YOUR LIFE!

IN THE EVENT OF A FIRE,

CALL 911

OR THE FIRE DEPARTMENT DISPATCHER, AT

| | |
|---|---|
| **Manhattan** | **(212) 999-2222** |
| **Bronx** | **(718) 999-3333** |
| **Brooklyn** | **(718) 999-4444** |
| **Queens** | **(718) 999-5555** |
| **Staten Island** | **(718) 999-6666** |

OR TRANSMIT AN ALARM FROM THE NEAREST FIRE ALARM BOX

<u>BASIC FIRE PREVENTION AND FIRE PREPAREDNESS MEASURES</u>

These are fire safety tips that everybody should follow:

1. Every apartment should be equipped with at least one smoke detector. Check them periodically to make sure they work. Most smoke detectors can be tested by pressing the test button. Replace the batteries in the spring and fall when you move your clocks forward or back an hour, and whenever a smoke detector chirps to signal that its battery is low. The smoke detector should be replaced on a regular basis in accordance with the manufacturer's recommendation, but at least once every ten years.

2. Carelessly handled or discarded cigarettes are the leading cause of fire deaths. Never smoke in bed or when you are drowsy, and be especially careful when smoking on a sofa. Be sure that you completely extinguish every cigarette in an ashtray that is deep and won't tip over. Never leave a lit or smoldering cigarette on furniture.

3. Matches and lighters can be deadly in the hands of children. Store them out of reach of children and teach them about the danger of fire.

4. Do not leave cooking unattended. Keep stove tops clean and free of items that can catch on fire. Before you go to bed, check your kitchen to ensure that your oven is off and any coffeepot or teapot is unplugged.

5. Never overload electrical outlets. Replace any electrical cord that is cracked or frayed. Never run extension cords under rugs. Use only power strips with circuit-breakers.

6. Keep all doorways and windows leading to fire escapes free of obstructions, and report to the owner any obstructions or accumulations of rubbish in the hallways, stairwells, fire escapes or other means of egress.


Initials: 

7. Install window gates only if it is absolutely necessary for security reasons. Install only approved window gates. Do not install window gates with key locks. A delay in finding or using the key could cost lives. Maintain the window gate's opening device so it operates smoothly. Familiarize yourself and the members of your household with the operation of the window gate.

8. Familiarize yourself and members of your household with the location of all stairwells, fire escapes and other means of egress.

9. With the members of your household, prepare an emergency escape route to use in the event of a fire in the building. Choose a meeting place a safe distance from your building where you should all meet in case you get separated during a fire.

10. Exercise care in the use and placement of fresh cut decorative greens, such as Christmas trees and holiday wreaths. If possible, keep them planted or in water. Do not place them in public hallways or where they might block egress from your apartment if they catch on fire. Keep them away from any flame, including fireplaces. Do not keep for extended period of time; as they dry, decorative greens become easily combustible.

<p align="center">BUILDING INFORMATION</p>

## Building Construction

In a fire emergency, the decision to leave or to stay in your apartment will depend in part on the type of building you are in.

Residential buildings built before 1968 are generally classified either as "fireproof" or "non-fireproof." Residential buildings built in or after 1968 are generally classified either as "combustible" or "non-combustible". The type of building construction generally depends on the size and height of the building.

A "non-combustible" or "fireproof" building is a building whose structural components (the supporting elements of the building, such as steel or reinforced concrete beams and floors) are constructed of materials that do not burn or are resistant to fire and therefore will not contribute to the spread of the fire. In such buildings, fires are more likely to be contained in the apartment or space in which they start and less likely to spread inside the building walls to other apartments and floors. THIS DOES NOT MEAN THAT THE BUILDING IS IMMUNE TO FIRE. While the structural; components of the building may not catch fire, all of the contents of the building (including furniture, carpeting, wood floors, decorations and personal belongings) may catch on fire and generate flame, heat and large amounts of smoke, which can travel throughout the building, especially if apartment or stairwell doors are left open.

A "combustible" or "non-fireproof" building has structural components (such as wood) that will burn if exposed to fire and can contribute to the spread of the fire. In such buildings, the fire can spread inside the building walls to other apartments and floors, in addition to the flame, heat and smoke that can be generated by the burning of the contents of the building.

**Be sure to check Part I (Building Information Section) of this fire safety plan to see what type of building you are in.**

## Means of Egress

All residential buildings have at least one means of egress (way of exiting the building), and most have at least two. There are several different types of egress:

**Interior Stairs:** All buildings have stairs leading to the street level. These stairs may be enclosed or unenclosed. Unenclosed stairwells (stairs that are not separated from the hallways by walls and doors) do not prevent the spread of flame, heat and smoke. Since flame, heat and smoke generally rise, unenclosed stairwells may not ensure safe egress in the event of a fire on a lower floor. Enclosed stairs are more likely to permit safe egress from the building, if the doors are kept closed. It is important to get familiar with the means of egress available in your building.

**Exterior Stairs:** Some buildings provide access to the apartments by means of stairs and corridors that are outdoors. The fact that they are outdoors and do not trap heat and smoke enhances their safety in the event of a fire, provided that they are not obstructed.


Initials:  

**Fire Tower Stairs:** These are generally enclosed stairwells in a "tower" separated from the building by air shafts open to the outside. The open air shafts allow heat and smoke to escape from the building.

**Fire Escapes:** Many older buildings are equipped with a fire escape on the outside of the building, which is accessed through a window or balcony. Fire escapes are considered a "secondary" or alternative means of egress, and are to be used if the primary means of egress (stairwells) cannot be safely used to exit the building because they are obstructed by flame, heat or smoke.

**Exits:** Most buildings have more than one exit. In addition to the main entrance to the building, there may be separate side exits, rear exits, basement exits, roof exits and exits to the street from stairwells. Some of these exits may have alarms. Not all of these exits may lead to the street. Roof exits may or may not allow access to adjoining buildings.

**Be sure to review Part I (Building Information Section) of this fire safety plan and familiarize yourself with the different means of egress from your building.**

<u>Fire Sprinkler Systems</u>

A fire sprinkler system is a system of pipes and sprinkler heads that when triggered by the heat of a fire automatically discharges water that extinguishes the fire The sprinkler system will continue to discharge water until it is turned off. When a sprinkler system activates, an alarm is sounded.

Sprinkler systems are very effective at preventing fire from spreading beyond the room in which it starts, However, the fire may still generate smoke, which can travel throughout the building.

Residential buildings are generally not required to have fire sprinkler systems. Some residential buildings are equipped with sprinkler systems, but only in compactor chutes and rooms or boiler rooms. All apartment buildings constructed or substantially renovated after March 1999 will be required by law to be equipped with fire sprinkler systems throughout the building.

**Be sure to review Part I (Building Information Section) of this fire safety plan to learn whether your building is equipped with fire sprinkler systems.**

<u>Interior Fire Alarm Systems</u>

Although generally not required, some residential buildings are equipped with interior fire alarm systems that are designed to warn building occupants of a fire in the building. Interior fire alarm systems generally consist of a panel located in a lobby or basement, with manual pull stations located near the main entrance and by each stairwell door. Interior fire alarm systems are usually manually-activated (must be pulled by hand) and do not automatically transmit a signal to the Fire Department, so a telephone call must still be made to 911 or the Fire Department dispatcher. Do not assume that the Fire Department has been notified because you hear a fire alarm or smoke detector sounding in the building.

**Be sure to review Part I (Building Information Section) of this fire safety plan to learn whether your building is equipped with an interior fire alarm system and whether the alarm Is transmitted to the Fire Department, and familiarize yourself with the location of the manual pull stations and how to activate them in the event of a fire.**

<u>Public Address Systems</u>

Although generally not required, some residential buildings are equipped with public address systems that enable voice communications from a central location, usually in the building lobby. Public address system are different from building intercoms, and usually consist of loudspeakers in building hallways and/or stairwells.

**Be sure to review Part I (Building Information Section) of this fire safety plan to learn whether your building is equipped with a public address system.**


Initials: 

38

## EMERGENCY FIRE SAFETY AND EVACUATION INSTRUCTIONS

**IN THE EVENT OF A FIRE, FOLLOW THE DIRECTIONS OF FIRE DEPARTMENT PERSONNEL. HOWEVER, THERE MAY BE EMERGENCY SITUATIONS IN WHICH YOU MAY BE REQUIRED TO DECIDE ON A COURSE OF ACTION TO PROTECT YOURSELF AND THE OTHER MEMBERS OF YOUR HOUSEHOLD.**

**THIS FIRE SAFETY PLAN IS INTENDED TO ASSIST YOU IN SELECTING THE SAFEST COURSE OF ACTION IN SUCH AN EMERGENCY. PLEASE NOTE THAT NO FIRE SAFETY PLAN CAN ACCOUNT FOR ALL OF THE POSSIBLE FACTORS AND CHANGING CONDITIONS; YOU WILL HAVE TO DECIDE FOR YOURSELF WHAT IS THE SAFEST COURSE OF ACTION UNDER THE CIRCUMSTANCES.**

General Emergency Fire Safety Instructions

1. Stay calm. Do not panic. Notify the Fire Department as soon as possible. Firefighters will be on the scene of a fire within minutes of receiving an alarm.

2. Because flame, heat and smoke rise, generally a fire on a floor below your apartment presents a greater risk to your safety than a fire on a floor above your apartment.

3. Do not overestimate your ability to put out a fire. Most fires cannot be easily or safely extinguished. Do not attempt to put the fire out once it begins to quickly spread. If you attempt to put a fire out, make sure you have a clear path of retreat from the room.

4. If you decide to exit the building during a fire, close all doors as you exit to confine the fire never use the elevator. It could stop between floors or take you to where the fire is.

5. Heat, smoke and gases emitted by burning materials can quickly choke you. If you are caught in a heavy smoke condition, get down on the floor and crawl. Take short breaths, breathing through your nose.

6. If your clothes catch fire, don't run. Stop where you are, drop to the ground, cover your face with your hands to protect your face and lungs and roll over to smother the flames.

Evacuation Instructions If The Fire Is In Your Apartment

(All Types of Building Construction)

1. Close the door to the room where the fire is, and leave the apartment.

2. Make sure <u>EVERYONE</u> leaves the apartment with you.

3. Take your keys.

4. Close, but do not lock, the apartment door.

5. Alert people on your floor by knocking on their doors on your way to the exit.

6. Use the nearest stairwell to exit the building.

7. <u>DO NOT USE THE ELEVATOR.</u>

8. Call 911 once you reach a safe location. Do not assume the fire has been reported unless firefighters are on the scene.

9. Meet the members of your household at a predetermined location outside the building. Notify responding firefighters if anyone is unaccounted for.




Initials:

**Evacuation Instructions if The Fire Is Not In Your Apartment**

"NON-COMBUSTIBLE" OR "FIREPROOF" BUILDINGS:

1. Stay inside your apartment and listen for instructions from firefighters unless conditions become dangerous.

2. If you must exit your apartment, first feel the apartment door and doorknob for heat. If they are not hot, open the door slightly and check the hallway for smoke, heat or fire.

3. If you can safely exit your apartment, follow the instructions above for a fire in your apartment.

4. If you cannot safely exit your apartment or building, call 911 and tell them your address, floor, apartment number and the number of people in your apartment.

5. Seal the doors to your apartment with wet towels or sheets, and seal air ducts or other openings where smoke may enter.

6. Open windows a few inches at top and bottom unless flames and smoke are coming from below. Do not break any windows.

7. If conditions in the apartment appear life-threatening, open a window and wave a towel or sheet to attract the attention of firefighters.

8. If smoke conditions worsen before help arrives, get down on the floor and take short breaths through your nose. If possible, retreat to a balcony or terrace away from the source of the smoke, heat or fire.

"COMBUSTIBLE" OR "NON-FIREPROOF" BUILDINGS:

1. Feel your apartment door and doorknob for heat. If they are not hot, open the door slightly and check the hallway for smoke, heat or fire.

2. Exit your apartment and building if you can safely do so, following the instructions above for a fire in your apartment.

3. If the hallway or stairwell is not safe because of smoke, heat or fire and you have access to a fire escape, use it to exit the building. Proceed cautiously on the fire escape and always carry or hold onto small children.

4. If you cannot use the stairs or fire escape, call 911 and tell them your address, floor, apartment number and the number of people in your apartment.

   A. Seal the doors to your apartment with wet towels or sheets, and seal air ducts or other openings where smoke may enter.

   B. Open windows a few inches at top and bottom unless flames and smoke are coming from below. Do not break any windows.

   C. If conditions in the apartment appear life-threatening, open a window and wave a towel or sheet to attract the attention of firefighters.

   D. If smoke conditions worsen before help arrives, get down on the floor and take short breaths through your nose. If possible, retreat to a balcony or terrace away from the source of the smoke, heat or fire.



# § 421-A(16) RIDER TO LEASE AGREEMENT
# (35 YEAR 421-A(16) BENEFITS)

| LEASE DATED | OWNER |
|---|---|
| July 1, 2024 | E 135 and 3rd Ave Owner LLC |

| APARTMENT |
|---|
| 19G in BUILDING at 2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street, Bronx, NY 10451 |

| TENANT |
|---|
| Tyla Mazyck and Yerilee Atkinson Velez |

Tenant ("You") are about to sign and deliver to Owner a Lease or a Lease Renewal (the "Lease") for the Apartment in the Building indicated above, dated as of the date shown above. In order to induce Owner to sign the Lease and rent the Apartment to You, You acknowledge and agree that:

**I. NOTICE REGARDING EXPIRATION OF RENT STABILIZATION & § 421-A(16) TAX BENEFITS**

**OWNER HAS OBTAINED OR EXPECTS TO OBTAIN REAL ESTATE TAX EXEMPTION BENEFITS PURSUANT TO REAL PROPERTY TAX LAW SECTION 421-A(16) ("§ 421-A(16)").**

**PLEASE BE ADVISED THAT THE APARTMENT IS NOT SUBJECT TO RENT STABILIZATION IF, ON THE DATE OF INITIAL OCCUPANCY OR THE DATE OF OCCUPANCY AFTER ANY VACANCY LEASE FOR THIS APARTMENT, THE AMOUNT OF MONTHLY RENT CHARGED FOR THE APARTMENT EXCEEDS THE DEREGULATION RENT THRESHOLD ("DRT") AS SET BY THE NEW YORK STATE DIVISION OF HOUSING AND COMMUNITY RENEWAL AND APPLICABLE AT THAT TIME. FOR THE PERIOD BETWEEN JANUARY 1, 2023 AND DECEMBER 31, 2023, THE DRT IS $0.00 AND SHALL INCREASE EACH JANUARY 1ST THEREAFTER BY THE ONE YEAR RENEWAL LEASE GUIDELINE PERCENTAGE ISSUED THE PRIOR YEAR BY THE NEW YORK CITY RENT GUIDELINES BOARD.**

**NOTWITHSTANDING THE ABOVE, SOLELY AS A RESULT OF § 421-A(16), IF THE INITIAL RENT FALLS BELOW THE DRT, AS PREVIOUSLY DEFINED, THEN THE APARTMENT WILL BE SUBJECT TO THE RENT STABILIZATION LAW ("RSL") AND CODE ("CODE"). OWNER IN GOOD FAITH BELIEVES THAT THE § 421-A(16) TAX BENEFITS WILL EXPIRE ON OR ABOUT _____**

**§ 421-A(16) PROVIDES THAT THE BUILDING WILL BE SUBJECT TO THE RSL FOR THIRTY-FIVE (35) YEARS, AND, UNLESS THE PRESENT LAWS ARE CHANGED, THE APARTMENT WILL ALSO BE SUBJECT TO STANDARD RENT INCREASES ON LEASE RENEWALS DURING SAID THIRTY-FIVE (35) YEAR PERIOD, AS APPROVED BY THE RENT GUIDELINES BOARD. ANY INCREASES GRANTED BY THE RENT GUIDELINES BOARD SHALL BE MADE TO THE RENT SHOWN IN THE ORIGINAL LEASE OR THE MOST RECENT LEASE RENEWAL NOTICE AS APPLICABLE.**

**THIS RIDER IS SUBORDINATE TO THE TERMS OF A CERTAIN § 421-A(16) RESTRICTIVE DECLARATION TO BE EXECUTED BY OWNER (THE "§ 421-A RESTRICTIVE DECLARATION"). THE § 421-A(16) RESTRICTIVE DECLARATION**


Initials: 

**IMPOSES CERTAIN CONDITIONS ON OWNER UNTIL IT TERMINATES ON A DATE WHICH IS THIRTY-FIVE (35) YEARS FROM THE DATE OF COMPLETION OF CONSTRUCTION (COMMENCING ON THE ISSUANCE OF THE EARLIER OF (A) THE FIRST TEMPORARY CERTIFICATE OF OCCUPANCY FOR ALL RESIDENTIAL AREAS IN THE BUILDING OR (B) A PERMANENT CERTIFICATE OF OCCUPANCY FOR THE ENTIRE BUILDING). THIS PERIOD IS CALLED THE "RESTRICTION PERIOD." OWNER IN GOOD FAITH BELIEVES THAT THE RESTRICTION PERIOD WILL END ON OR ABOUT _____ . IF ON THE DATE OF INITIAL OCCUPANCY AND THE DATE OF OCCUPANCY AFTER ALL VACANCY LEASES FOR THIS APARTMENT, THE AMOUNT OF MONTHLY RENT CHARGED FOR THE APARTMENT IS BELOW THE DRT, THEN UPON THE EXPIRATION OF THE LEASE IN EFFECT WHEN THE RESTRICTION PERIOD ENDS, THE APARTMENT WILL NO LONGER BE RENT STABILIZED.**

**AFTER SUCH DATE, THE APARTMENT WILL NOT BE REGULATED AS TO THE AMOUNT OF RENT THAT MAY BE CHARGED FOR THE APARTMENT NOR WILL THE OWNER BE LEGALLY OBLIGATED TO RENEW THE LEASE. IF THE OWNER SHOULD ELECT TO RENEW THE LEASE AT THAT TIME, THE OWNER WILL NOT BE LEGALLY BOUND BY ANY GOVERNMENTAL RENT GUIDELINES AND MAY CHARGE AN UNREGULATED RENT.**

**HOWEVER, AS PREVIOUSLY INDICATED, IF ON THE DATE OF INITIAL OCCUPANCY OR OCCUPANCY AFTER ANY VACANCY LEASE FOR THIS APARTMENT, THE AMOUNT OF MONTHLY RENT CHARGED FOR THE APARTMENT EXCEEDS THE DRT, THIS APARTMENT IS NOT SUBJECT TO THE RSL AND CODE.**

**TENANT ACKNOWLEDGES THAT HE OR SHE HAS BEEN INFORMED OF OWNER'S RIGHT TO INCLUDE THIS PROVISION IN THE LEASE.**

## II. YOUR CONFIRMATION

By signing this Rider below, You confirm that You have read and understand this Rider, and that you agree to all of its terms and requirements. If more than one person is a tenant under the Lease, each of us signing below, acknowledges, represents and agrees with the foregoing.

**E 135 and 3rd Ave Owner LLC**


Signed by Tyla Mazyck
Thu May 2 2024 04:00:58 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

5/23/2024
11:34 AM EDT

| | |
|---|---|
| Tyla Mazyck *(Tenant)* | Date |
| (Landlord/Agent) | Date |


Signed by Yerilee Atkinson Velez
Thu May 2 2024 09:25:55 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

Yerilee Atkinson Velez *(Tenant)*                Date


Initials:

# ACKNOWLEDGMENTS

I hereby acknowledge that a true copy of the document entitled "Rent Stabilization Lease Apartment House Tenants Residing in New York City" ("Rider") has been received by me and is attached as an addendum to my lease dated **July 1, 2024**.

It is further acknowledged that the Rider expressly provides that its provisions are not part of said lease nor does the Rider modify such said Lease.

Initials: **T.M.**   **Y.A.**

I hereby acknowledge that a true copy of the document entitled "WINDOW GUARDS REQUIRED LEASE NOTICE TO TENANT" has been received by me and is attached as an addendum to my Lease dated **July 1, 2024**.

Initials: **T.M.**   **Y.A.**

I hereby acknowledge that a true copy of the document entitled "FIRE SAFETY PLAN REQUIRED LEASE NOTICE TO TENANT" has been received by me and is attached as an addendum to my lease dated **July 1, 2024**.

Initials: **T.M.**   **Y.A.**

Tenant acknowledges that Landlord has strongly recommended that for Tenant's own protection Tenant obtain apartment renter's insurance at Tenant's own cost and expense.

Initials: **T.M.**   **Y.A.**

Tenant's Name: **Tyla Mazyck**
Date: **May 2, 2024**
Address: **2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street, Bronx, NY 10451**
Apartment #: **19G**

Signed by Tyla Mazyck
Thu May 2 2024 04:01:15 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

_____
Tyla Mazyck                                    *Date*

Tenant's Name: **Yerilee Atkinson Velez**
Date: **May 2, 2024**
Address: **2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street, Bronx, NY 10451**
Apartment #: **19G**

Signed by Yerilee Atkinson Velez
Thu May 2 2024 09:26:16 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

_____
Yerilee Atkinson Velez                         *Date*

*Initials:*  

# THE MOTTO SOCIAL MEMBERSHIP PACKAGE

Dear | **Tyla Mazyck and Yerilee Atkinson Velez**

Congratulations to your new home at **The Motto**! We are pleased to welcome you to **2455-2457 Third Avenue** and look forward to having you as our newest resident.

As you explore **The Motto**, you might encounter our state of the art, members-only club. We've named it **The Motto** Social- for the profusion of entertainment and workout spaces our club has to offer. Your new membership can give you exclusive access to the panoramic roof deck, a variety of seating areas, a range of fitness areas including a fully equipped gym, a game room, a recreation room and our stunning, open-concept lounge, offering classic and modern pastimes beside a catering-ready kitchen and bar, located on the 24th floor.

We hope you will enjoy using these beautiful new spaces as much as we enjoyed designing them. And if there is ever anything we can do to optimize your experience here, just let us know. Welcome home to **The Motto**-we look forward to meeting you at **The Motto** Social!

Sincerely,

**K and R Realty Management** Inc.
Operator for **The Motto** Social
**316 West 118th Street**
**New York, NY 10026**
212-360-5092
marketing@kandrrealty.com




*Initials:*

44

# PART I: MEMBERSHIP APPLICATION AND STATEMENT OF DUES

| Name |
| --- |
| Tyla Mazyck and Yerilee Atkinson Velez |
| **Apt No** |
| 19G |

☒ **The Motto** Social Membership includes:

**ROOF LOUNGE & TERRACE**
**FOURTH FLOOR LOUNGE & TERRACE**
**FITNESS ROOM**
**PET SPA**
**GAME ROOM**
**COWORKING SPACE**

Together referred to as **The Motto** Social

| Membership Start Date: | Concession: |
| --- | --- |
| 6/1/2024 | $6,242.50 |
| **Total Annual Membership** | **Reduced Introductory Annual Membership Dues:** |
| $6,242.50 | $0.00 |

By signing below, you agree to abide by the Policies promulgated by the operator **K and R Realty Management** (hereafter called the "Operator") in connection with the operation of **The Motto** Social (hereafter called the "Club") including the items set forth in this Membership Contract, including the Membership Terms and Conditions, Rules & Regulations, Waiver of Liability and Indemnity Agreement and all signs posted throughout the Club areas. All annual membership fees **are payable on an annual basis**, and full annual membership shall be charged even if Member ends their tenancy. Club Member agrees and understands that a pre-condition of club membership is that any such Club Member must be a tenant of **The Motto**. As such, it is agreed and understood that in the event a Member's tenancy at **The Motto** ends or is otherwise terminated, notwithstanding the term of the Membership, Club membership shall also end upon the end or termination of the Member's tenancy at **The Motto**. Annual memberships will be automatically renewed on the ending date unless intent to not renew is received 45 days prior to expiration. It is understood and agreed that the Member will not be entitled to any reimbursement of membership fee or be granted an extension of his/her own membership as a result of the closing of the Club, or any portion of the Club, for private events, the performance of necessary repairs, maintenance, for an emergency, or for non-member events. The Operator reserves the right to change the Membership Dues from time to time, without notice, in its sole discretion; provided however, that any changes shall not be retroactive. Club hours are subject to change without notice. The Operator may revoke Membership(s) as a result of a Substantial breach (i) of any of the provisions of this Contract; or (ii) for Member's generally undesirable behavior, which shall be determined by the Operator at its sole discretion.

**E 135 and 3rd Ave Owner LLC**

Signed by Tyla Mazyck
Thu May 2 2024 04:01:34 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

5/23/2024
11:35 AM EDT

---
Tyla Mazyck *(Tenant)*                                      *Date*

---
*(Landlord/Agent)*                                      *Date*

Signed by Yerilee Atkinson Velez
Thu May 2 2024 09:26:33 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

---
Yerilee Atkinson Velez *(Tenant)*                          *Date*




Initials: _____

45

# PART II: WAIVER OF LIABILITY AND INDEMNITY AGREEMENT

In consideration of the acceptance of the application for a membership in "**The Motto Sociall**," (understood to refer to the facilities composed of the following components: roof deck, roof lounge, fourth floor lounge and terrace, fitness room, pet spa, game room, and recreation room; located on roof/24th floor and 4th floor of the **The Motto** at **2455-2457 Third Avenue, Bronx, New York, 10451** (hereinafter collectively referred to as the "Club") of the undersigned (hereinafter called the "Member"), and as a condition of such membership and as a condition of use by the Member of the Club's facilities, services and equipment, the Member agrees as follows:

**(i)**  The Member shall participate in the Club's programs and use the Club's facilities, services, and equipment at his/her own risk.

**(ii)**  Member hereby releases and discharges the Club, its owners, affiliates, agents and employees, including without limitation to the general and limited partners - **K and R Realty Management, Inc.** (hereinafter called the "Building Owner") and the Club operator **K and R Realty Management Inc** (hereinafter called the "Operator")-from any and all liabilities, suits, claims, demands, actions or damages (including reasonable attorneys fees and disbursements) incurred by Member, Member's guests or invitees arising out of the use, or intended use, of the Club, its facilities, services or equipment, including without limitation, all claims for property damage, personal injuries or wrongful death.

**(iii)** The Member shall indemnify and hold harmless Building Owner and the Operator from and against any and all liabilities, suits, claims, demands and damages, including reasonable attorney's fee, asserted against the Club, Operator or Building Owner arising out of or resulting from loss, theft, or damage to personal property belonging to Member, Member's guests or invitees, including but not limited to, money or jewelry; and neither the Club, nor the Building Owner, nor the Operator shall not be liable for any loss or damage suffered by Member, Member's guests or invitees as a result of personal injuries sustained by Member, Member's guests or invitees in, on, or about the premises of the Club.

**(iv)** Member agrees that any claim or action arising out of the use of the Club shall be subject exclusively to the laws of the State of **New York** and be brought exclusively in the courts of **New York**.

**(v)**  Member agrees that the Club may revoke Member's right to use the Club upon 1) Member's material breach of any of the representations or agreements made herein by me or of the rules and regulations regarding access and use of the Club facilities and equipment; or 2) Member's generally undesirable behavior, which shall be determined by the Club in its sole discretion, or 3) any breach by Member of Member's Lease with Building Owner.

**(vi)** Member represents that he/she is in good health and has no health condition, illness or communicable disease that may make Member's use of the facilities injurious to Member or other users of the Club. If Member should develop any such condition, illness or disease during the term, Member agrees to discontinue use of these facilities until he/she received an appropriate medical release for Member's doctor authorizing Member to continue using the facilities. Member further agrees to hold the Operator harmless from all liability or damages which Member may incur if Member, or any third party, should sustain injury or damage while using the facilities which is caused by Member's conditions, illness or disease. Member acknowledges that if he/she has any chronic physical disability or medical condition, member may be at risk in using the Fitness Center's facilities. Member is aware that the use of the Fitness Center involves certain risks of injury and Member expressly assumes the risk and responsibilities for any and all accidents or injuries of any kind, which Member may sustain by reason of Member's physical exercise and use of the Fitness Center's facilities.

Member hereby states he/she has read this Waiver of Liability and Indemnity Agreement. Member furthermore states that he/she is of lawful age and is legally competent to sign this document, fully understands its terms, including, without limitation, that he/she has given up substantial rights by signing it. Member hereby attests that he/she has signed this document freely and without any inducement of assurance of any nature and intend it to be a complete and unconditional release of all liability to the greatest extent allowed by law and agree that if any portion of this document is held to be invalid, the balance, notwithstanding, shall continue in full force and effect.

**E 135 and 3rd Ave Owner LLC**

Signed by Tyla Mazyck
Thu May 2 2024 04:04:23 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

5/23/2024
11:35 AM EDT

_____          _____
Tyla Mazyck *(Tenant)*              *Date*    *(Landlord/Agent)*                                      *Date*

Signed by Yerilee Atkinson Velez
Thu May 2 2024 09:26:41 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

_____
Yerilee Atkinson Velez *(Tenant)*          *Date*



Initials:  

# PART III: TERMS AND CONDITIONS

1. **PRO RATION OF MEMBERSHIP DUES:** The Club reserves the right to pro rate the Membership Dues so that the membership expiration date and the Member's most recent lease expiration date are coterminous.

2. **ACKNOWLEDGMENT OF OPERATOR:** Member acknowledges that the club is not operated by the building owner or landlord and Member will look solely to **K and R Realty Management Inc.** in connection with the club's operation, and any and all matters related to the club. Member acknowledges, understands and agree that (i) the club is not a service being provided by the landlord of the building and is not a service required by to be provided to Member or any of the tenants of the building under any lease or occupancy agreement (including Member's lease or occupancy agreement) or pursuant to any rent stabilization or control laws or any other laws; and (ii) the Operator of the Club shall have the right, at any time, upon notice to member, to permanently discontinue and close the club.

3. **CONSUMER'S RIGHTS TO CANCELLATION. YOU MAY CANCEL THIS CONTRACT WITHOUT PENALTY OR FURTHER OBLIGATION WITHIN THREE (3) DAYS FROM THE DATE OF THIS CONTRACT.** Notice of cancellation shall be in writing subscribed by the Member and mailed by registered or certified United States mail to the Operator at Operator's business address. The Contract forms shall accompany such notice, and other documents or evidence of membership previously delivered to the Member.

4. **ADDITIONAL RIGHT TO CANCELLATION:** Member may also cancel this Contract for any of the following reasons:

   **(a)** If upon a doctor's order, Member cannot physically receive the service because of a significant physical disability for a period.

   **(b)** If Member dies, Member's estate shall be relieved of any further obligation for payment under the Contract not then due and owing.

   **(c)** If Member's lease with **The Motto** expires or ends for any reason.

   **(d)** If the services cease to be offered as stated in the Contract.

   **(e)** After initial notification, any cancellation will be processed, and the fee will be removed as of the first of the following month. Any money paid pursuant to this Contract, if cancelled for the reasons contained in the subdivision, shall be refunded to Member within fifteen (15) days of the Operator's receipt of such notice of cancellation; provided, however that the Operator may:

       **i.** Require reasonable evidence for cancellation pursuant to the above reasons. If Member cancels this Contract pursuant to this Paragraph (2) (a) (doctor's order), this Paragraph (2) (b) (death), or this Paragraph (2) (c) (change of residence), Member shall provide Operator with written substantiation of such grounds for cancellations on forms to be supplied by Operator. Such documents may be delivered by certified mail or by hand delivery to the Operator, provided Member obtains a written receipt for delivery of such documents.

       **ii.** Retain the expenses and the portion of the total price representing the service used or completed;

       **iii.** Demand the reasonable costs of goods and services which the Member has consumed or wishes to retain after cancellation of the Contract. In no instance shall the Operator demand more than the full Contract price from the Member.

5. **MEMBERSHIP FREEZES:** Freezes are for medical reasons only and are for a minimum of one month and maximum of 3 months per year. All freeze requests must be accompanied by a letter from a Physician explaining why the freeze is necessary.

6. **CHECK POLICY:**

   **(a)** Checks submitted for payment of Member's dues that are returned due to insufficient funds or are otherwise not able to be deposited by Operator for any reason are subject to a **$75.00** non-negotiable fee.

   **(b)** The Owner reserves the right to require payment in full for the total balance remaining on Member contract in the event a check submitted by Member for payment of monthly dues is returned or otherwise not able to be deposited by Operator.

7. **BILLING, PAYMENT AND LATE PAYMENT:**

   **(a)** Annual membership dues are to be paid at time of lease signing for new tenants or at the next rent cycle for current tenants.

   **(b)** "Paid" means a check for the full balance of dues has been received in the Operator's lockbox, or via any other method of payment deemed acceptable by Operator in writing.


Initials:  

8. **DEFINITION OF RESIDENTS, GUESTS AND GUEST POLICY:**

   **(a)** The term "Resident" shall be understood to refer only to the following persons:

      **i.** Leaseholders of units at **2455-2457 Third Avenue**, and

      **ii.** Occupants whose primary residence is a unit at **2455-2457 Third Avenue**, are over the age of sixteen (16), and who are not leaseholders for this residence, but have been approved to reside in unit by Owner.

   **(b)** "Guests" are non-residents who do not reside in the building as leaseholders or occupants.

   **(c)** Only non-residents may be brought as guests to the Club.

   **(d)** Members are permitted to bring no more than three (3) non-resident guests per visit.

   **(e)** Operator reserves the right to limit the number of guests in the club at any given time, and/or discontinue the guest policy without prior notice.

9. **CONSTRUCTION:**

   **(a)** Member acknowledges that Building Owner may be in the process of constructing or renovating the Club areas which may result in a delay in Club facility availability.

10. **SPECIAL EVENTS AND TEMPORARY CLUB CLOSING:**

   **(a)** The Club may be rented for private parties for an additional fee. Please contact the Operator for an application and information.

   **(b)** It is agreed and understood that Operator can, of its own choosing, or shall, at the request of the Owner of the Building, be permitted to temporarily close Club for any reason (including, but not limited to, a private party, maintenance, etc). It is agreed and understood that this closing may be imposed by the Club, at any time, without prior notice.

   **(c)** In the event of a temporary closing there shall be no reduction, suspension, abatement, apportionment of membership dues.

11. **CHANGE IN FACILITIES AND OPERATING HOURS:** Operator reserves the right the change without prior notice the number and type of facilities available at the Club as well as Club hours of operation.

12. **NON DISCRIMINATION:** Club represents it will not discriminate against any person because of sex, race, creed, age, color, national origin, or ancestry in considering applications for membership. Notwithstanding the above, the minimum age for club membership is sixteen (16) years of age.

**E 135 and 3rd Ave Owner LLC**

Signed by Tyla Mazyck
Thu May 2 2024 04:04:43 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

5/23/2024
11:35 AM EDT

———————————————————————————  ———————————————————————————
Tyla Mazyck *(Tenant)*                Date    *(Landlord/Agent)*                    Date

Signed by Yerilee Atkinson Velez
Thu May 2 2024 09:27:21 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

———————————————————————————
Yerilee Atkinson Velez *(Tenant)*         Date




Initials:

# RULES AND REGULATIONS

The following Rules and Regulations are for the benefit of all Members. Your compliance is important to ensure all members enjoy **The Motto** Social.

1.  Use of the club shall be limited to members and guests, as defined in Part III Paragraph 9, who are accompanied by Member.

2.  All persons (whether members, guests, etc.) entering into and/or using Club facilities (including, but not limited to the lounge, roof deck and fitness areas) must be at least 16 years of age. Resident and non-resident Minors under the age of 16 may enter into and/or use Club facilities if accompanied by Member. Unaccompanied minors under the age of 16 may not hold Club membership nor enter and/or use Club facilities.

3.  The Club will be monitored via Closed Circuit TV or similar system on a 24-hour basis.

4.  The hours of operation for the roof deck, roof lounge, fourth floor lounge and terrace, game room, coworking rooms and pet spa are **10 am to 10 pm, 7 days a week**.

5.  The hours of operation for the **fitness room ONLY** are **6 am to 10 pm, 7 days a week**. During the peak morning and evening hours of **6 am to 8 am and 6 pm to 8 pm**, cardio equipment use must be limited to 30 minutes if others are waiting. All machines must be wiped down after use.

6.  Use of the fitness equipment is restricted to Members only. Guests are prohibited from using fitness equipment.

7.  No outside personal trainers are permitted.

8.  All members are required to be in respectable attire while in any part of the Club. Operator reserves the right to determine whether attire is respectable. Athletic attire and rubber-soled shoes are required in the Fitness Room. Athletic attire and a mat are required in the yoga movement room.

9.  Use of all club facilities (both indoors and outdoors) prior to opening or after closing is prohibited. Members must leave the club promptly at closing.

10. Members and guests may never utilize the amenities or more than 6 hours at a time.

11. No person shall make unnecessary noise or behave in an objectionable manner, including music/dj.

12. Club Operator reserves the right to revoke, or suspend the membership of any member who acts in a manner detrimental to the operation of the Club, or to the safety of other members, or to the enjoyment of the Club by other members. Club Operator reserves the right to cancel membership privileges if any member or guest violates the rules and regulations of the club. In the event of cancellation Operator will not be liable for the refund of any membership or guest fees.

13. Additional Rules and Regulations for health and safety may be posted from time to time within the Club. Operator reserves the right to modify or amend these Rules and Regulations at any time. It is agreed and understood by Member that this modification or amendment may be imposed by Operator, at any time, without prior notice, and that Member will obey any modifications or amendments as they are posted.

14. Club Operator reserves the right to cancel activities at its discretion.

15. Food and beverages are limited to the designated areas in Club.

16. Pets are not allowed in any area of the Club, indoors or outdoors.

17. Smoking is not permitted anywhere in the club, indoors or outdoors.

18. Glassware and other objects manufactured of glass or similarly fragile materials are prohibited in the Club.

19. Alcohol consumption is prohibited in the Club.

20. No chairs or lounges, or other types of furniture other than those provided by Operator will be permitted in the Club. Seating is on a "First-Come, First-Served" basis.

21. Items in the club may not be removed from the club, including, but not limited to, TV remote controls, furnishings and any other items put in the Club by Operator.

22. Bicycles and other wheeled vehicles or toys, including but not limited to, wagons, tricycles, rollerblades, rollerskates, skateboards, scooters, long boards and any other type of recreational device that the Operator may deem unacceptable, are not permitted in any area of the club, indoors or outdoors.

23. Member shall be responsible for any property damage to the Club caused by the negligence of Member and/or Member's guests.


Initials:  

**24.** Operator reserves the right to modify or amend or discontinue the club's facilities, services, amenities, events, games, etc. at any time. It is agreed and understood that this modification or amendment or discontinuance may be imposed by the club, at any time, without prior notice.

**25.** Club doors are not to be held open by Members to allow other people to enter the club.

**26.** Access to the Club is through electronic key access - building staff and other members are not permitted to grant access to the Club.

**27.** Stairwells in the vicinity of the club are for emergency use only and are not to be used to entry or egress.

**28.** Reservations will only be approved if the tenant is up to date with all payments and has an account balance of $0.

**29.** Reservations require payment to be made and security deposit to be submitted at least 48 hours prior to the reservation start time.

**30.** Payment for reservations may be submitted via Clickpay, money order or certified bank check.

**31.** Reservations can be made no further than 60 days in advance.

**32.** Reservations must be cancelled by no later than 48 hours before the reservation start time. If reservations are cancelled within the 48 period, tenant will be charged for the reservation.

**33.** Amenities may not be available for reservation on certain Holidays.

**34.** Tenants may arrive no more than 30 minutes prior to the reservation start time to set up, provided there isn't already another reservation in progress.

**35.** Space must be cleaned and returned to the state in which it was found by the reservation end time.

**36.** Overstaying the reservation could result in forfeiting part or all of the security deposit.

**37.** Any damages, misuse, excessive noise, loud music, or failure to abide by the posted rules for each space could result in the forfeiting part or all of the security deposit.

**38.** The lounge and any amenity spaces are for personal use only, no commercial or business use event or reservation may take place. No ads or advertisements may be posted by residents/guests etc.

**39.** Management reserves the right to add or edit rules of the Amenity spaces at any time

**E 135 and 3rd Ave Owner LLC**

Signed by Tyla Mazyck
Thu May 2 2024 04:05:25 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

5/23/2024
11:35 AM EDT

Tyla Mazyck *(Tenant)*                                    *Date*          *(Landlord/Agent)*                                    *Date*

Signed by Yerilee Atkinson Velez
Thu May 2 2024 09:31:01 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

Yerilee Atkinson Velez *(Tenant)*                      *Date*



Initials: _____

50

# APARTMENT STANDARDS

This Apartment Standards Addendum attached to and forming part of lease dated **May 2, 2024** between **2455 THIRD AVENUE - MARKET** (hereafter called Landlord), and **Tyla Mazyck and Yerilee Atkinson Velez** (hereafter called Tenant), for apartment #**19G** in the building known as **2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street #19G, Bronx, NY 10451.**

**Apartment & System Maintenance:**

**A.** Resident agrees to keep the Unit clean; use the plumbing, HVAC, and other equipment for its designed purposes: provide appropriate climate control; and take other measures to retard and prevent mold and mildew from accumulating in the Unit. Resident agrees to clean and dust the Unit on a regular basis and to remove visible moisture accumulation on windows, walls and other surfaces as soon as reasonably possible. Resident agrees not to block or cover any of the heating, ventilation or air conditioning ducts in the Unit. Resident also agrees to immediately report to the management office: (i) any evidence of a water leak or excessive moisture in the Unit, as well as in any storage room, garage or other common areas; (ii) any failure or malfunction in the heating, ventilation or air conditioning system in the Unit; (iii) any inoperable doors or windows; and (iv) any evidence of mold or mildew-like growth that cannot be removed by simply applying a common household cleaner and wiping the area. Resident further agrees that Resident shall be responsible for damage to the Unit and Resident's property as well as personal injury to Resident and Occupants resulting from Resident's failure to comply with the terms of this addendum.

**B.** A default under the terms of this Addendum shall be deemed a material default under the terms of the Lease, and Lessor shall be entitled to exercise all rights and remedies at law or in equity. Except as specifically stated herein, all other terms and conditions of the Lease shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease, the terms of this Addendum shall control. Any term that is capitalized but not defined in this Addendum that is capitalized and defined in the Lease shall have the same meaning for purposes of this Addendum as it has for purposes of the Lease.

**Conduct in the Apartment:**

**A.** Tenant acknowledges and understands that his/her actions and conduct will impact the other residential tenants in the Building and that Tenant has an obligation to be mindful and aware of the other tenants' right to quietly enjoy and occupy their respective apartments. Any objectionable conduct on the part of Tenant including but not limited to causing unreasonable noise, noxious odors and/or excessive vibrations from the use of business machines, exercise equipment, entertainment components, etc., to emanate from the Apartment may constitute a material infringement on the quiet enjoyment of the other tenants in the Building. For the foregoing reasons, Tenant acknowledges and agrees that the prevention by Tenant, its invitees and guests of any objectionable conduct, including but limited to causing unreasonable noise, noxious odors and/or excessive vibrations to emanate from the Apartment is OF THE ESSENCE to this Lease, and Tenant covenants and agrees to take all measure necessary, at its own cost and expense, to minimize all such objectionable conduct. Tenant agrees that any breach of this covenant and agreement affecting the quiet enjoyment of the other tenants shall be a material breach of this Lease; that irreparable damage to Owner might result if this covenant and agreement are not specifically enforced; and therefore that in addition to all other rights and remedies of Landlord as provided herein such covenant and agreement shall be enforceable in a court of competent jurisdiction by a decree of specific performance and by appropriate injunctive relief, all in accordance with applicable law. In addition, Tenant agrees to indemnify and hold Landlord harmless from and against any and all loss or damage which Landlord may incur as a result of the breach by Tenant of any of the foregoing restrictions, including, without limitation, any withholding of rent by tenants of the Building, and reasonable attorneys' fees and disbursements incurred by Landlord in connection with any litigation or negotiation with Tenant or any other tenants of the Building with respect to the foregoing.

**B.** At Landlord's request Tenant agrees at its own cost and expense, and subject to Landlord's prior written approval, to do whatever soundproofing is necessary I the Demised Premises so that no sounds will disturb the quiet enjoyment of the other tenants in the Building.

**C.** Tenant's failure to promptly cease and desist from causing or permitting unreasonable noise, or noxious odors to emanate from the Apartment, or causing pr permitting excessive vibrations to disturb other tenants, upon notice from Landlord to Tenant is a substantial breach of Tenant's covenants under this Lease agreement.


Initials: 

**D.** Tenant agrees that in the event Landlord commences any proceeding or action for possession, including a summary proceeding for possession of the apartment, Tenant will not interpose any defense or counterclaim alleging that the Building's distribution ductwork, common walls, radiators, piping and other elements of the Building are insufficient to prevent the infiltration of noise or noxious odors into the common areas of the Building and/or into other apartments in the Building.

**E 135 and 3rd Ave Owner LLC**

**Signed by Tyla Mazyck**
Thu May 2 2024 04:06:09 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

5/23/2024
11:35 AM EDT

---

Tyla Mazyck *(Tenant)*                          *Date*

*(Landlord/Agent)*                                        *Date*

**Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:32:06 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

---

Yerilee Atkinson Velez *(Tenant)*               *Date*

Initials: 

# CARBON MONOXIDE NOTICE TO THE TENANT

Owners are required to provide written information regarding the testing and maintenance of carbon monoxide detecting devices to at least one adult occupant of each dwelling unit including, but not limited to, general information concerning carbon monoxide poisoning and what to do if a carbon monoxide detecting device goes off, the useful life of the device and the owner's duty to replace the device. Please review the provided Carbon Monoxide Poising Brochure for important information.

**NOTICE**

The law requires the owner of the premises to provide a carbon monoxide alarm in each apartment in this building. The carbon monoxide alarm must be placed within 15 feet of the primary entrance to each room lawfully used for sleeping, must be of the type equipped with an end of life audio indicator, and must be periodically replaced by the property owner as necessary. Carbon monoxide alarms have a useful life limitation, and that the owner has a duty to replace such alarms upon the expiration of such useful life. In the event of such expiration, it is the tenantâ##s duty to notify owner.

Tenants are furthermore responsible for the maintenance and repair of the alarms installed in the apartment and for replacing any or all alarms that are stolen, removed, missing, or become inoperable during the occupancy of the apartment. The law provides that the occupant of each Class A apartment in a building in which a carbon monoxide alarm is provided and installed shall pay the owner $25.00 per alarm for the cost of such work for the initial and each periodic end of life replacement. The occupant has one year from the date of installation to make such payment to the owner.

**E 135 and 3rd Ave Owner LLC**



**Signed by Tyla Mazyck**
Thu May 2 2024 04:06:21 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

_____

Tyla Mazyck *(Tenant)*                                    *Date*

**Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:32:15 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

_____

Yerilee Atkinson Velez *(Tenant)*                          *Date*

**5/23/2024**
**11:35 AM EDT**

_____

*(Landlord/Agent)*                                        *Date*

 

**ADDITIONAL CLAUSES ATTACHED TO AND FORMING A PART OF THE LEASE DATED <u>MAY 2, 2024</u> BETWEEN <u>2455 THIRD AVENUE - MARKET</u> (LANDLORD) AND <u>TYLA MAZYCK AND YERILEE ATKINSON VELEZ</u> (TENANT) REGARDING APARTMENT <u>19G</u> IN THE PREMISES LOCATED AT <u>2455-2457 THIRD AVENUE, BRONX, NY  10451</u>. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PROVISIONS OF THIS RIDER AND THE PROVISIONS OF THE LEASE TO WHICH THIS RIDER IS ANNEXED, THE PROVISIONS OF THIS RIDER SHALL GOVERN AND BE BINDING. THE PROVISIONS OF THIS RIDER SHALL BE CONSTRUED TO BE IN ADDITION TO AND NOT IN LIMITATION OF THE RIGHTS OF THE OWNER AND THE OBLIGATIONS OF THE TENANT.**

<u>**2455 THIRD AVENUE - MARKET**</u>

<u>**2455-2457 Third Avenue, Bronx, NY  10451**</u>

# CONSTRUCTION RIDER

Tenant acknowledges that Landlord may be in the process of constructing or renovating the lobby, common areas and public hallways of the building including but not limited to the 4th Floor Lounge & Terrace, 24th Floor Roof Lounge & Terrace, Fitness Center, Recreation Room, Game Room, Dog Washing Room, Parking, private terraces, and laundry facilities. Tenant further acknowledges that there is on going construction and renovation of the building. Tenant agrees not to withhold or deduct rent or to seek any offset, reduction, concession or abatement based on diminution of services or breach of the Warranty of Habitability due to any conditions arising from said construction and renovation or due to any condition of the public spaces during this period in which they are undergoing improvements.

**E 135 and 3rd Ave Owner LLC**

Signed by Tyla Mazyck
Thu May 2 2024 04:06:31 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

5/23/2024
11:36 AM EDT

_____
Tyla Mazyck *(Tenant)*                        *Date*

_____
*(Landlord/Agent)*                        *Date*

Signed by Yerilee Atkinson Velez
Thu May 2 2024 09:32:25 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

_____
Yerilee Atkinson Velez *(Tenant)*             *Date*



Initials:

NAME

**Tyla Mazyck**
**Yerilee Atkinson Velez**

APT.NO.

**19G**

NAME

**Tyla Mazyck**
**Yerilee Atkinson Velez**

APT.NO.

**19G**

**2455-2457 Third Avenue, Bronx,**    **19G**
**NY 10451 AKA 227 East 134th**
**Street**
**Tyla Mazyck**
**Yerilee Atkinson Velez**



Initials: 

Premises: **2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street Bronx NY 10451**
Apartment No.: **19G**
Tenant(s): **Tyla Mazyck and Yerilee Atkinson Velez**

# RIDER TO LEASE
# EARLY OCCUPANCY LICENSE AGREEMENT

**IN THE EVENT THAT THERE ARE ANY PROVISIONS CONTAINED IN THIS RIDER WHICH ARE INCONSISTENT WITH THE PROVISIONS CONTAINED IN THE MAIN BODY OF THIS LEASE, IT SHALL BE DEEMED TO BE THE INTENT OF THE PARTIES HERETO THAT THE PROVISIONS CONTAINED IN THIS RIDER SUPERSEDE ANY INCONSISTENT PROVISIONS THEREIN SUCH THAT SAID LEASE IS DEEMED MODIFIED HEREBY.**

**AGREEMENT,** made as of **May 2, 2024**, between **2455 THIRD AVENUE - MARKET** ("Licensor"), with offices at **2455 3rd Ave, Bronx, NY 10451**, and **Tyla Mazyck and Yerilee Atkinson Velez** ("Licensee")

**WHEREAS,** pursuant to a certain lease dated **May 2, 2024** (hereinafter "the Lease"), Licensee will be the tenant of Apartment **19G** (the "Apartment") at **2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street Bronx NY 10451** ("Subject Building") commencing on **July 1, 2024** ("the commencement date"); and

**WHEREAS,** notwithstanding the commencement date of the Lease and the commencement of Licensee's tenancy thereunder, Licensor has agreed to permit Licensee to enter into occupancy of the Apartment prior to said commencement date.

**NOW,** therefore, in consideration of the foregoing and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

- Premises: Licensor hereby grants permission to the Licensee to occupy the Apartment. This permission is revocable by licensor at any time.
- Term: The license shall be for a period of **1 month** commencing **June 1, 2024** and expiring on **June 30, 2024** (the License Term).
- Nature of Occupancy: The occupancy of the Licensee at the Apartment prior to the commencement date of the Lease shall be as the licensee of Licensor and not as a tenant, and no landlord-tenant relationship shall exist between Licensee and Licensor with respect to this agreement. It is expressly understood that Licensee has entered into this License Agreement with Licensor predicated solely as an incident of the Licensee's having entered into the Lease for the Apartment. Absent the Licensee's having leased the Apartment, Licensor would not have offered or executed this License Agreement with the Licensee. Any fees paid to landlord during the term of this License Agreement or to landlord in exchange for the license shall be considered use and occupancy, not rent.

  It is expressly understood and agreed that the occupancy by the Licensee pursuant to this License Agreement is exempt from and is not covered by the Rent Stabilization Law, the Rent Stabilization Code, the City Rent Law or the Rent and Eviction Regulations.
- Occupancy and Use: Licensee shall use and occupy the Apartment for its residential purposes only and for no other purpose and by no other person. Licensee specifically agrees that only the Licensee may use the apartment.
- Assignment and Sublease: Licensee for itself, its heirs, distributees, executors, administrators, legal representatives, successors and assigns, expressly covenants that it shall not assign, mortgage or encumber this agreement, nor assign, underlet, sublet or suffer or permit the Apartment or any part thereof to be used by others, without the prior written consent of the Licensor in each instance. Said consent of Licensor can be unreasonably withheld. If the Licensee assigns or sublets his/her right to occupancy of the Apartment, the license shall end and expire immediately upon such attempted assignment or sublease.
- Condition of Premises: Licensee has examined the Apartment and accepts it in its present condition and upon the signing of this Early Occupancy Agreement shall have been deemed to have waived any objections to the condition of said premises.
- Consideration for Premises: Predicated upon Licensee's representation as to Licensee's intention to honor and proceed with the Lease on its commencement date, tenant shall pay, concurrent with signing, use and occupancy for the License Term in the amount of **$3,985.00**
- Covenants, Rules and Regulations: Licensee agrees that Licensee shall be bound, during the term of this license, to all obligations, rules and regulations of the Lease for the Apartment, as if said Lease were applicable to the Apartment during the term of the License.
- Terms of Occupancy: It is hereby acknowledged that the Licensee has read and understands this License Agreement and the Lease and will not violate either it in any way.
- Termination of License: This is a revocable license, and accordingly, Licensor may terminate Licensee's license to occupy the Apartment at any time by giving Licensee a written ten (10) day notice to quit pursuant to RPAPL â§ 713. The License term; if not sooner terminated, shall automatically terminate upon the commencement date of the Lease.


Initials:  

It is specifically understood and agreed by and between the parties that this License Agreement is the result of negotiations between the parties, such that both parties shall be deemed to have drawn these documents in order to avoid any negative inference by any court as against the preparer of the document.

• <u>Rider to Lease:</u> This Rider shall be deemed to be incorporated into and is made a part of the Lease between the parties regarding the renting of the Apartment.

• <u>Cross-Default to Lease:</u> In the event that this agreement shall be terminated by reason of the default of Licensee, then, at the option of Licensor, the lease shall be deemed void and of no force or effect.

**********

The parties hereto have caused this Rider to be executed as of the day and year recited below as the date signed by Landlord.

**E 135 and 3rd Ave Owner LLC**

**Signed by Tyla Mazyck**
Thu May 2 2024 04:09:23 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

_____        5/23/2024
Tyla Mazyck *(Tenant)*                    *Date*        11:36 AM EDT

_____
(Landlord/Agent)                    *Date*

**Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:32:59 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

_____
Yerilee Atkinson Velez *(Tenant)*        *Date*




*Initials:*  _____

57

## PROCEDURE FOR TENANTS REGARDING SUSPECTED GAS LEAKS

The law requires the owner of the premises to advise tenants that when they suspect that a gas leak has occurred, they should take the following actions:

1. Quickly open nearby doors and windows and then leave the building immediately; do not attempt to locate the leak. Do not turn on or off any electrical appliances, do not smoke or light matches or lighters, and do not use a house-phone or cell-phone within the building;

2. After leaving the building, from a safe distance away from the building, call 911 immediately to report the suspected gas leak;

3. After calling 911, call the gas service provider for this building as follows:

   **Provider:** _____ ,   **Number:** _____

**E 135 and 3rd Ave Owner LLC**

Signed by Tyla Mazyck
Thu May 2 2024 04:09:32 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

5/23/2024
11:36 AM EDT

_____                    _____
Tyla Mazyck *(Tenant)*                    *Date*        *(Landlord/Agent)*                    *Date*

Signed by Yerilee Atkinson Velez
Thu May 2 2024 09:33:17 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

_____
Yerilee Atkinson Velez *(Tenant)*                    *Date*

## PROCEDIMIENTO PARA LOS INQUILINOS CUANDO HAY SOSPECHA DE FUGA DE GAS

La ley requiere que el propietario de la casa o edificio informe a los inquilinos que cuando sospechan que se ha producido un escape de gas, deben tomar las siguientes medidas

1. Abra rápidamente las puertas y ventanas cercanas y salga del edificio inmediatamente; No intente localizar el escape de gas. No encienda o apague ningún electrodoméstico, no fume ni encienda fósforos ni encendedores, y no utilice un teléfono de la casa o un teléfono celular dentro del edificio;

2. Después de salir del edificio, a una distancia segura del edificio, llame al 911 inmediatamente para reportar sus sospechas;

3. Después de llamar al 911, llame al proveedor de servicio de gas para este edificio, de la siguiente manera:

   **Proveedor:** _____ ,   **Telefono:** _____



*Initials:* ___  T.M. EFCDFF47  Y.A. 0F469534

# HOUSE RULES & REGULATIONS

1. The Sidewalks, entrances, public halls, passenger elevators, and stairways shall not be obstructed nor used for any other purpose than for ingress to, and egress from the apartment. Where applicable, service entrance must be used when you are entering or exiting the building with your bicycle.

2. No Tenant shall make or permit any disturbing noises in the building by himself, his family, friends, guests or staff, nor do or permit anything by such persons that will interfere with the rights, comforts or convenience of other Tenants. No tenant shall play or suffer to be played any musical instrument in the premises between the hours of 10:00p.m. and the following 8:00 a.m. If the same shall disturb or annoy other occupants of the building, in no event shall tenant practice or suffer to be practiced either vocal or instrumental music for more than 2 hours in any day or between the hours of 6:00 p.m. and 8:00 a.m. If same shall disturb or annoy other occupants of the building.

3. Each Tenant shall keep the premises leased in a good state of preservation and cleanliness and shall not sweep or throw or permit to be swept or thrown from the premises leased, any dirt or other substance into any of the corridors or halls or stairways of said building, or out of any window or door of the building. Tenant, guests, and staff are expressly forbidden to throw anything out of the windows or doors, or in the halls of the building or upon any part of the land adjacent to the building.

4. No employees of the Landlord shall be sent out of the building by any Tenant at any time for any purpose. Landlord or Landlord's agents and employees are not responsible to You for any of the following: (1) any loss of or damage to Your or Your property in the Apartment or the Building due to any accidental or intentional cause, or a theft or another crime committed in the Apartment or elsewhere in the Building; (2) any loss of or damage to Your property delivered to any employee of the Building (i.e., doorman, superintendent, etc.); or (3) any damage or inconvenience caused to You by actions, negligence or violations of a Lease by any other tenant or person in the Building except to the extent required by law.

5. It is strongly recommended that you obtain and keep in full force and effect during the term of this lease, a comprehensive tenants' insurance policy with a replacement cost endorsement. Market goods, furniture and packages over 50 pounds are to be delivered through the service entrance provided for such service. Landlord will not be held responsible for the loss or damage of any tenant's property, notwithstanding such loss or damage may occur through the carelessness or negligence of the employees of the building.

6. All garbage and refuse must be placed in the provided compactor rooms as instructed therein and no household garbage is to be placed the litter baskets on grounds.

7. The obstruction of the fire stairwell and common halls and areas is a menace to life and is prohibited by the Fire Department and Landlord.

8. No garbage cans, kitchen, supplies, ice or other articles shall be placed in the hallways or on the staircase landings nor shall anything be hung from the windows or balconies, or placed upon any window sill, ledge or balcony; neither shall any table cloths, clothing, curtains, carpets matting or rugs be hung or shaken from any of the windows or the doors.

9. The water-closets and other water apparatus shall not be used for any purpose than those for which they were constructed, nor shall neither any sweepings, rubbish rags nor any other improper articles be thrown into the same. Damage resulting from misuse thereof shall be borne by tenant by whom or upon whose premises it shall have been caused.

10. No baby carriages, bicycles, wagons, or similar articles, toys, playthings, or other personal property of any tenant or his family, friends, guests, employees or staff, shall be placed in or permitted to remain in the halls, corridors, vestibules or stairways of the building.

11. No tenant, resident, occupant and / or family member and / or employee of said tenant, resident, and or occupant shall loiter and or congregate in the public hallways, lobby elevator, stairways sundeck or laundry room other than for the purposes to which they are intended.

12. No Tenant, nor any member of his family, nor any employee or servant, guest or visitor of any tenant, shall loiter in or about the entrance hallway, lobbies, corridors, vestibules or stairways of the building at any time.

13. Tenants shall not add or affix any locks or bolts on doors or windows without first obtaining the written approval of landlord and any such locks or bolts so added shall become the property of landlord and shall not be removed by tenant. Keys to such locks must be provided to Landlord.

14. No window guards or window stops shall be removed from windows.

15. Rollerblading, bicycle and scooter riding, and skateboarding are prohibited in all common areas.

ACKNOWLEDGED, UNDERSTOOD, AND AGREED


Initials: 

**E 135 and 3rd Ave Owner LLC**



**Signed by Tyla Mazyck**
Thu May 2 2024 04:10:16 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

**5/23/2024**
**11:36 AM EDT**

Tyla Mazyck *(Tenant)*                                Date      *(Landlord/Agent)*                                                      Date

**Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:33:26 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

Yerilee Atkinson Velez *(Tenant)*                     Date

*Initials:* 

# LEASE/COMMENCEMENT OF OCCUPANCY NOTICE FOR INDOOR ALLERGEN HAZARDS

1.  The owner of this building is required, under New York City Administrative Code section 27- 2017.1 et seq., to make an annual inspection for indoor allergen hazards (such as mold, mice, rats, and cockroaches) in your apartment and the common areas of the building. The owner must also inspect if you inform him or her that there is a condition in your apartment that is likely to cause an indoor allergen hazard, or you request an inspection, or the Department has issued a violation requiring correction of an indoor allergen hazard for your apartment. If there is an indoor allergen hazard in your apartment, the owner is required to fix it, using the safe work practices that are provided in the law. The owner must also provide new tenants with a pamphlet containing information about indoor allergen hazards.

2.  The owner of this building is also required, prior to your occupancy as a new tenant, to fix all visible mold and pest infestations in the apartment, as well as any underlying defects, like leaks, using the safe work practices provided in the law. If the owner provides carpeting or furniture, he or she must thoroughly clean and vacuum it prior to occupancy. This notice must be signed by the owner or his or her representative, and state that he or she has complied with these requirements.

I, **2455 THIRD AVENUE - MARKET** (owner or representative name in print), certify that I have complied with the requirements of the New York City Administrative Code section 27- 2017.5 by removing all visible mold and pest infestations and any underlying defects, and where applicable, cleaning and vacuuming any carpeting and furniture that I have provided to the tenant. I have performed the required work using the safe work practices provided in the law.

**E 135 and 3rd Ave Owner LLC**

<div style="margin-left:40%">

_____

5/23/2024
11:36 AM EDT

_____

</div>

*(Landlord/Agent)*                                                        *Date*



*Initials:*

# What Every Tenant Should Know About Indoor Allergens
## (Local Law 55 of 2018)

Allergens are things in the environment that make indoor air quality worse. They can cause asthma attacks or make asthma symptoms worse. Common indoor allergens, or triggers, include cockroaches and mice; mold and mildew; and chemicals with strong smells, like some cleaning products. Environmental and structural conditions, like leaks and cracks in walls often found in poorly maintained housing, lead to higher levels of allergens.

New York City law requires that landlords take steps to keep their tenants' homes free of pests and mold. This includes safely fixing the conditions that cause these problems. Tenants also play a role in preventing indoor allergens.

Tenants should:

- Keep homes clean and dry
- Place food in sealed containers, keep counters and sinks clean, and get rid of clutter such as newspapers and paper bags
- Use garbage cans with tight-fitting lids
- Take garbage and recycling out every day, and tie up garbage bags before putting them in compactor chutes
- Avoid using pesticides and chemicals with strong smells (e.g., cleaning products, air fresheners, etc.)
- Tell landlords right away if there are pests, water leaks, or holes or cracks in the walls and floors
- Let building staff into homes to make any needed repairs
- Call **311** if landlords do not fix the problem or if repair work is being done unsafely

**If you are a tenant and you or your child has asthma, and there are pests or mold in your home, your doctor can request a free home environmental inspection for you through the New York City Health Department's Online Registry. Talk to your doctor or call 311 to learn more.**

For more information about building owner and landlord responsibilities and safely fixing indoor allergen hazards, see the reverse side of this handout.

For more information about safely controlling asthma, visit **nyc.gov/health/asthma**.



Español | 繁體中文| 简体中文 | Русский |한국어| Kreyòl ayisyen | العربية

nyc.gov/health    "healthy neighborhoods"




*Initials:*  

# What Landlords Must Do to Keep Homes Free of Pests and Mold

New York City law requires that landlords of buildings with three or more apartments – or buildings of any size where a tenant has asthma – take steps to keep tenant homes free of pests and mold. This includes safely fixing the conditions that cause these problems.

Landlords must:

- **Inspect** every apartment and the building's common areas for cockroach and rodent infestations, mold and the conditions that lead to these hazards, at least once a year and more often if necessary. Landlords must also respond to tenant complaints or requests for an inspection.

- **Use integrated pest management (IPM) practices** to safely control pests and fix building-related issues that lead to pest problems.
    - ✓ Remove pest nests and thoroughly clean pest waste and other debris using a HEPA vacuum. Make sure to limit the spread of dust when cleaning.
    - ✓ Repair and seal any holes, gaps or cracks in walls, ceilings, floors, molding, base boards, around pipes and conduits, and around within cabinets.
    - ✓ Attach door sweeps to all doors that lead to hallways, basements or outside.
    - ✓ Remove all water sources for pests by repairing drains, faucets and other plumbing materials that collect water or leak.
    - ✓ Use pesticides sparingly. If pesticides must be used to correct a violation, they must be applied by a New York State Department of Environmental Conservation–licensed pest professional.

- **Remove indoor mold** and safely fix the problems that cause mold.
    - ✓ Remove any standing water, and fix leaks or moisture conditions.
    - ✓ Move or cover furniture, and seal off doorways, ventilation ducts and other openings securely with plastic sheeting.
    - ✓ Gently spray the moldy area with soap or detergent and water before cleaning to limit the spread of dust.
    - ✓ Clean the work area with wet mops or HEPA vacuums before work starts, at the end of each day and after all repair work is completed.
    - ✓ Dry the cleaned area completely.
    - ✓ Throw away all cleaning-related waste in heavy-duty plastic bags and seal securely.
    - ✓ To clean 10 or more square feet of mold in a building with 10 or more apartments, landlords **must** hire a New York State Department of Labor–licensed mold assessor and remediator. Per New York City Administrative Code section 24-154 and New York State Labor Law Article 32, assessors and remediators must submit paperwork to the New York City Department of Environmental Protection.

- Make sure vacant apartments are thoroughly **cleaned and free of pests and mold** before a new tenant moves in.

- Provide a copy of this fact sheet and a notice with each tenant's lease that clearly states the landlord's and tenant's responsibilities to keep the building free of indoor allergens.

For more information about building owner and landlord responsibilities and safely fixing indoor allergen hazards, visit **nyc.gov/hpd** and search for **indoor allergen hazards**.



Español | 繁體中文 | 简体中文 | Русский | 한국어 | Kreyòl ayisyen | العربية



nyc.gov/health          "healthy neighborhoods"




Initials:

# RESIDENT INSURANCE REQUIREMENTS

| **Tenant(s):** |
|---|
| Tyla Mazyck and Yerilee Atkinson Velez |
| **Unit Address:** |
| 2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street #19G, Bronx, NY  10451 |

Tenant(s): **Tyla Mazyck and Yerilee Atkinson Velez**
Unit Address: **2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street #19G, Bronx, NY  10451**

Tenant agrees to maintain, at Tenant's sole expense during the term of this lease and any subsequent renewal periods, a policy of personal liability, issued by a licensed insurance company of the tenant's choice, which provides limits of liability in an amount of **$25,000.00 per occurrence**. Tenant agrees to waive subrogation rights against Landlord, its manager and their officers, directors and employees to the fullest extent allowed.

I understand that the owner of this apartment community is a landlord renting residential apartment space and (1) is not responsible for the loss of my property and (2) does not provide insurance for me.

*Please check one:*

❏ **I WILL PURCHASE COVERAGE.**      I recognize my need for insurance and will take advantage of the program made available to residents of properties managed by or owned by the property management company. Information and premium amounts for this program can be obtained by **calling 888-205-8118 or by logging onto www.erenterprotection.com**.

❏ **I HAVE COVERAGE.**     I have and will maintain throughout the term of my lease the following coverage. (I will provide a copy of my declaration page for the leasing office file.)

☒ **I DECLINE RENTERS INSURANCE.**     I understand the landlord is not responsible for the loss of my property and does not provide insurance for me

| **Insurance Company:** |
|---|
| **Policy Number:** |
| **Property Limit:** |
| **Liability Limit:** |

**NOTE:**
*This form must be completed in full and signed by both the resident and an authorized representative of the property management company. Any insurance suggested in connection with this lease can be satisfied by a policy purchased through an authorized agent or insurance company in this state.*

| | 5/23/2024<br>11:36 AM EDT | Signed by Tyla Mazyck<br>Thu May 2 2024 04:11:08 PM EDT<br>Key: EFCDFF47; IP Address: 174.229.48.89 |
|---|---|---|
| *(Owner/Agent)* | *Date* | Tyla Mazyck *(Resident Signature)*        *Date* |

Signed by Yerilee Atkinson Velez
Thu May 2 2024 09:33:57 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

Yerilee Atkinson Velez *(Resident Signature)*        *Date*

Initials:  



To: **Tyla Mazyck and Yerilee Atkinson Velez**
From: **2455 THIRD AVENUE - MARKET**
Date: **May 2, 2024**

# PROTECT YOUR CHILD FROM LEAD POISONING AND WINDOW FALLS
## Annual Notice

New York City law requires that tenants living in buildings with 3 or more apartments complete this form and return it to their landlord before **February 15**, each year. **If you do not return this form, your landlord is required to visit your apartment to determine if children live in your apartment.**

## Peeling Lead Paint

**By law**, your landlord is required to inspect your apartment for peeling paint and other lead paint hazards at least once a year if a child under 6 years of age (5 years or younger) lives with you.

- You must notify your landlord in writing if a child under 6 comes to live with you during the year.
- If a child under 6 lives with you, your landlord must inspect your apartment and provide you with the results of these paint inspections.
- Your landlord must use safe work practices to repair all peeling paint and other lead paint hazards.
- *Always report peeling paint to your landlord. Call 311 if your landlord does not respond.*

*These requirements apply to buildings with 3 or more apartments built before 1960. They also apply to buildings built between 1960 and 1978 if the landlord knows that lead paint is present.*

## Window Guards

**By law**, your landlord is required to install window guards in all your windows if a child under 11 years of age (10 years or younger) lives with you, OR if you request them (even if no children live with you).

- **It is against the law** for you to interfere with installation, or remove window guards where they are required. Air conditioners in windows must be permanently installed.
- Window guards must be installed so there is no space greater than 4½ inches above or below the guard, on the side of the guard, or between the bars.
- ONLY windows that open to fire escapes, and one window in each first floor apartment when there is a fire escape on the outside of the building, are legally exempt from this requirement.

*These requirements apply to all buildings with 3 or more apartments, regardless of when they were built.*

*Fill out and detach the bottom part of this form and return it to your landlord.*

-------------------------------------------------------------------------------------------------------------------------------

Please check all boxes that apply:

❏ **A child under 6 years of age (5 years or younger) lives in my apartment.**
❏ **A child under 11 years of age (10 years or younger) lives in my apartment and:**
　❏ Window guards are installed in all windows as required.
　❏ Window guards need repair.
　❏ Window guards are NOT installed in all windows as required.
☒ **No child under 11 years of age (10 years or younger) live in my apartment.**
　❏ I want window guards installed anway.
　❏ I have window guards, but they need repair.

| Last Name: | First Name: | Middle Name: | Telephone Number: |
|---|---|---|---|
| Mazyck | Tyla | | (347) 814-3073 |

| Last Name: | First Name: | Middle Name: | Telephone Number: |
|---|---|---|---|
| Atkinson Velez | Yerilee | | (787) 412-6234 |

| Street Address: | Apt. #: | City: | State: | Zip Code |
|---|---|---|---|---|
| 2455-2457 Third Avenue | 19G | Bronx | NY | 10451 |

**Signed by Tyla Mazyck**
Thu May 2 2024 04:11:17 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

_____
Tyla Mazyck　　　　　　　　　　　　　　*Date*

**Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:34:10 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

_____
Yerilee Atkinson Velez　　　　　　　　　*Date*

**Deadline for return: February 15, 2025**
Return form to: **2455 3rd Ave, Bronx, NY  10451**. Call 311 for more information on preventing lead poisoning and window falls.

Approved 10/26/2017

 

Initials:

# NON SMOKING ADDENDUM

IN THE EVENT THAT THERE ARE ANY PROVISIONS CONTAINED IN THIS RIDER WHICH ARE INCONSISTENT WITH THE PROVISIONS CONTAINED IN THE BODY OF THE LEASE BETWEEN THE PARTIES, IT SHALL BE DEEMED TO BE THE INTENT OF THE PARTIES HERETO THAT THE PROVISIONS CONTAINED IN THIS RIDER SUPERSEDE ANY INCONSISTENT PROVISIONS THEREIN SUCH THAT SAID LEASE IS DEEMED MODIFIED HEREBY.

Smoke in a multi-family residential setting, like a multi-floor apartment building with common/shared ventilation systems, is extremely difficult to control. Studies have shown that smoke can travel from the end of lit cigarettes/cigars to many other areas of a building. Smoke and other odors can travel through the plumbing, the electrical system, the air conditioning and heating systems, through cabinets and closets, fireplaces, ventilation systems and under and around doors and windows. It can also enter windows and doors from tenants/occupants smoking on terraces/balconies and in court yards, sometimes even when windows and doors are closed. In this close proximity environment it is often difficult to trace the location of where the smoke is coming from.

The term "smoking" means inhaling, exhaling, burning, or carrying any lighted cigar, pipe, cigarette or other tobacco or other product in any manner or in any form.

Owner has advised Tenant that it is Owner's preference that the building be a "non-smoking building" and that Owner shall use its best efforts to maintain the building in such manner.

Tenant acknowledges that this information was made available to me before renting this apartment in the building and that I made the decision to rent in this building fully aware of this restriction.

As a material inducement for Owner entering into a Lease with Tenant, Tenant represents that neither Tenant nor any persons that do or will enter into or occupy the apartment with Tenant or by Tenant's permission are not currently smokers (or choose or agree not to smoke in the building) and will not smoke anywhere in the building including all common areas, all amenity spaces, all fire stairs, any roof decks, terraces and gardens, inside my apartment, on my private terrace (if Tenant has one attached to my apartment), and in a perimeter of 30 feet around the entire building envelope, in any retail area/areas, etc. and that Tenant shall so inform all such persons that do or will enter into or occupy the apartment with Tenant or by Tenant's permission and shall be responsible for the conduct thereof.

If Tenant or any of such persons that do or will enter into or occupy the apartment with Tenant or by Tenant's permission were to smoke (either regularly or in one instance) in any area of the building including my apartment, Tenant agrees and understands that such action would be a violation of this Lease Rider, such that Owner may elect to take action against Tenant, including legal steps leading to my eviction from my apartment and the building.

Notwithstanding anything to the contrary contained herein, Tenant acknowledges that Tenant's obligations under this Lease are not contingent upon Owner maintaining the building as a non smoking building, nor shall Owner's failure or inability to maintain the bridling as a non smoking building serve as a basis for Tenant to withhold or receive an abatement of any rent or additional rent or for Tenant to have a right to terminate this Lease.

Tenant understands that Owner will make "best efforts" to maintain the non-smoking nature of the building and that the Owner may or may not choose to take action against a specific tenant, group of tenants, specific occupant or group of occupants.

Tenant expressly acknowledges that Owner (whether acting as Owner hereunder or in any other capacity) has not made and will not make, nor shall Owner be deemed to have made, any warranty or representation, express or implied with respect to its intention or ability to maintain a non smoking building.

The parties shall be deemed to have jointly drawn this Agreement in order to avoid any negative inference against the preparer of the document.


Initials: 

**E 135 and 3rd Ave Owner LLC**

 **Signed by Tyla Mazyck**
Thu May 2 2024 04:11:35 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

**5/23/2024**
**11:36 AM EDT**

_____     _____
Tyla Mazyck *(Tenant)*                    *Date*     *(Landlord/Agent)*                          *Date*

 **Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:34:26 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

_____
Yerilee Atkinson Velez *(Tenant)*          *Date*

 
*Initials:*

# NOTICE DISCLOSING TENANTS' RIGHTS TO REASONABLE ACCOMMODATIONS FOR PERSONS WITH DISABILITIES

<u>Reasonable Accommodations</u>

The New York State Human Rights Law requires housing providers to make reasonable accommodations or modifications to a building or living space to meet the needs of people with disabilities. For example, if you have a physical, mental, or medical impairment, you can ask your housing provider to make the common areas of your building accessible, or to change certain policies to meet your needs.

To request a reasonable accommodation, you should contact your property manager by calling **(212) 360-5092** or by e-mailing _____ . You will need to show your housing provider that you have a disability or health problem that interferes with your use of housing, and that your request for accommodation may be necessary to provide you equal access and opportunity to use and enjoy your housing or the amenities and services normally offered by your housing provider.

If you believe that you have been denied a reasonable accommodation for your disability, or that you were denied housing or retaliated against because you requested a reasonable accommodation, you can file a complaint with the New York State Division of Human Rights as described at the end of this notice.

Specifically, if you have a physical, mental, or medical impairment, you can request:

- Permission to change the interior of your housing unit to make it accessible (however, you are required to pay for these modifications, and in the case of a rental your housing provider may require that you restore the unit to its original condition when you move out);

- Changes to your housing provider's rules, policies, practices, or services;

- Changes to common areas of the building so you have an equal opportunity to use the building. The New York State Human Rights Law requires housing providers to pay for reasonable modifications to common use areas.

Examples of reasonable modifications and accommodations that may be requested under the New York State Human Rights Law include:

- If you have a mobility impairment, your housing provider may be required to provide you with a ramp or other reasonable means to permit you to enter and exit the building.

- If your doctor provides documentation that having an animal will assist with your disability, you should be permitted to have the animal in your home despite a "no pet" rule.

- If you need grab bars in your bathroom, you can request permission to install them at your own expense. If your housing was built for first occupancy after March 13, 1991 and the walls need to be reinforced for grab bars, your housing provider must pay for that to be done.

- If you have an impairment that requires a parking space close to your unit, you can request your housing provider to provide you with that parking space or place you at the top of a waiting list if no adjacent spot is available.

- If you have a visual impairment and require printed notices in an alternative format such as large print font or need notices to be made available to you electronically, you can request that accommodation from your landlord.

Required Accessibility Standards

All buildings constructed for use after March 13, 1991, are required to meet the following standards:

- Public and common areas must be readily accessible to and usable by persons with disabilities;

- All doors must be sufficiently wide to allow passage by persons in wheelchairs; and

- All multi-family buildings must contain accessible passageways, fixtures, outlets, thermostats, bathrooms, and kitchens.

If you believe that your building does not meet the required accessibility standards, you can file a complaint with the New York State Division of Human Rights.



<u>How to File a Complaint</u>

A complaint must be filed with the Division within one year of the alleged discriminatory act. You can find more information on your rights, and on the procedures for filing a complaint, by going to <u>www.dhr.ny.gov</u>, or by calling 1-888-392-3644 with questions about your rights. You can obtain a complaint form on the website, or one can be e-mailed or mailed to you. You can also call or e-mail a Division regional office. The regional offices are listed on the website.



**Signed by Tyla Mazyck**
Thu May 2 2024 04:11:52 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

Tyla Mazyck *(Tenant)*      *Date*



**Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:34:40 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

Yerilee Atkinson Velez *(Tenant)*      *Date*



*Initials:* _____  _____

**ADDITIONAL CLAUSES ATTACHED AND FORMING A PART OF THE LEASE DATED <u>MAY 2, 2024</u> BETWEEN <u>2455 THIRD AVENUE - MARKET</u> (LANDLORD) AND <u>TYLA MAZYCK AND YERILEE ATKINSON VELEZ</u> (TENANT) REGARDING APARTMENT <u>19G</u> IN THE PREMISES LOCATED AT <u>2455-2457 THIRD AVENUE, BRONX, NY 10451 AKA 227 EAST 134TH STREET, BRONX, NY 10451</u>. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PROVISIONS OF THIS RIDER AND THE PROVISIONS OF THE LEASE TO WHICH THIS RIDER IS ANNEXED, THE PROVISIONS OF THIS RIDER SHALL GOVERN AND BE BINDING. THE PROVISIONS OF THIS RIDER SHALL BE CONSTRUED TO BE IN ADDITION TO AND NOT IN LIMITATION OF THE RIGHTS OF THE OWNER AND THE OBLIGATIONS OF THE TENANT.**

# OCCUPANCY RIDER

The only people who may reside in the Apartment are:

1. named Tenants on the lease ("Tenants");

2. any other person who is authorized by all named Tenants to reside in the Apartment is entitled to be so authorized under Section 235-f of the New York Real Property Law ("Occupants"). Occupants shall not have the right to reside in the Apartment if the Tenants die or if the Tenant vacates or abandons the Apartment except as otherwise specifically prescribed by a non-waivable provision of the New York Real Property Law.

3. Tenant agrees that, absent express written consent by the Owner, no family member, occupant, dependant child thereof or any other person other than the Tenant(s) shall acquire any right to occupancy of the Apartment or any other independent tenancy rights or occupancy rights to the Apartment. Neither the tender nor the acceptance of a rent payment by or on behalf of any person other than the Tenant(s) named on the lease shall constitute such express written consent.

Tenant(s) warrant and represent that no one apart from the following individuals will occupy the Apartment and will do so from the inception of the lease.

| Name of Occupants | Relationship to Tenant |
|---|---|
| Tyla Mazyck | |
| Yerilee Atkinson Velez | |
| | |
| | |
| | |

The inclusion of the above named additional residents in this document shall at no time represent an Owner/Tenant relationship between said resident and Owner. Tenant must notify owner of any change in additional occupancy, which may be allowable under Section 235-f of the New York Real Property Law.

ACKNOWLEDGED, UNDERSTOOD AND AGREED:

**E 135 and 3rd Ave Owner LLC**

Signed by Tyla Mazyck
Thu May 2 2024 04:12:02 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

5/23/2024
11:36 AM EDT

_____     _____
Tyla Mazyck *(Tenant)*          *Date*     *(Landlord/Agent)*          *Date*

Signed by Yerilee Atkinson Velez
Thu May 2 2024 09:35:25 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

_____
Yerilee Atkinson Velez *(Tenant)*          *Date*


Initials:  

# PEST CONTROL RIDER

ADDITIONAL CLAUSES attached to and inform part of Lease dated **May 2, 2024**, executed on the date hereof, between **2455 THIRD AVENUE - MARKET**, (hereafter called Landlord), and **Tyla Mazyck and Yerilee Atkinson Velez** (hereafter called Tenant), for Apartment #**19G**.

I authorize all pest control technicians contracted by **K and R Realty Management** as agent for **2455-2457 Third Avenue, Bronx, NY  10451**, to enter my apartment to perform pest control services in the event that I am not home on the date and time that service is to be rendered. It is understood that in the event that I am not home on the date of service that Building Manager will accompany any pest control technicians to my apartment.

It is further understood that I will work in cooperation with the Landlord to seek resolution of any issues that may arise whether discovered by myself, the pest control technician and/or the Landlord. It is also understood that I will immediately notify the Landlord of the presence of nay pests, including bedbugs that I may observe in my apartment by contacting the management office. I acknowledge that based on the extent of infestation, certain items may need to be disposed of as part of the pest control treatment, which will be determined on a case-by-case basis by management in conjunction with exterminating technicians. I understand that I will not be compensated for items that must be discarded in order to curtail an infestation.

I further acknowledge that the Landlord's obligation under applicable law and regulations is to provide exterminating/eradication services in the apartment to control pests, however I am responsible for the care and maintenance of my personal property. Accordingly I covenant and agree that I shall, at my own cost and expense: (i) clean and maintain my personal property in order to avoid and/or eradicate any pest infestation and (ii) fully cooperate with the exterminating technicians contracted by Landlord to prepare the Apartment and my personal property for proper exterminating/eradication services.

Failure to timely notify the Landlord of the presence of any pests or to cooperate with the Landlord is a substantial and material default of my obligations under my lease.

This acknowledgment shall remain in effect until such time as it is canceled by the undersigned

ACKNOWLEDGED, UNDERSTOOD AND AGREED

**E 135 and 3rd Ave Owner LLC**

Signed by Tyla Mazyck
Thu May 2 2024 04:12:09 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

5/23/2024
11:37 AM EDT

Tyla Mazyck *(Tenant)*                                          *Date*         *(Landlord/Agent)*                                          *Date*

Signed by Yerilee Atkinson Velez
Thu May 2 2024 09:35:34 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

Yerilee Atkinson Velez *(Tenant)*                              *Date*




*Initials:* _____

# PET RIDER

ADDITIONAL CLAUSES ATTACHED AND FORMING A PART OF THE LEASE DATED **MAY 2, 2024** BETWEEN **2455 THIRD AVENUE - MARKET** (LANDLORD) AND **TYLA MAZYCK AND YERILEE ATKINSON VELEZ** (TENANT) REGARDING APARTMENT **19G** LOCATED AT **2455-2457 THIRD AVENUE, BRONX, NY 10451 AKA 227 EAST 134TH STREET #19G, BRONX, NY 10451**. IN THE EVENT OF ANY INCONSISTENCY BETWEEEN THE PROVISIONS OF THIS RIDER AND THE PROVISIONS OF THE LEASE TO WHICH THIS RIDER IS ANNEXED, THE PROVISIONS OF THIS RIDER SHALL GOVERN AND BE BINDING. THE PROVISIONS OF THIS RIDER SHALL BE CONSTRUED TO BE IN ADDITION TO AND NOT IN LIMITATION OF THE RIGHTS OF THE OWNER AND THE OBLIGATIONS OF THE TENANT.

**PET POLICY ACKNOWLEDGEMENT AND OVERVIEW**

This is to acknowledge I was informed of the pet policy at the Building.

I acknowledge that I must seek written approval from the owner prior to obtaining and bringing any pet into my Apartment. Should I receive approval for a pet, I will follow the rules and regulations pertaining to having a pet in my Apartment, as set forth in my Lease, the riders thereto, and any other rules or regulations adopted by the Owner. If, in the Owner's sole opinion, my pet becomes a nuisance, permission to have a pet in my Apartment may be revoked.

I understand that the Owner shall specifically rely upon the representations made in this Rider and that except as provided in this Rider, no pets may be harbored in the Apartment. Upon the Owner's counter-signing and delivery of this Rider to Tenant, Owner confirms that it permits Tenant to harbor only the below identified pet(s) in the Apartment upon Tenant's full compliance with the following terms and conditions, which terms and conditions are hereby agreed to by Tenant.

| No pets have been authorized at this time. |
| --- |

**TERMS AND CONDITIONS:**

1. Rules

    a. Pets may be dogs and/or cats only. Tenants shall harbor no other types of animals in the Apartment or Building.

    b. The number of pets may not exceed two (2) pets.

    c. The combined weight of two (2) pets may not exceed eighty (80) pounds. Tenant represents that aforementioned pet(s) weigh no more than eighty (80) pounds combined, and are of breeds that will not exceed eighty (80) pounds combined weight at their maturity. In the case that the Tenant has represented that Tenant has only one (1) pet by providing information pertaining to only one (1) pet above, pet is not to exceed forty five (45) pounds at maturity. Tenant furthermore agrees to produce aforementioned pet(s) for weight verification by Owner with a scale of Owner's choosing at any time during the term of Tenant's residency at Building. Upon written notice from Owner to Tenant of Owner's desire to verify pet(s) weight, Tenant has seven (7) days to produce pet(s) for weight verification. Tenant may be required to remove one (1) or both pets from Apartment and Owner's property immediately following i) failure to produce pet(s) by the expiration of seven (7) day notification period and/or ii) verification by Owner that pet(s) exceed eighty (80) pounds combined weight limit.

    d. Pet(s) must be regularly examined by a veterinarian, spayed or neutered prior to reaching the age of six (6) months, have current rabies vaccinations, be up to date with all necessary shots and be licensed by the NYC Department of Health and Mental Hygiene. Tenant has 90 days from date of Owner's agent's receipt of registration to furnish Owner with certification from a veterinarian licensed by New York State proving compliance with all the aforementioned conditions.

    e. Under no circumstances may Tenant harbor any pet other than, in lieu of, or in replacement of the pet(s) specifically described above. Furthermore, any pet that is not registered with the Owner's agent may not reside in nor visit an Apartment on Owner's property.

    f. Pet(s) must not be a nuisance or be a disturbance, threat or danger to the Owner, Owner's property, other tenants of the building or guests or invitees entering the building. Pets that exhibit aggressive behavior, pets that are not clean and parasite-infected pets will in the Owner's determination be considered a nuisance. Excessive barking, as determined by Owner, shall be considered a nuisance or disturbance.

    g. Tenant represents that aforementioned pet(s) have never to Tenant's knowledge caused serious harm to any person or other animals. Pets that are vicious, threatening, bite people or other pets, including but not limited to fighting and attack dogs, are not permitted on Building property or in any Building Apartments.

    h. Notwithstanding the above, permission is not given to harbor dogs of the Rottweiler, American pit-bull, Pit-bull Terrier, Pit-bull, German Shepherd and Doberman Pinscher variety, mixed or pedigreed, or any breed (in the Owner's sole discretion) with an aggressive nature.

    i. When being transported through public or common areas, all pets (including service animals) must wear a collar about its neck with both i) its NYC Department of Health and Mental Hygiene metal license tag and ii) a tag denoting Tenant's


Initials:  

name and Apartment number.

**j.** Pet(s) must be kept on a leash no longer than six (6) feet and accompanied by a person at all times outside of the Apartment. Pet(s) are not permitted in any common areas of the building, including but not limited to the Health Club, lounges, roof decks, terraces, courtyards, elevators and laundry room, except for the hallways of Tenant's floor, the designated pet elevator, stairwells and lobby when being transported in and out of the Building. Owner reserves the right to require Tenant to muzzle animals in common areas. Tenant may not loiter in common areas with pet(s).

**k.** Pet(s) may only be transported in the designated pet elevator.

**l.** Pets must be housebroken. Tenants must clean up after pet debris in Apartment and Building. Pet waste including cat litter must be disposed of in compactors with regular garbage and not in septic systems. Should pet(s) urinate or defecate in Apartment or Building, Tenant accepts full cost of cleaning and disinfecting affected areas, including the cost of replacing affected materials should Owner deem it necessary. The cost of curing such damages shall be collectible as rent by Owner.

**m.** Should pet(s) reach an age or possess a condition where pet(s) cannot control bodily functions, Owner may require Tenant to cause pet(s) removal from Building.

**n.** Tenant must notify Owner's agent when Tenant plans to leave pet(s) in Apartment for a period exceeding twenty-four (24) hours. Tenant must arrange for a pet-sitter and notify Owner's agent of pet-sitter's name prior to departure.

**2.** Tenant indemnifies Owner and holds Owner harmless against any and all claims, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and expenses) asserted against, suffered or incurred by Owner, based on or arising from any claim or claims that any pet claimed to be owned by or in the custody or control of Tenant caused or threatened to cause any death, injury or harm (whether physical or mental) to any person or damage to any property or otherwise caused any nuisance, disturbance, interference, disruption, or any unsafe, unsanitary, or other adverse condition in the Building. Tenant shall be responsible for all damages caused by pet(s).

**3.** Tenant represents and agrees that Tenant shall fully comply with the conditions set forth in this Rider.

**4.** Owner's consent to the harboring of the pet(s) is predicated upon the specific presentations and compliance with the representations and agreements herein by Tenant, absent which Owner would not have executed this Rider.

**5.** If at any time Owner, in its sole discretion, determines that any pet of Tenant has caused or has threatened to cause any nuisance, disturbance, interference, unsafe or unsanitary or other adverse or undesirable condition in the Building, Owner may revoke any permission it may have granted to Tenant to harbor the pet, and in the event of such revocation of permission, Tenant shall immediately remove the pet from the Building.

**6.** Tenant acknowledges, agrees, warrants and represents that a breach by Tenant, or Tenant's guests or invitees, of the terms of this Rider shall constitute a material breach of a substantial obligation of the Lease, and that, upon any such breach, this permission to harbor pet(s) is revoked. Tenant shall promptly upon notice of said breach remove the pet being harbored in the Apartment. In the event that Tenant breaches any of the terms contained in this Rider, Owner may proceed with all legal remedies necessary to rectify said breach, including commencing legal proceedings against Tenant in order to remove pet(s) from the Apartment or enforce the provisions of Lease, at the Owner's option in accordance with the Default and Termination paragraphs contained in the Lease. Tenant acknowledges Tenant shall be solely responsible for and, upon Owner's demand, shall pay to Owner all legal costs (including, without limitation, court costs and attorneys' fees and expenses) incurred by Owner in connection with Owner's efforts to cure said breach or otherwise to enforce any of Owner's rights and remedies.

**7.** Tenant's failure to notify Owner of any pet residing in Building, or to adhere to the provisions of this rider, shall not imply any tacit acceptance or agreement on the Owner's part to the harboring of pets, regardless of the length of stay or whether they meet the building criteria.

**8.** The Owner does not waive any provision of the Lease or any of its rights or remedies at law or equity by entering into this Rider. This Rider shall be deemed to be incorporated into and is made a part of the Lease.


Initials: 

**9.**  Owner reserves the right to rescind or amend any of these rules and regulations and to institute any such other rules and regulations from time to time as may be deemed necessary for the safety, care, or cleanliness of the Building and for securing the comfort and convenience of all tenants.

**E 135 and 3rd Ave Owner LLC**

**Signed by Tyla Mazyck**
Thu May 2 2024 04:12:37 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

5/23/2024
11:37 AM EDT

Tyla Mazyck *(Tenant)*                    *Date*        *(Landlord/Agent)*                                *Date*

**Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:35:52 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

Yerilee Atkinson Velez *(Tenant)*        *Date*

 

*Initials:* _____  _____

74

# K&R REALTY MANAGEMENT REASONABLE ACCOMMODATION POLICY

K&R Realty Management is committed to granting reasonable accommodations to its rules, policies, practices or services where such accommodations enable people with disabilities the equal opportunity to use and enjoy their dwellings as required by federal, state and local law. A reasonable accommodation may include an exception to a rule or policy or physical change to a unit or common area. A disability-related reasonable accommodation exists when there is an identifiable relationship, or nexus, between the requested accommodation and the individual's disability. An accommodation is reasonable unless it causes undue hardship.

**Reasonable Accommodation Requests**

K&R Realty Management accepts reasonable accommodation requests from persons with disabilities and those acting on their behalf. Individuals who would like to request a reasonable accommodation may submit a request in our office to the front desk, over the phone at 212-590-0590, or via email at maintenance@kandrrealty.com. We have reasonable accommodation request forms available to submit a request.

We will decide on your request within 10 calendar days following the receipt of all required documentation. If the request is of a time-sensitive nature, please let us know and we will make our best efforts to expedite the decision-making process. If we grant the request, we will let you know in writing by sending you a dated letter.

In the event we need additional information to make a determination, we will advise you of the specific information needed within 10 calendar days of your request. It is K&R Realty Management's policy to seek only the information needed to determine if a reasonable accommodation should be granted under federal, state or local law. K&R Realty Management will never require individuals to provide details of a disability beyond that which is minimally sufficient to demonstrate the existence of a disability and the relationship between the disability and the requested accommodation. If we deny the request, we will provide you with a dated letter or email stating all the reasons for our denial. If an individual with a disability believes a request for reasonable accommodation has been unreasonably delayed, denied unlawfully, or that the individual has otherwise been discriminated against on the basis of a disability, then the individual may file a complaint by writing or calling any of the following:

New York City Commission on Human Rights 22 Reade Street
New York, NY 10007
(718) 722-3131
NYC.gov/Human Rights

US Department of Housing and Urban Development Office of Fair Housing and Equal Opportunity
26 Federal Plaza, Rm 3532
New York, NY 10278
(212) 542-7519
http://hud.gov/complaints

New York State Division of Human Rights 1 Fordham Plaza, 4th Fl.
Bronx, NY 10458
(718) 741-8400
https://dhr.ny.gov/complaint

**Service Animals and Emotional Support Animals**

One type of reasonable accommodation is allowing a person with a disability to keep a service animal or an emotional support animal. A service animal is an animal that does work or performs tasks for an individual with a disability. For example, a dog that guides an individual with a visual impairment is a service animal. An emotional support animal is an animal that provides emotional support or other assistance that ameliorates the symptoms of a disability. K&R Realty Management is committed to ensuring that individuals with disabilities may keep such animals to the extent required by federal, state, and local law.

K&R Realty Management encourages residents to make an accommodation request before, or as soon as reasonably possible after, their service animal or emotional support animal moves into the residence. However, the fact that the animal is already living with the individual in the residence or the fact that the individual has been issued a violation for having an animal is not a factor that will be considered in reviewing a request for a reasonable accommodation.

K&R Realty Management does not place any breed or weight restrictions on the animals which it allows, and does not require animals to wear any item that identifies the animal as an assistance animal. K&R Realty Management does not require that assistance animals complete behavioral training. K&R Realty Management does not require individuals to indemnify K&R Realty Management or pay a fee to have an assistance animal. If service animal or emotional support animal is a dog or cat, once the animal has been selected, the individual must submit a photograph of the animal. If the animal is a dog, the individual


Initials:  

must also submit information that the animal has been vaccinated as required by New York State law. In the event the service animal or emotional support animal passes away or is no longer living, and the individual who has received a reasonable accommodation to K&R Realty Management's no pet policy obtains a new service animal or emotional support animal, the individual must provide a photograph of the new animal and proof of vaccination.

**Service Animals**

A service animal is an animal that does work or performs tasks for an individual with a disability. For example, a dog that guides an individual with a visual impairment is a service animal. If a person's disability is apparent, or otherwise known to K&R Realty Management, and if the work or task that the

animal performs is apparent or otherwise known, for example, a dog that guides an individual with a visual impairment, K&R Realty Management will not inquire about the individual's disability or the animal's training. Otherwise, K&R Realty Management may require that the resident provide:

    **a)** A statement from a health professional ("Health professional") means a person who provides medical care, therapy, or counseling to persons with disabilities, including, but not limited to, doctors; physician assistants; psychiatrists; psychologists; or social workers.) indicating that the person has a disability; and

    **b)** Information that an animal is able to do work or perform tasks that would ameliorate one or more symptoms or effects of the disability

K&R Realty Management will not require that the animal demonstrate its work or task or require that the animal be registered with, or certified by, any organization.

**Emotional Support Animals**

An emotional support animal is an animal that provides emotional support or other assistance that ameliorates the symptoms of a disability. When a resident requests a reasonable accommodation for an emotional support animal, K&R Realty Management may require a statement from a health or social service professional indicating:

    **a)** That the applicant has a disability; and

    **b)** That the animal would provide emotional support or other assistance that would ameliorate one or more symptoms or effects of the disability.

K&R Realty Management will not require information about how an emotional support animal assists with the "activities of daily living."

If an animal both provides emotional support or other assistance that ameliorates one or more effects of a disability and does work or performs tasks for the benefit of a person with a disability, K&R Realty Management may require compliance with either the service animal or emotional support animal requirements above, but not both.

**Conduct of Approved Service and Emotional Support Animals**

In most cases K&R Realty Management requires that service and emotional support animals be leashed or harnessed in the elevators and common areas unless doing so would interfere with the animal's work, or the person's disability prevents use of these devices. Service and emotional support animals that cannot be leashed for the aforementioned reasons must be otherwise under the control of their handler at all times.

If an assistance animal poses a direct threat to the health or safety of other individuals, or if the animal causes substantial physical damage to the property of others that cannot be reduced or eliminated by another reasonable accommodation, K&R Realty Management maintains its right to pursue legal action to abate a nuisance or to enforce the terms and conditions of the lease.

**Damage Caused by Service or Emotional Support Animals**

 

Residents will be responsible for the cost of any damage caused by their service animal or emotional support animal in the same manner in which they would be responsible for any damage caused by themselves to their unit or the building. Residents will not be charged any additional security deposit up front for their service animal or emotional support animal.

**E 135 and 3rd Ave Owner LLC**

**Signed by Tyla Mazyck**
Thu May 2 2024 04:13:05 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

5/23/2024
11:37 AM EDT

Tyla Mazyck *(Tenant)*                    *Date*          *(Landlord/Agent)*                    *Date*

**Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:36:44 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

Yerilee Atkinson Velez *(Tenant)*          *Date*



*Initials:* ___  ___

# RENT CONCESSION AGREEMENT

The Residential Lease/Rental Agreement ("the Agreement") for the term of **2 years** commencing on **July 1, 2024** and terminating on **June 30, 2026** between **2455 THIRD AVENUE - MARKET** as Landlord or Agent to the Landlord and **Tyla Mazyck and Yerilee Atkinson Velez** as Tenant, of property located at **2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street #19G, Bronx, NY  10451** (the "Premises"), is hereby amended to include the following terms and conditions:

### ONE-TIME CONCESSION

You have been granted a <u>one-time concession</u> in the amount of **$3,985.00** which will be deducted from your rent in the **5th** month of your tenancy.

You have been granted a <u>one-time concession</u> in the amount of **$3,985.00** which will be deducted from your rent in the **13th** month of your tenancy.

---

**Signed by Tyla Mazyck**
Thu May 2 2024 04:13:21 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

Tyla Mazyck *(Tenant)*                                    *Date*

**Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:36:52 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

Yerilee Atkinson Velez *(Tenant)*                          *Date*

5/23/2024
11:37 AM EDT

*(Landlord/Agent)*                                       *Date*


Initials:

# Short Term Rental Rider

Rider attached to and forming part of Lease dated the **1st** day of **July 2024**, between **2455 THIRD AVENUE - MARKET**, as Agent for **K and R Realty Management**, with offices at **316 West 118th Street, New York, NY  10026** (hereinafter referred to as "Landlord"), and , (hereinafter referred to as "Tenant") for apartment number **19G** in the building known as the **2455 THIRD AVENUE - MARKET**, located at **2455-2457 Third Avenue, Bronx, NY   10451** (hereinafter referred to as the subject premises").

1) **Purpose of Rider.** The parties acknowledge and understand that the State and City of New York have enacted legislation specifically recognizing the dangers inherent in allowing an apartment in a class A multiple dwelling to be used for transient short term dwelling and prohibiting the use of class A multiple dwellings for other than permanent residence purposes.

2) **Definition of Permanent Residence Purposes.** Section 27-2004(8) (a) of the **Bronx City** Administrative Code provides that a class A multiple dwelling shall not only be occupied for permanent residence purposes which means occupancy by the tenant or tenant's family for no less than **three hundred sixty-five (365)** consecutive days.

3) **Prohibition Against Short Term Rental.** Tenant agrees and acknowledges that the subject premises to be occupied by Tenant and members of Tenant's household is an apartment in a class A multiple dwelling. Tenant further acknowledges and agrees that it is a non-curable substantial violation of this lease to advertise to rent and to rent, sublease or license in any way the subject premises for less than a period of **three hundred sixty-five (365)** consecutive days and Tenant covenants and agrees that Tenant shall not rent, sublease or license in any way the subject premises for less than a period of **three hundred sixty-five (365)** consecutive days. Tenant further covenants and agrees not to advertise the subject premises as being available for rent, sublease or license for a period less than **three hundred sixty-five (365)** consecutive days whether said advertisement be on the internet, in printed publications or in any other form of mass media. Nothing contained herein shall be deemed permission for Tenant to sublease the subject premises for **three hundred sixty-five (365)** consecutive days or more without obtaining Landlord's prior written consent as required by the Lease and/or Sec. 226-b of the Real Property Law.

4) **Effect of Breach and Landlord's Remedies.** A breach of this Rider by the Tenant shall be a material breach of the Lease and grounds for immediate termination of the Lease by the Landlord and commencing a summary proceeding to evict the Tenant from the subject premises. Tenant agrees that any breach of the covenants and agreements contained herein shall be a material breach of this Lease; that irreparable damage to Landlord might result if these covenants and agreements are not specifically enforced; and therefore that in addition to all other rights and remedies of Landlord as provided in this Lease such covenants and agreements shall be enforceable in a court competent jurisdiction by a decree of specific performance and by appropriate injunctive relief, all in accordance with applicable law. In addition, Tenant agrees to indemnify and hold Landlord harmless from and against any and all loss or damage which Landlord may incur as a result of the breach by Tenant of any of the foregoing, including without limitation, any withholding of rent by tenants of the Building, and reasonable attorneys' fees and disbursements incurred by Landlord in connection with any litigation or negotiations with Tenant or any other tenants of the Building with respect to the foregoing.

**E 135 and 3rd Ave Owner LLC**

**Signed by Tyla Mazyck**
Thu May 2 2024 04:13:32 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

5/23/2024
11:37 AM EDT

_____
Tyla Mazyck *(Tenant)*                          *Date*

_____
*(Landlord/Agent)*                          *Date*

**Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:37:25 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

_____
Yerilee Atkinson Velez *(Tenant)*          *Date*



Initials:

# SMOKE ALARM/CARBON MONOXIDE DETECTOR RECEIPT

Date: **May 2, 2024**
Tenant: **Tyla Mazyck and Yerilee Atkinson Velez**
Address: **2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street, Bronx, NY 10451**
Apartment: **19G**

I have received smoke alarm(s)/carbon monoxide detector(s) installed in the above apartment in working condition. I understand that I (we) will be responsible for the maintenance and repair of same which also includes the replacement of batteries.

**Signed by Tyla Mazyck**
Thu May 2 2024 04:13:48 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

**Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:37:33 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

_____
Tyla Mazyck *(Tenant)*                                    Date

_____
Yerilee Atkinson Velez *(Tenant)*                          Date

_____
*(Witness)*                                               Date



*Initials:* _____

# TEMPORARY AMENITIES RIDER

**IT IS HEREBY AGREED** by and between <u>2455 THIRD AVENUE - MARKET</u> (hereinafter "Owner"), owner of the premises known as and located at <u>2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street, Bronx, NY 10451</u> ("subject premises") and <u>Tyla Mazyck and Yerilee Atkinson Velez</u> (hereinafter "Tenant"), tenant of Apartment <u>19G</u> in the subject premises (hereinafter "Apartment") as follows:

1. Pursuant to a certain lease dated <u>May 2, 2024</u> (hereinafter "the Lease"), Tenant will be the tenant of the Apartment.

2. Tenant understands that the subject premises is new construction and that Tenant's occupancy of the apartment in the subject premises will commence shortly after the subject premises has been opened for renting and occupancy.

3. Tenant understands that, due to the subject premises being new construction and Tenant's occupancy thereof commencing during the early phase of occupancy of said premises, Owner intends to provide certain amenities, on a temporary basis only, in order to facilitate Tenant's occupancy and enjoyment of the premises.

4. Tenant understands that such amenities are provided on a temporary basis only, but that such amenities are not intended to nor shall they be provided on a permanent basis, such that such temporary amenities are not and shall not be considered as "required services"under the Rent Stabilization Law and/or Code.

5. Such temporary amenities shall include, but are not limited to, to following:

   a. During the early phase of the occupancy of the subject premises, the Owner may provide, from time to time, an employee to operate the automatic passenger elevator. This is provided only as a temporary amenity during the early phase of occupancy in order to ensure that the automatic passenger elevator operates properly and efficiently. Following the initial phase of occupancy, Tenant understands that the Owner shall *not* provide an employee to operate the automatic passenger elevator; such that, following the initial phase of occupancy, Tenant understands that the automatic passenger elevator shall not be staffed and shall be passenger operated;

   b. **(i)** Tenant understands that Tenant is responsible for the cost of and payment for the electrical service to the Apartment. Tenant has read the Lease and confirms that the Lease so provides that Tenant is responsible for the cost of and payment for the electrical service to the Apartment.

   **(ii)** Nonetheless, when Tenant first takes occupancy of the Apartment, there may be a lag period between the Tenant's initial occupancy and the Owner discontinuing the master electric meter to the Apartment and the individual electric meter for the Apartment commencing operation.

   **(iii)** Notwithstanding the foregoing, Tenant understands and agrees that it is *not* intended by the parties to the Lease that electrical service to the Apartment be permanently master metered or that the electric cost will be permanently borne by the Owner; rather, Tenant understands and agrees that, notwithstanding any lag time between the initial occupancy of the apartment by Tenant and the commencement of the individual electric meter's operation, it is intended by the parties to the Lease that electrical service to the Apartment is a cost to be borne solely by the Tenant.

   **(iv)** Tenant further agrees and specifically consents to Owner providing and/or releasing such information and/or document to the utility company as is necessary for Owner to inform said utility as to the commencement of the tenancy and the commencement of the individual electric metering of the Apartment; such information may include, but is not limited to Tenant's name; Tenant's date of birth; Tenant's social security number; copy of Tenant's driver's license or other photographic identification.

   **(v)** Tenant agrees and understands that Owner's providing such information and/or document to the utility company (as referred to in "iv") is merely as an accommodation to Tenant, and as a means of facilitating the commencement of Tenant's electrical service and individual meter operation, but that Tenant is solely responsible for making and/or confirming that all arrangements have been properly made with the utility for the commencement of Tenant's electrical service and individual meter operation in the Apartment following the commencement of the tenancy.

   **(vi)** During the early phase of the occupancy of the subject premises, prior to the subject premises being 20% occupied, the U.S. Post Office will not deliver mail to individual tenant mailboxes at the subject premises. Owner has been informed by the U.S. Post Office that, on a temporary basis, mail will be delivered to the building via bulk mail. Owner will establish procedures for the sorting of mail for tenants. Tenant agrees and understands that this is provided by Owner only as a temporary amenity, such that, following this initial phase of occupancy, other than Owner maintaining the mailbox in the subject premises, Tenant shall be solely responsible for Tenant's receipt of mail from the U.S. Post Office.

   **(vii)** Such other temporary amenities as Owner may determine are needed during the early phase of occupancy of the subject premises in order to facilitate the occupancy and enjoyment of said premises.

   **(viii)** The parties shall be deemed to have jointly drawn this Rider in order to avoid any negative inference against the preparer of the document.



Initials:  

**(ix)**  The covenants, agreements, terms, provisions and conditions contained in this Rider shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

E 135 and 3rd Ave Owner LLC



**Signed by Tyla Mazyck**
Thu May 2 2024 04:14:31 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

5/23/2024
11:37 AM EDT

| | |
|---|---|
| Tyla Mazyck *(Tenant)* | Date |
| *(Landlord/Agent)* | Date |

**Signed by Yerilee Atkinson Velez**
Thu May 2 2024 09:37:57 PM EDT
Key: 0F469534; IP Address: 70.18.214.174

Yerilee Atkinson Velez *(Tenant)*      Date

 

*Initials:* _____

| Form **W-9** (Rev. March 2024) Department of the Treasury Internal Revenue Service | **Request for Taxpayer Identification Number and Certification** ▶ Go to *www.irs.gov/FormW9* for instructions and the latest information. | **Give form to the requester. Do not send it to the IRS.** |

**Before you begin.** For guidance related to the purpose of Form W-9, see Purpose of Form, below.

<table>
<tr><td rowspan="11" style="writing-mode:vertical"><b>Print or type.</b> See <b>Specific Instructions</b> on page 3.</td>
<td colspan="2"><b>1</b> Name of entity/individual. An entry is required. (For a sole proprietor or disregarded entity, enter the owner's name on line 1, and enter the business/disregarded entity's name on line 2.)<br><br><b>Tyla Mazyck</b></td></tr>
<tr><td colspan="2"><b>2</b> Business name/disregarded entity name, if different from above</td></tr>
<tr>
<td><b>3a</b> Check the appropriate box for federal tax classification of the entity/individual whose name is entered on line 1. Check only <b>one</b> of the following seven boxes.<br>☒ Individual/sole proprietor or   ☐ C corporation   ☐ S corporation   ☐ Partnership   ☐ Trust/estate<br>☐ LLC. Enter the tax classification (C=corporation, S=S corporation, P=Partnership) ▶ _____<br><b>Note:</b> Check the "LLC" box above and, in the entry space, enter the appropriate code (C, S, or P) for the tax classification of the LLC, unless it is a disregarded entity. A disregarded entity should instead check the appropriate box for the tax classification of its owner.<br>☐ Other (see instructions) ▶</td>
<td><b>4</b> Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):<br><br>Exempt payee code (if any)_____<br><br>Exemption from Foreign Account Tax Compliance Act (FATCA) reporting code (if any)<br><br>_____<br><i>(Applies to accounts maintained outside the United States)</i></td>
</tr>
<tr><td colspan="2"><b>3b</b> If on line 3a you checked "Partnership" or "Trust/estate," or checked "LLC" and entered "P" as its tax classification, and you are providing this form to a partnership, trust, or estate in which you have an ownership interest, check this box if you have any foreign partners, owners, or beneficiaries. See instructions   ☐</td></tr>
<tr><td><b>5</b> Address (number, street, and apt. or suite no.) See instructions.<br><br><b>2455-2457 Third Avenue, Bronx, NY 10451 AKA 227 East 134th Street #19G</b></td>
<td>Requester's name and address (optional)</td></tr>
<tr><td colspan="2"><b>6</b> City, state, and ZIP code<br><br><b>Bronx, New York 10451</b></td></tr>
<tr><td colspan="2"><b>7</b> List account number(s) here (optional)</td></tr>
</table>

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*, later.

**Note:** If the account is in more than one name, see the instructions for line 1. See also *What Name and Number To Give the Requester* for guidelines on whose number to enter.

| Social security number |
|---|
| 0 6 5 8 6 3 5 2 4 |
| **or** |
| Employer identification number |

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification Instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**

 **Signed by Tyla Mazyck**
Thu May 2 2024 04:15:06 PM EDT
Key: EFCDFF47; IP Address: 174.229.48.89

Tyla Mazyck *(Signature of U.S. Person)*      *Date*

### General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9*.

**What's New**

Line 3a has been modified to clarify how a disregarded entity completes this line. An LLC that is a disregarded entity should check the appropriate box for the tax classification of its owner. Otherwise, it should check the "LLC" box and enter its appropriate tax classification.

New line 3b has been added to this form. A flow-through entity is required to complete this line to indicate that it has direct or indirect foreign partners, owners, or beneficiaries when it provides the Form W-9 to another flow-through entity in which it has an ownership interest. This change is intended to provide a flow-through entity with information regarding the status of its indirect foreign partners, owners, or beneficiaries, so that it can satisfy any applicable reporting requirements. For example, a partnership that has any indirect foreign partners may be required to complete Schedules K-2 and K-3. See the Partnership Instructions for Schedules K-2 and K-3 (Form 1065).

**Purpose of Form**

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS is giving you this form because they

---

Cat. No. 10231X      Form **W-9** (Rev. 3-2024)

must obtain your correct taxpayer identification number (TIN), which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

- Form 1099-INT (interest earned or paid).

- Form 1099-DIV (dividends, including those from stocks or mutual funds).

- Form 1099-MISC (various types of income, prizes, awards, or gross proceeds).

- Form 1099-NEC (nonemployee compensation).

- Form 1099-B (stock or mutual fund sales and certain other transactions by brokers).

- Form 1099-S (proceeds from real estate transactions).

- Form 1099-K (merchant card and third-party network transactions).

- Form 1098 (home mortgage interest), 1098-E (student loan interest), and 1098-T (tuition).

- Form 1099-C (canceled debt).

- Form 1099-A (acquisition or abandonment of secured property).

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

**Caution:** If you don't return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See *What is backup withholding,* later.

**By signing the filled-out form,** you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued);

2. Certify that you are not subject to backup withholding; or

3. Claim exemption from backup withholding if you are a U.S. exempt payee; and

4. Certify to your non-foreign status for purposes of withholding under chapter 3 or 4 of the Code (if applicable); and

5. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting is correct. See *What Is FATCA Reporting,* later, for further information.

**Note:** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

- An individual who is a U.S. citizen or U.S. resident alien;

- A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States;

- An estate (other than a foreign estate); or

- A domestic trust (as defined in Regulations section 301.7701-7).

**Establishing U.S. status for purposes of chapter 3 and chapter 4 withholding.** Payments made to foreign persons, including certain distributions, allocations of income, or transfers of sales proceeds, may be subject to withholding under chapter 3 or chapter 4 of the Code (sections 1441–1474). Under those rules, if a Form W-9 or other certification of non-foreign status has not been received, a withholding agent, transferee, or partnership (payor) generally applies presumption rules that may require the payor to withhold applicable tax from the recipient, owner, transferor, or partner (payee). See Pub. 515, Withholding of Tax on Nonresident Aliens and Foreign Entities.

The following persons must provide Form W-9 to the payor for purposes of establishing its non-foreign status.

- In the case of a disregarded entity with a U.S. owner, the U.S. owner of the disregarded entity and not the disregarded entity.

- In the case of a grantor trust with a U.S. grantor or other U.S. owner, generally, the U.S. grantor or other U.S. owner of the grantor trust and not the grantor trust.

- In the case of a U.S. trust (other than a grantor trust), the U.S. trust and not the beneficiaries of the trust.

See Pub. 515 for more information on providing a Form W-9 or a certification of non-foreign status to avoid withholding.

**Foreign person.** If you are a foreign person or the U.S. branch of a foreign bank that has elected to be treated as a U.S. person (under Regulations section 1.1441-1(b)(2)(iv) or other applicable section for chapter 3 or 4 purposes), do not use Form W-9. Instead, use the appropriate Form W-8 or Form 8233 (see Pub. 515). If you are a qualified foreign pension fund under Regulations section 1.897(l)-1(d), or a partnership that is wholly owned by qualified foreign pension funds, that is treated as a non-foreign person for purposes of section 1445 withholding, do not use Form W-9. Instead, use Form W-8EXP (or other certification of non-foreign status).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a saving clause. Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items.

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4. The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

***Example.*** Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if their stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first Protocol) and is relying on this exception to claim an exemption from tax on their scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity, give the requester the appropriate completed Form W-8 or Form 8233.

## Backup Withholding

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 24% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include, but are not limited to, interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, payments made in settlement of payment card and third-party network transactions, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1. You do not furnish your TIN to the requester;

2. You do not certify your TIN when required (see the instructions for Part II for details);

3. The IRS tells the requester that you furnished an incorrect TIN;

4. The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only); or

5. You do not certify to the requester that you are not subject to backup withholding, as described in item 4 under "*By signing the filled-out form*" above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See *Exempt payee code,* later, and the separate Instructions for the Requester of Form W-9 for more information.

See also *Establishing U.S. status for purposes of chapter 3 and chapter 4 withholding,* earlier.

## What Is FATCA Reporting?

The Foreign Account Tax Compliance Act (FATCA) requires a participating foreign financial institution to report all U.S. account holders that are specified U.S. persons. Certain payees are exempt from FATCA reporting. See *Exemption from FATCA reporting code,* later, and the Instructions for the Requester of Form W-9 for more information.

## Updating Your Information

You must provide updated information to any person to whom you claimed to be an exempt payee if you are no longer an exempt payee and anticipate receiving reportable payments in the future from this person. For example, you may need to provide updated information if you are a C corporation that elects to be an S corporation, or if you are no longer tax exempt. In addition, you must furnish a new Form W-9 if the name or TIN changes for the account, for example, if the grantor of a grantor trust dies.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

### Line 1

You must enter one of the following on this line; **do not** leave this line blank. The name should match the name on your tax return.

If this Form W-9 is for a joint account (other than an account maintained by a foreign financial institution (FFI)), list first, and then circle, the name of the person or entity whose number you entered in Part I of Form W-9. If you are providing Form W-9 to an FFI to document a joint account, each holder of the account that is a U.S. person must provide a Form W-9.

- **Individual.** Generally, enter the name shown on your tax return. If you have changed your last name without informing the Social Security Administration (SSA) of the name change, enter your first name, the last name as shown on your social security card, and your new last name.

  **Note for ITIN applicant:** Enter your individual name as it was entered on your Form W-7 application, line 1a. This should also be the same as the name you entered on the Form 1040 you filed with your application.

- **Sole proprietor.** Enter your individual name as shown on your Form 1040 on line 1. Enter your business, trade, or "doing business as" (DBA) name on line 2.

- **Partnership, C corporation, S corporation, or LLC, other than a disregarded entity.** Enter the entity's name as shown on the entity's tax return on line 1 and any business, trade, or DBA name on line 2.

- **Other entities.** Enter your name as shown on required U.S. federal tax documents on line 1. This name should match the name shown on the charter or other legal document creating the entity. Enter any business, trade, or DBA name on line 2.

- **Disregarded entity.** In general, a business entity that has a single owner, including an LLC, and is not a corporation, is disregarded as an entity separate from its owner (a disregarded entity). See Regulations section 301.7701-2(c)(2). A disregarded entity should check the appropriate box for the tax classification of its owner. Enter the owner's name on line 1. The name of the owner entered on line 1 should never be a disregarded entity. The name on line 1 should be the name shown on the income tax return on which the income should be reported. For

example, if a foreign LLC that is treated as a disregarded entity for U.S. federal tax purposes has a single owner that is a U.S. person, the U.S. owner's name is required to be provided on line 1. If the direct owner of the entity is also a disregarded entity, enter the first owner that is not disregarded for federal tax purposes. Enter the disregarded entity's name on line 2. If the owner of the disregarded entity is a foreign person, the owner must complete an appropriate Form W-8 instead of a Form W-9. This is the case even if the foreign person has a U.S. TIN.

### Line 2

If you have a business name, trade name, DBA name, or disregarded entity name, enter it on line 2.

### Line 3a

Check the appropriate box on line 3a for the U.S. federal tax classification of the person whose name is entered on line 1. Check only one box on line 3a.

| IF the entity/individual on line 1 is a(n)... | THEN check the box for... |
|---|---|
| • Corporation | Corporation. |
| • Individual or<br>• Sole proprietorship | Individual/sole proprietor. |
| • LLC classified as a partnership for U.S. federal tax purposes or<br>• LLC that has filed Form 8832 or 2553 electing to be taxed as a corporation | Limited liability company and enter the appropriate tax classification:<br>P = Partnership,<br>C = C corporation, or<br>S = S corporation. |
| • Partnership | Partnership. |
| • Trust/estate | Trust/estate. |

### Line 3b

Check this box if you are a partnership (including an LLC classified as a partnership for U.S. federal tax purposes), trust, or estate that has any foreign partners, owners, or beneficiaries, and you are providing this form to a partnership, trust, or estate, in which you have an ownership interest. You must check the box on line 3b if you receive a Form W-8 (or documentary evidence) from any partner, owner, or beneficiary establishing foreign status or if you receive a Form W-9 from any partner, owner, or beneficiary that has checked the box on line 3b.

**Note:** A partnership that provides a Form W-9 and checks box 3b may be required to complete Schedules K-2 and K-3 (Form 1065). For more information, see the Partnership Instructions for Schedules K-2 and K-3 (Form 1065).

If you are required to complete line 3b but fail to do so, you may not receive the information necessary to file a correct information return with the IRS or furnish a correct payee statement to your partners or beneficiaries. See, for example, sections 6698, 6722, and 6724 for penalties that may apply.

### Line 4 Exemptions

If you are exempt from backup withholding and/or FATCA reporting, enter in the appropriate space on line 4 any code(s) that may apply to you.

**Exempt payee code.**

- Generally, individuals (including sole proprietors) are not exempt from backup withholding.

- Except as provided below, corporations are exempt from backup withholding for certain payments, including interest and dividends.

- Corporations are not exempt from backup withholding for payments made in settlement of payment card or third-party network transactions.

- Corporations are not exempt from backup withholding with respect to attorneys' fees or gross proceeds paid to attorneys, and corporations that provide medical or health care services are not exempt with respect to payments reportable on Form 1099-MISC.

The following codes identify payees that are exempt from backup withholding. Enter the appropriate code in the space on line 4.

**1—** An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2).

**2—** The United States or any of its agencies or instrumentalities.

**3—** A state, the District of Columbia, a U.S. commonwealth or territory, or any of their political subdivisions or instrumentalities.

**4—** A foreign government or any of its political subdivisions, agencies, or instrumentalities.

**5—** A corporation.

**6—** A dealer in securities or commodities required to register in the United States, the District of Columbia, or a U.S. commonwealth or territory.

**7—** A futures commission merchant registered with the Commodity Futures Trading Commission.

**8—** A real estate investment trust.

**9—** An entity registered at all times during the tax year under the Investment Company Act of 1940.

**10—** A common trust fund operated by a bank under section 584(a).

**11—** A financial institution as defined under section 581.

**12—** A middleman known in the investment community as a nominee or custodian.

**13—** A trust exempt from tax under section 664 or described in section 4947.

The following chart shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 13.

| IF the payment is for... | THEN the payment is exempt for... |
|---|---|
| • Interest and dividend payments | All exempt payees except for 7. |
| • Broker transactions | Exempt payees 1 through 4 and 6 through 11 and all C corporations. S corporations must not enter an exempt payee code because they are exempt only for sales of noncovered securities acquired prior to 2012. |
| • Barter exchange transactions and patronage dividends | Exempt payees 1 through 4. |
| • Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt payees 1 through 5.[2] |
| • Payments made in settlement of payment card or third-party network transactions | Exempt payees 1 through 4. |

[1] See Form 1099-MISC, Miscellaneous Information, and its instructions.

[2] However, the following payments made to a corporation and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, gross proceeds paid to an attorney reportable under section 6045(f), and payments for services paid by a federal executive agency.

**Exemption from FATCA reporting code.** The following codes identify payees that are exempt from reporting under FATCA. These codes apply to persons submitting this form for accounts maintained outside of the United States by certain foreign financial institutions. Therefore, if you are only submitting this form for an account you hold in the United States, you may leave this field blank. Consult with the person requesting this form if you are uncertain if the financial institution is subject to these requirements. A requester may indicate that a code is not required by providing you with a Form W-9 with "Not Applicable" (or any similar indication) entered on the line for a FATCA exemption code.

**A—** An organization exempt from tax under section 501(a) or any individual retirement plan as defined in section 7701(a)(37).

**B—** The United States or any of its agencies or instrumentalities.

**C—** A state, the District of Columbia, a U.S. commonwealth or territory, or any of their political subdivisions or instrumentalities.

**D—** A corporation the stock of which is regularly traded on one or more established securities markets, as described in Regulations section 1.1472-1(c)(1)(i).

**E—** A corporation that is a member of the same expanded affiliated group as a corporation described in Regulations section 1.1472-1(c)(1)(i).

**F—** A dealer in securities, commodities, or derivative financial instruments (including notional principal contracts, futures, forwards, and options) that is registered as such under the laws of the United States or any state.

**G—** A real estate investment trust.

**H—** A regulated investment company as defined in section 851 or an entity registered at all times during the tax year under the Investment Company Act of 1940.

**I—** A common trust fund as defined in section 584(a).

**J—** A bank as defined in section 581.

**K—** A broker.

**L—** A trust exempt from tax under section 664 or described in section 4947(a)(1).

**M—** A tax-exempt trust under a section 403(b) plan or section 457(g) plan.

**Note:** You may wish to consult with the financial institution requesting this form to determine whether the FATCA code and/or exempt payee code should be completed.

### Line 5

Enter your address (number, street, and apartment or suite number). This is where the requester of this Form W-9 will mail your information returns. If this address differs from the one the requester already has on file, enter "NEW" at the top. If a new address is provided, there is still a chance the old address will be used until the payor changes your address in their records.

### Line 6

Enter your city, state, and ZIP code.

### Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have, and are not eligible to get, an SSN, your TIN is your IRS ITIN. Enter it in the entry space for the Social security number. If you do not have an ITIN, see *How to get a TIN below.*

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN.

If you are a single-member LLC that is disregarded as an entity separate from its owner, enter the owner's SSN (or EIN, if the owner has one). If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note:** See *What Name and Number To Give the Requester,* later, for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local SSA office or get this form online at *www.SSA.gov.* You may also get this form by calling 800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at *www.irs.gov/EIN.* Go to *www.irs.gov/Forms* to view, download, or print Form W-7 and/or Form SS-4. Or, you can go to *www.irs.gov/OrderForms* to place an order and have Form W-7 and/or Form SS-4 mailed to you within 15 business days.

If you are asked to complete Form W-9 but do not have a TIN, apply for a TIN and enter "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, you will generally have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note:** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon. See also *Establishing U.S. status for purposes of chapter 3 and chapter 4 withholding,* earlier, for when you may instead be subject to withholding under chapter 3 or 4 of the Code.

**Caution:** A disregarded U.S. entity that has a foreign owner must use the appropriate Form W-8.

Form W-9 (Rev. 3-2024)

Page **5**

## Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if item 1, 4, or 5 below indicates otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). In the case of a disregarded entity, the person identified on line 1 must sign. Exempt payees, see Exempt payee code, earlier.

**Signature requirements.** Complete the certification as indicated in items 1 through 5 below.

1. **Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

2. **Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

3. **Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

4. **Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments made in settlement of payment card and third party network transactions, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

5. **Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), ABLE accounts (under section 529A), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) other than an account maintained by an FFI | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Two or more U.S. persons (joint account maintained by an FFI) | Each holder of the account |
| 4. Custodial account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 5. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee[1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 6. Sole proprietorship or disregarded entity owned by an individual | The owner[3] |
| 7. Grantor trust filing under Optional Filing Method 1 (see Regulations section 1.671-4(b)(2)(i)(A))** | The grantor* |

| For this type of account: | Give name and EIN of: |
|---|---|
| 8. Disregarded entity not owned by an individual | The owner |
| 9. A valid trust, estate, or pension trust | Legal entity*** |
| 10. Corporation or LLC electing corporate status on Form 8832 or Form 2553 | The corporation |
| 11. Association, club, religious, charitable, educational, or other taxexempt organization | The organization |
| 12. Partnership or multi-member LLC | The partnership |
| 13. A broker or registered nominee | The broker or nominee |
| 14. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |
| 15. Grantor trust filing Form 1041 or under the Optional Filing Method 2, requiring Form 1099 (see Regulations section 1.671-4(b)(2)(i)(B))** | The trust |

[1]List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2]Circle the minor's name and furnish the minor's SSN.

[3]You must show your individual name on line 1, and enter your business or DBA name, if any, on line 2. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

*** List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity itself is not designated in the account title.)

***Note:** The grantor must also provide a Form W-9 to the trustee of the trust.

** For more information on optional filing methods for grantor trusts, see the Instructions for Form 1041.

**Note:** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records From Identity Theft

Identity theft occurs when someone uses your personal information such as your name, SSN, or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

• Protect your SSN,

• Ensure your employer is protecting your SSN, and

• Be careful when choosing a tax return preparer.

If your tax records are affected by identity theft and you receive a notice from the IRS, respond right away to the name and phone number printed on the IRS notice or letter.

If your tax records are not currently affected by identity theft but you think you are at risk due to a lost or stolen purse or wallet, questionable credit card activity, or a questionable credit report, contact the IRS Identity Theft Hotline at 800-908-4490 or submit Form 14039.

For more information, see Pub. 5027, Identity Theft Information for Taxpayers.

Form W-9 (Rev. 3-2024)                                                                                                                Page **6**

Victims of identity theft who are experiencing economic harm or a systemic problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. The most common act is TAS toll-free case intake line at 877-777-4778 or TTY/TDD 800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

If you receive an unsolicited email claiming to be from the IRS, forward this message to *phishing@irs.gov*. You may also report misuse of the IRS name, logo, or other IRS property to the Treasury Inspector General for Tax Administration (TIGTA) at 800-366-4484. You can forward suspicious emails to the Federal Trade Commission at *spam@uce.gov* or report them at *www.ftc.gov/complaint*. You can contact the FTC at *www.ftc.gov/idtheft* or 877-IDTHEFT (877-438-4338). If you have been the victim of identity theft, see *www.IdentityTheft.gov* and Pub. 5027.

Go to *www.irs.gov/IdentityTheft* to learn more about identity theft and how to reduce your risk.

**Privacy Act Notice**

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons (including federal agencies) who are required to file information returns with the IRS to report interest, dividends, or certain other income paid to you; mortgage interest you paid; the acquisition or abandonment of secured property; the cancellation of debt; or contributions you made to an IRA, Archer MSA, or HSA. The person collecting this form uses the information on the form to file information returns with the IRS, reporting the above information. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation and to cities, states, the District of Columbia, and U.S. commonwealths and territories for use in administering their laws. The information may also be disclosed to other countries under a treaty, to federal and state agencies to enforce civil and criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. You must provide your TIN whether or not you are required to file a tax return. Under section 3406, payors must generally withhold a percentage of taxable interest, dividends, and certain other payments to a payee who does not give a TIN to the payor. Certain penalties may also apply for providing false or fraudulent information.



# Payment History for: "Yerilee Atkinson Velez".

| Property Address | Amount | LLC/Association | Description |
|---|---|---|---|
| Date: 1/1/2025 5:32:15 AM EST  - Confirmation #: A2501010532_YN4TJ0  - Total: $1,802.95 | | | |
| 2455 Third Avenue, #19G, Bronx, NY | $1,802.95 | The Motto Apts A-F (2455 Third Avenue) | Total Amount Due |
| Date: 12/1/2024 6:08:08 AM EST  - Confirmation #: A2412010608_YG6JR5 - Total: $1,802.95 | | | |
| 2455 Third Avenue, #19G, Bronx, NY | $1,802.95 | The Motto Apts A-F (2455 Third Avenue) | Total Amount Due |
| Date: 11/1/2024 5:12:04 AM EST  - Confirmation #: A2411010512_MQ1QE8 - Total: $1,802.95 | | | |
| 2455 Third Avenue, #19G, Bronx, NY | $1,802.95 | The Motto Apts A-F (2455 Third Avenue) | Total Amount Due |
| Date: 10/1/2024 4:57:51 AM EST  - Confirmation #: A2410010457_FU1BO7 - Total: $1,802.95 | | | |
| 2455 Third Avenue, #19G, Bronx, NY | $1,802.95 | The Motto Apts A-F (2455 Third Avenue) | Total Amount Due |
| Date: 9/1/2024 5:44:06 AM EST  - Confirmation #: A2409010544_PI0BU9  - Total: $1,802.95 | | | |
| 2455 Third Avenue, #19G, Bronx, NY | $1,802.95 | The Motto Apts A-F (2455 Third Avenue) | Total Amount Due |
| Date: 8/1/2024 4:58:20 AM EST  - Confirmation #: A2408010458_SJ6TG0  - Total: $1,802.95 | | | |
| 2455 Third Avenue, #19G, Bronx, NY | $1,802.95 | The Motto Apts A-F (2455 Third Avenue) | Total Amount Due |
| Date: 7/1/2024 3:06:32 PM EST  - Confirmation #: A2407011506_FR0WW2 - Total: $1,802.95 | | | |
| 2455 Third Avenue, #19G, Bronx, NY | $1,802.95 | The Motto Apts A-F (2455 Third Avenue) | Balance as of July |

| Billing Period | Batch Number | Type | Trans Date | Charge Description | Billing/ Adjustment | Check Number | Payments | Running Balance |
|---|---|---|---|---|---|---|---|---|
| | | | | **May 2024** | | | | |
| **Opening Balance** | | | | | | | | 0.00 |
| | 62797A | PAID | 05/30/24 | | | 9106589124 | 2,025.00 | -2,025.00 |
| | 62797B | PAID | 05/30/24 | | | 9106589123 | 2,025.00 | -4,050.00 |
| | 62797C | PAID | 05/30/24 | | | | 3,920.00 | -7,970.00 |
| | | | | **June 2024** | | | | |
| **Opening Balance** | | | | | | | | -7,970.00 |
| 06/01/24 | SYS | BILL | 06/01/24 | USE & OCCUP | 3,985.00 | | | -3,985.00 |
| 06/01/24 | SYS | BILL | 06/01/24 | USE & OCCUP CR | -3,985.00 | | | -7,970.00 |
| 06/01/24 | SYS | BILL | 06/01/24 | CLUB FEE | 6,242.50 | | | -1,727.50 |
| 06/01/24 | SYS | BILL | 06/01/24 | CLUB FEE CR | -6,242.50 | | | -7,970.00 |
| 06/01/24 | SYS | BILL | 06/01/24 | Security Dep | 3,985.00 | | | -3,985.00 |
| | | | | **July 2024** | | | | |
| **Opening Balance** | | | | | | | | -3,985.00 |
| 07/01/24 | SYS | BILL | 07/01/24 | APT RENT | 3,985.00 | | | 0.00 |
| | 64000 | PAID | 07/02/24 | | | CP_ACH | 1,802.95 | -1,802.95 |
| | 64121 | PAID | 07/03/24 | | | CP_CC | 1,000.00 | -2,802.95 |
| | 65016A | PAID | 07/30/24 | | | CP_CC | 200.00 | -3,002.95 |
| | 65016B | PAID | 07/30/24 | | | CP_CC | 300.00 | -3,302.95 |
| | | | | **August 2024** | | | | |
| **Opening Balance** | | | | | | | | -3,302.95 |
| 08/01/24 | SYS | BILL | 08/01/24 | APT RENT | 3,985.00 | | | 682.05 |
| | 65168 | PAID | 08/02/24 | | | CP_ACH | 1,802.95 | -1,120.90 |
| | | | | **September 2024** | | | | |
| **Opening Balance** | | | | | | | | -1,120.90 |
| 09/01/24 | SYS | BILL | 09/01/24 | APT RENT | 3,985.00 | | | 2,864.10 |
| | 66279 | PAID | 09/03/24 | | | CP_ACH | 1,802.95 | 1,061.15 |
| | 66425 | PAID | 09/05/24 | | | CP_CC | 500.00 | 561.15 |
| | | | | **October 2024** | | | | |
| **Opening Balance** | | | | | | | | 561.15 |
| 10/01/24 | SYS | BILL | 10/01/24 | APT RENT | 3,985.00 | | | 4,546.15 |
| 10/01/24 | SYS | BILL | 10/01/24 | RESERVATIONS | 400.00 | | | 4,946.15 |
| | 67491 | PAID | 10/02/24 | | | CP_ACH | 1,802.95 | 3,143.20 |
| | | | | **November 2024** | | | | |
| **Opening Balance** | | | | | | | | 3,143.20 |
| 11/01/24 | SYS | BILL | 11/01/24 | APT RENT | 3,985.00 | | | 7,128.20 |
| 11/01/24 | SYS | BILL | 11/01/24 | Rent Credit | -3,985.00 | | | 3,143.20 |
| | 68708 | PAID | 11/04/24 | | | CP_ACH | 1,802.95 | 1,340.25 |
| | 69396 | PAID | 11/20/24 | | | CP_CC | 400.00 | 940.25 |
| | | | | **December 2024** | | | | |
| **Opening Balance** | | | | | | | | 940.25 |
| 12/01/24 | SYS | BILL | 12/01/24 | APT RENT | 3,985.00 | | | 4,925.25 |
| | 69657 | PAID | 12/02/24 | | | CP_ACH | 1,802.95 | 3,122.30 |
| 10/01/24 | 70245 | ADJ | 12/10/24 | RESERVATIONS | -400.00 | | | 2,722.30 |
| | 70245 | Reapplied | 12/10/24 | | | | 0.00 | 2,722.30 |
| | | | | **January 2025** | | | | |
| **Opening Balance** | | | | | | | | 2,722.30 |
| 01/01/25 | SYS | BILL | 01/01/25 | APT RENT | 3,985.00 | | | 6,707.30 |
| | 70822 | PAID | 01/02/25 | | | CP_ACH | 1,802.95 | 4,904.35 |
| | 71861 | PAID | 01/28/25 | | | CP_CC | 504.35 | 4,400.00 |
| | | | | **February 2025** | | | | |
| **Opening Balance** | | | | | | | | 4,400.00 |
| 02/01/25 | SYS | BILL | 02/01/25 | APT RENT | 3,985.00 | | | 8,385.00 |
| | 72084 | PAID | 02/03/25 | | | CP_ACH | 1,802.95 | 6,582.05 |
| | 72286 | PAID | 02/05/25 | | | CP_CC | 400.00 | 6,182.05 |
| | | | | **March 2025** | | | | |
| **Opening Balance** | | | | | | | | 6,182.05 |
| 03/01/25 | SYS | BILL | 03/01/25 | APT RENT | 3,985.00 | | | 10,167.05 |

M Gmail

Yerilee Atkinson <yeri.atk@gmail.com>

---

## Re: Direct Response to Formal Letter of Demand | Rent Arrears 2455 Third Avenue APT 19G

12 messages

---

**Tyla Monet** <tyla.m.mazyck@gmail.com>                                  Thu, Mar 6, 2025 at 2:58 PM
To: Yerilee Atkinson <yeri.atk@gmail.com>
Cc: Leasing <leasing@kandrrealty.com>, Arlette Guerra <arlette@kandrrealty.com>, accounting@kandrrealty.com

Dear Yerilee Atkinson Velez,


Thank you for your communication regarding the outstanding rent balance for our shared apartment at 2455 Third Avenue, APT 19G, Bronx, NY 10451. I would like to clarify a few points and address your concerns.


Firstly, I must remind you that you are not my landlord, and as such, any discussions regarding rent arrears and balances will be addressed in accordance with my known obligations under the leasing agreement directly with the leasing company.


Additionally, after confirming with the leasing department, I can verify that neither the security deposit nor the first month's rent has been applied to any outstanding rent payments, as mentioned in your letter.


As you previously mentioned, I will concur in the breaking of the lease if management agrees to assign the lease to a new tenant, which would release me from any further financial obligations to the apartment after May 1, 2025. I trust this will be handled in a fair and timely manner with the leasing company.


I will continue to communicate with the leasing company regarding any necessary actions related to my financial obligations, and I trust this matter will be addressed appropriately as per the terms of the lease agreement.


Thank you for your understanding.

CIVIL COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX
-------------------------------------------------------------X
YERILEE ATKINSON VELEZ

             Plaintiff,

        -against-

TYLA MONET MAZYCK,

             Defendant.
-------------------------------------------------------------X

**NOTICE OF MOTION TO
DISMISS**

**Index No.: CV-006582-25/BX**

**PLEASE TAKE NOTICE** that upon the annexed Affirmation of Defendant, Tyla Mazyck,
all prior pleadings and proceedings herein, and upon all other papers and proof as may
be presented at the hearing, Defendant will move this Court before the Part 34, 5th
Floor, on the 29th of September, 2025 at the courthouse located at 851 Grand
Concourse, Bronx, New York 10451 on a date to be set by the Court, for an order:

1. Dismissing the Complaint in its entirety, with prejudice, pursuant to CPLR
   3211(a)(1), (a)(2), (a)(7), and the doctrine of laches;
2. Alternatively, granting summary judgment in favor of Defendant pursuant to
   CPLR 3212; and
3. Granting such other and further relief as the Court deems just and proper.

The grounds for this motion are:

- Plaintiff lacks standing to assert claims arising from the lease;

- Defendant was released from all obligations by a written surrender agreement
  executed with the landlord;

- The landlord commenced a nonpayment proceeding in Bronx Housing Court
  against both parties, barring relitigation under the doctrine of res judicata;


Scanned with
CamScanner

- No enforceable agreement exists between Plaintiff and Defendant obligating repayment of any rent;

- Plaintiff's claims are barred by laches and bad faith; and

- The Complaint fails to state a cause of action.

**PLEASE TAKE FURTHER NOTICE that,** pursuant to Civil Court rules, Defendant submits her Affirmation in Support, together with exhibits, all prior pleadings, papers, and proceedings in this action and such other evidence and arguments as may be presented at the hearing of this motion.

Dated: September 29, 2025

New York, New York

Respectfully Submitted,

Tyla Monet Mazyck
Defendant Pro Se
2618 Harding Avenue, Apt 1
Bronx, NY 10465

Via Certified Mail and Hand Delivery
TO:   YERILEE ATKINSON VELEZ
2455 Third Avenue, Apt. 19G
Bronx, NY 10451

Scanned with
CamScanner

Sincerely,

Tyla Mazyck

On Mar 5, 2025, at 5:00 PM, Yerilee Atkinson <yeri.atk@gmail.com> wrote:

Dear Tyla Mazyck,

I am writing to formally demand payment of the outstanding rent you owe for our shared apartment at 2455 Third Avenue, APT 19G, Bronx, NY 10451.

On March 4, 2025, the leasing company issued a 30-day notice for a total amount of $6,182.05, which was taped to the front door. However, this figure does not accurately reflect your financial responsibility. As of March 5th, 2025, your outstanding balance is $12,022.29. This discrepancy exists because the leasing company included my first month's rent and security deposit—amounts that are not part of your obligation. You may reference the ledger history provided on February 12, 2025, or request an updated one.

As documented in our prior communications dating back to April-May 2024, you have an established duty to cover your share of the rent amounting to $1,702.96 due on the 1st of every month additional to your gross security deposit and first month rent. Therefore, I expect you to remit the total outstanding amount of $12,022.29.

Please submit this payment in full within 30 days via the Click Pay portal. As I will continue to explore every avenue to ensure that you meet our agreement fairly.

Additionally, please be advised that any financial obligations you discuss with the leasing company are separate from this matter. As co-tenants, we share joint responsibility for the rent, and your unpaid balance directly impacts my financial liability.

The Thirty Day Notice issued by K&R Realty has been taped to your bedroom door for your reference.

For transparency and clarity, I am copying the leasing and accounting departments on this communication so they remain informed of this ongoing issue.

I hope this matter can be resolved promptly and professionally.

Sincerely,

**Tenant Ledger**

| Billing Period | Batch Number | Type | Trans Date | Charge Description | Billing/ Adjustment | Check Number | Payments | Running Balance |
|---|---|---|---|---|---|---|---|---|
| | 73906 | PAID | 03/18/25 | | | 43326281 | 4,900.00 | 5,267.05 |
| | | | | **April 2025** | | | | |
| Opening Balance | | | | | | | | 5,267.05 |
| 04/01/25 | SYS | BILL | 04/01/25 | APT RENT | 3,985.00 | | | 9,252.05 |

M Gmail

Yerilee Atkinson <yeri.atk@gmail.com>

---

### Re: Direct Response to Formal Letter of Demand | Rent Arrears 2455 Third Avenue APT 19G

12 messages

---

**Tyla Monet** <tyla.m.mazyck@gmail.com>                                              Thu, Mar 6, 2025 at 2:58 PM
To: Yerilee Atkinson <yeri.atk@gmail.com>
Cc: Leasing <leasing@kandrrealty.com>, Arlette Guerra <arlette@kandrrealty.com>, accounting@kandrrealty.com

Dear Yerilee Atkinson Velez,

Thank you for your communication regarding the outstanding rent balance for our shared apartment at 2455 Third Avenue, APT 19G, Bronx, NY 10451. I would like to clarify a few points and address your concerns.

Firstly, I must remind you that you are not my landlord, and as such, any discussions regarding rent arrears and balances will be addressed in accordance with my known obligations under the leasing agreement directly with the leasing company.

Additionally, after confirming with the leasing department, I can verify that neither the security deposit nor the first month's rent has been applied to any outstanding rent payments, as mentioned in your letter.

As you previously mentioned, I will concur in the breaking of the lease if management agrees to assign the lease to a new tenant, which would release me from any further financial obligations to the apartment after May 1, 2025. I trust this will be handled in a fair and timely manner with the leasing company.

I will continue to communicate with the leasing company regarding any necessary actions related to my financial obligations, and I trust this matter will be addressed appropriately as per the terms of the lease agreement.

Thank you for your understanding.

CIVIL COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

-------------------------------------------------------------X

YERILEE ATKINSON VELEZ

           Plaintiff,

        -against-

TYLA MONET MAZYCK,

           Defendant.

-------------------------------------------------------------X

**NOTICE OF MOTION TO
DISMISS**

**Index No.: CV-006582-25/BX**

**PLEASE TAKE NOTICE** that upon the annexed Affirmation of Defendant, Tyla Mazyck,
all prior pleadings and proceedings herein, and upon all other papers and proof as may
be presented at the hearing, Defendant will move this Court before the Part 34, 5th
Floor, on the 29th of September, 2025 at the courthouse located at 851 Grand
Concourse, Bronx, New York 10451 on a date to be set by the Court, for an order:

1. Dismissing the Complaint in its entirety, with prejudice, pursuant to CPLR
   3211(a)(1), (a)(2), (a)(7), and the doctrine of laches;
2. Alternatively, granting summary judgment in favor of Defendant pursuant to
   CPLR 3212; and
3. Granting such other and further relief as the Court deems just and proper.

The grounds for this motion are:

- Plaintiff lacks standing to assert claims arising from the lease;

- Defendant was released from all obligations by a written surrender agreement
  executed with the landlord;

- The landlord commenced a nonpayment proceeding in Bronx Housing Court
  against both parties, barring relitigation under the doctrine of res judicata;


Scanned with
CamScanner

- No enforceable agreement exists between Plaintiff and Defendant obligating repayment of any rent;

- Plaintiff's claims are barred by laches and bad faith; and

- The Complaint fails to state a cause of action.

**PLEASE TAKE FURTHER NOTICE that,** pursuant to Civil Court rules, Defendant submits her Affirmation in Support, together with exhibits, all prior pleadings, papers, and proceedings in this action and such other evidence and arguments as may be presented at the hearing of this motion.

Dated: September 29, 2025

New York, New York

Respectfully Submitted,

Tyla Monet Mazyck
Defendant Pro Se
2618 Harding Avenue, Apt 1
Bronx, NY 10465

Via Certified Mail and Hand Delivery
TO:    YERILEE ATKINSON VELEZ
2455 Third Avenue, Apt. 19G
Bronx, NY 10451

Scanned with
CamScanner


Sincerely,

Tyla Mazyck


On Mar 5, 2025, at 5:00 PM, Yerilee Atkinson <yeri.atk@gmail.com> wrote:


Dear Tyla Mazyck,


I am writing to formally demand payment of the outstanding rent you owe for our shared apartment at 2455 Third Avenue, APT 19G, Bronx, NY 10451.

On March 4, 2025, the leasing company issued a 30-day notice for a total amount of $6,182.05, which was taped to the front door. However, this figure does not accurately reflect your financial responsibility. As of March 5th, 2025, your outstanding balance is $12,022.29. This discrepancy exists because the leasing company included my first month's rent and security deposit—amounts that are not part of your obligation. You may reference the ledger history provided on February 12, 2025, or request an updated one.

As documented in our prior communications dating back to April-May 2024, you have an established duty to cover your share of the rent amounting to $1,702.96 due on the 1st of every month additional to your gross security deposit and first month rent. Therefore, I expect you to remit the total outstanding amount of $12,022.29.

Please submit this payment in full within 30 days via the Click Pay portal. As I will continue to explore every avenue to ensure that you meet our agreement fairly.

Additionally, please be advised that any financial obligations you discuss with the leasing company are separate from this matter. As co-tenants, we share joint responsibility for the rent, and your unpaid balance directly impacts my financial liability.

The Thirty Day Notice issued by K&R Realty has been taped to your bedroom door for your reference.

For transparency and clarity, I am copying the leasing and accounting departments on this communication so they remain informed of this ongoing issue.

I hope this matter can be resolved promptly and professionally.


Sincerely,

**Civil Court of the City of New York**
**County of Bronx**

Index Number: **CV-006582-25/BX**

Yerilee Atkinson Velez
            Plaintiff(s)

    -against-

Tyla Monet Mazyck
            Defendant(s)

**NOTICE OF MOTION**

       **PLEASE TAKE NOTICE** that upon the annexed affidavit of **Yerilee Atkinson Velez** sworn to on 7th day of **May 2025**, and the exhibits annexed thereto, and upon all the prior pleadings and proceedings had herein, the **AMEND THE COMPLAINT** will move this court located at **851 Grand Concourse, Bronx, NY 10451  Part 34**, 5th Floor, Room 503 , on the 29th day of **September , 2025** at 9:30 am , or as soon thereafter as can be heard for an Order :

**AMEND THE COMPLAINT**

and for such other and further relief as this Court deems just and proper.

**PLEASE TAKE FURTHER NOTICE** that ( check the applicable box below):

[X ] **Appearances are required on the return date of the motion by the moving party. The non moving party(ies) should also attend to interpose any response.**

[] these papers have been served on you at least eight days before the motion is scheduled to be heard. You must serve your answering papers, if any, at least two days before such time upon the movant.

[] these papers have been served on you at least twelve days before the motion is scheduled to be heard. You must serve your answering papers, if any, at least seven days before such time upon the movant.

      **MAIL TO:**

      **Tyla Monet Mazyck (Defendant)**
      **c/o The Barnes Firm**
      **420 Lexington Ave**
      **#2140**
      **New York, NY 10170**

**All answering papers to the Court are to be filed on the return date of the motion with the Clerk in the Part listed above.**

*August 1, 2025*

From: Yerilee Atkinson Velez
2455 Third Ave
Apt 19G
Bronx, NY 10451



**Yerilee Atkinson Vélez v. Tyla Monet Mazyck**

**Premises:** 2455 Third Avenue, Apt 19G, Bronx, NY 10451
**Civil Claim – Bronx Civil Court**

**To the Honorable Judge of the Court:**

I, **Yerilee Atkinson Vélez**, respectfully submit this formal request for relief against the defendant, **Tyla Monet Mazyck**, for unpaid rent, related expenses, and declaratory judgment pertaining to our shared lease at the above-referenced premises.

**1. Total Relief Sought: $14,165.09**

This amount reflects the following:

- **Outstanding rent owed** by the defendant: $10,528.21
- **Court and service expenses** incurred in pursuit of justice: $267.21
- **Gross rent security deposit and first-month overage** paid by Tyla and currently held in the ClickPay ledger: $2,217.04
- **Prejudgment interest** on unpaid rent (July 1, 2024 – September 29, 2025+): $1,152.63

These amounts represent funds I have paid to maintain the lease in good standing, protect my credit, and preserve my housing after the defendant abandoned the premises without notice or formal release.

**2. Security Deposit & Ledger Breakdown**

- **Total Rent Owed by Tyla (11 months x $1,702.96): $18,732.56**
- **Total Paid by Tyla (to date):** $8,204.35 (4.81 months of rent paid)

Of the remaining balance:

- **$4,464.09** remains in our shared ClickPay ledger. These funds must be forfeited by the defendant as she vacated early and relinquished tenancy rights.
  - $2,247.05 of that amount was paid by me at move-in and is not subject to refund or claim by the defendant.
  - $2,217.04 was paid by Tyla as part of her gross rent/security share and must be forfeited.
- **Remaining Rent Balance Owed:** $10,528.21 (6.18 months of missed rent payments)
  This is the amount I seek direct reimbursement for, reflecting out-of-pocket payments I made on her behalf.

**Clerical Adjustment Explanation**

Plaintiff acknowledges a clerical miscalculation in the previously submitted Motion to Amend dated August 1, 2025. The original relief amount requested was **$14,491.65**. Upon reviewing rent ledgers, certified mail costs, and interest calculations, the corrected total relief sought is **$14,165.09**. The $326.56 discrepancy was the result of early projection and rounding errors and is hereby corrected to maintain full transparency and accuracy before the Court.

**3. Itemized Monetary Relief**

| Description | Amount |
|---|---|
| Unpaid Rent (July 2024 – June 2025) | $10,528.21 (6.18 months of missed rent payments) |
| Prejudgment Interest (15 months+) | $1,152.63 |
| Security Funds Forfeited (ClickPay) | $2,217.04 |
| Civil Claim Filing Fee | $45.00 |
| Legal Process Server (Undisputed Legal) | $111.88 |
| Sheriff Process Server | $59.35 |
| Certified Mail (June 27, 2025) | $9.90 |
| Certified Mail (July 9, 2025) | $9.90 |

Certified Mail (July 22, 2025)                $10.48

Certified Mail (August 5th, 2025)            $20.70

**Total Monetary Relief Requested        $14,165.09**

*(To be paid directly to Plaintiff)*          **$11,948.05**

*Note: $2,217.04 of the above total is currently held in the ClickPay portal and must be forfeited by the defendant. The remaining $11,948.05 is requested as a direct payment to me, the Plaintiff.*

**4. Request for Prejudgment & Post-Judgment Interest**

Pursuant to **CPLR § 5001 and § 5004**, I respectfully request:

- **Prejudgment interest at 9% per annum** on the unpaid rent balance of $10,528.21, from **July 1, 2024, through the date of judgment.**
- **Post-judgment interest at 9% per annum** until full payment is rendered.

**5. Declaratory Judgment Relief**

I respectfully request a declaratory judgment confirming that:

- Tyla Mazyck is solely liable for the $10,528.21 in unpaid rent;
- I, Yerilee Atkinson Vélez, covered both tenant shares to preserve the lease and protect my credit;
- I shall not be held liable for any future rent collection efforts by management related to this balance.

**6. Method of Payment Requested**

I request that all awarded relief be made **directly payable to me**, via check or electronic deposit, as I have been the **sole contributor of rent** via ClickPay since the defendant's abandonment.

## 7. Enforcement of Judgment

If the defendant fails to pay voluntarily, I request authorization to pursue:

- **Wage garnishment**
- **Bank levy**
- **Other enforcement mechanisms permitted under NY law**

## 8. Recovery of Costs and Expenses

I respectfully request reimbursement of:

- Court filing fees
- Certified mailing and postage
- Legal process server costs
- Any other reasonable expenses related to pursuing this claim

## 9. Acknowledgment of Good Faith Mitigation

I request acknowledgment of my efforts to mitigate damages, including:

- Paying both shares of rent to avoid eviction
- Cooperating with management
- Allowing temporary unauthorized occupancy to preserve the lease

## 10. Joint and Several Liability Clarification

I request that the Court confirm that, under New York lease law, **co-tenants are jointly and severally liable**. I am therefore entitled to full recovery from the defendant for her unpaid share.

## 11. Request for Sanctions or Legal Compensation (Optional)

If the Court determines that the defendant acted in **bad faith**, or used the Temporary Restraining Order as a retaliatory tactic to avoid financial accountability, I respectfully request consideration of:

- **Sanctions** or
- **Reasonable legal compensation** for the burden imposed

## Conclusion

I respectfully request that the Court grant the full relief detailed above to restore justice, recognize the financial burden I have borne, and ensure I am not left solely responsible for the consequences of the defendant's actions.

Thank you for your time and consideration.

Respectfully,
**Yerilee Atkinson Vélez**

**Civil Court of the City of New York**
**County of Bronx**

Index Number: **CV-006582-25/BX**

Yerilee Atkinson Velez
          Plaintiff(s)

   -against-

Tyla Monet Mazyck
          Defendant(s)

**AFFIDAVIT IN SUPPORT OF**
**NOTICE OF MOTION**

**Yerilee Atkinson Velez**, being duly sworn,  states that I would like to obtain the following *relief* from the

**Court: TO AMEND THE COMPLAINT**

The basis for my request is : I'm amending my claim for $11,176.41 to $14,491.65 to reflect 11 full months of occupancy instead of 10.5 months, because I was unable to sublet due to the balance Tyla left on the account. I've also added costs of process server, sheriff, certified mail fees, filing fees and security deposit. The updated total is $14,491.65 not including sanctions and interest.

WHEREFORE, THE UNDERSIGNED RESPECTFULLY REQUESTS THE WITHIN MOTION
BE GRANTED.
Sworn to before me this 1 day of July , 2025 .

Notary Public/ Court Employee (kc)

_Signature of Movant_

## TENANT SURRENDER AND RELEASE AGREEMENT
## (RESIDENTIAL LEASE)

This Tenant Surrender and Release Agreement (this "Agreement") is entered into as of August 4, 2025 by and between E 135 and 3rd Ave Owner LLC with an address at c/o K&R Realty Management, Inc., 316 West 118th Street, New York, NY 10026 (hereinafter, "Landlord") and Tyla Mazyck with an address at 2618 Harding Avenue, Apt 1, Bronx, New York 10465 (hereinafter, "Mazyck").

### RECITALS

Whereas, Mazyck and Yerilee Velez (collectively, "Tenant") and Landlord entered into that certain Residential Lease Agreement dated as of July 1, 2024 (the "Lease") for unit 19G in the building located at 2455 3rd Avenue, Bronx, New York 10451 (hereinafter, the "Premises") for which Tenant was jointly and severally liable for any obligations under the Lease.

WHEREAS, Mazyck vacated and surrendered possession of the Premises to Landlord on or about March 30, 2025 (the "Surrender Date") at which point Landlord had commenced legal proceedings against Tenant due to Tenant's failure to pay fixed rent as and when required under the Lease; and

WHEREAS, Landlord and Mazyck desire to fully resolve any and all claims, rights, and obligations arising out of the Lease.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**1. Acknowledgment of Surrender**. Mazyck confirms that as of the Surrender Date, Mazyck (i) voluntarily vacated and surrendered possession of the Premises to Landlord and (ii) surrendered any and all of Mazyck's status, rights of tenancy, and possession of the Premises.

**2. Payment by Mazyck.** In full and final satisfaction of any and all obligations of Mazyck under the Lease, Mazyck shall pay to Landlord the total amount of $697.73 (the "Surrender Payment") upon execution of this Agreement. This payment shall be made by certified check and covers all unpaid rent, utilities, damage, and any other amounts owed through the Surrender Date.

**3. Mutual Release.** (a) Release by Landlord: Upon receipt of the Surrender Payment, Landlord releases and forever discharges Mazyck from any and all claims, liabilities, and obligations under or related to the Lease and the Premises, whether known or unknown, including any future claims for rent, damages, or breach of the Lease.

(b) Release by Mazyck: Mazyck releases and forever discharges Landlord from any and all claims, liabilities, and obligations relating to the Lease or Premises, including



without limitation any claims for return of security deposit, except as specifically provided in this Agreement.

**4. Security Deposit.** Mazyck acknowledges and agrees that the security deposit has been forfeited and shall not be returned.

**5. No Admission of Liability.** This Agreement is a compromise and settlement of disputed claims and is not an admission of liability by either party.

**6. Entire Agreement; No Modification.** This Agreement represents the entire understanding between the parties and supersedes any and all prior discussions or agreements relating to the Lease or the Premises. This Surrender Agreement may not be altered or modified except by writing, signed and acknowledged by both parties.

**7. Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

**8. Successors and Assigns.** This Agreement shall bind and inure to the benefit of parties here to, their heirs, administrators, executors, successors, and assigns.

**9. Execution in Counterparts.** This Agreement may be executed in counterparts with the same effect as if both parties hereto had executed the same document. All counterparts shall be construed together and shall constitute a single Agreement. The Parties hereto consent and agree that this Agreement may be signed and/or transmitted by e-mail of a .pdf, .tif or .jpeg document or using electronic signature technology (e.g., via DocuSign or similar electronic signature technology), and that such signed record shall be valid and as effective to bind the party so signing as a paper copy bearing such Party's handwritten signature.

*[Remainder of Page Intentionally Left Blank; Signature Page to Follow]*

**ACKNOWLEDGED AND AGREED**

**Landlord**

**Mazyck**

**E 135 AND 3ᴿᴰ AVE OWNER LLC**

**By: K&R Realty Management, Inc.,
Its Managing Agent**

BY: _____

    Name: _____

    Title: _____

_____

Tyla Mazyck, an individual